**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
**JARED D. HAGER, WSB #38961**
Assistant United States Attorney
U.S. Attorney's Office for the District of Oregon
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2902
Phone: 503.727.1120
Email:  jared.hager@usdoj.gov
    Attorneys for the Respondent

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **BILLY F. STEFFEY**, | Case No.: 3:19-cv-00093-JR |
| Petitioner, | |
| v. | DECLARATION OF WILLIAM J. CHETWOOD |
| **WARDEN J. SALAZAR**, | |
| Respondent. | |

## DECLARATION OF WILLIAM J. CHETWOOD

I, William J. Chetwood hereby declare:

1. I am currently employed by the Federal Bureau of Prisons (BOP) as a Discipline Hearing Officer (DHO) at the Federal Correctional Institution in Lompoc, CA. I have been employed by the BOP since December 6, 1998. I have served as the DHO at FCI Lompoc since 2015.

2. I am making this declaration in the case of Billy F. Steffey, Jr. v. Warden J. Salazar, Case No. 3:19-cv-00093-JR, wherein inmate Billy F. Steffey, Jr., Register Number 68463-097, ("Petitioner"), has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the findings of my February 16, 2018 DHO report.

3. As a part of my routine duties I have access to various records kept in the regular course of business containing information about the inmate population. One record system is called SENTRY. SENTRY indicates Petitioner was sentenced on August 7, 2014 to 84 months of imprisonment for violations of 18 USC § 371; § 1029(a)(2); § 1029(c)(1)(A)(i); and § 1028A (conspiracy to traffic in and use one or more counterfeit devices to obtain things in value in excess of $1,000; and aggravated identity theft). Petitioner is currently housed at the Federal Correctional Institution (FCI), Sheridan, OR. His projected release date is November 2, 2020. Petitioner was housed at FCI Lompoc, CA, at the time of his prohibited act and my disciplinary decision.

4. Petitioner argues I was not fair and impartial in my role as DHO (see Petition at 6-7). He also contends I did not have adequate evidence upon which to base my decision. Specifically, Petitioner claims the drugs attributed to him were contained in an envelope addressed to another inmate (hereinafter "Inmate X") (id. at 16); the Narcotics Identification Kit (NIK) used to detect the results I relied upon is not designed to identify the drugs attributed to Petitioner (i.e.

amphetamines) (id. at 7); I failed to confirm the kit was not "expired" (id.); lab tests were conducted which exonerated Petitioner but were not revealed to him (id. at 16); and NIK results are rampantly falsified by BOP staff to intentionally generate false positives (id. at 17).

5. My responsibilities as DHO consist of conducting administrative hearings for inmates alleged to have committed rule violations established by BOP policy. I make my determinations based on established policy, available evidence, inmate statements, witness statements, and sound correctional judgment. I have attended DHO training and am certified in DHO policies and procedures. I have access to DHO Reports, Incident Reports, Inmate Disciplinary Records, staff memoranda, and inmate statements to form the basis of my decision.

6. The current inmate disciplinary policy is Program Statement 5270.09, Inmate Discipline Program, which was issued on June 20, 2011 and made effective for all violations committed on or after August 1, 2011. A true and correct copy of the program statement is attached as Exhibit ("Ex.") A. My responsibilities as DHO consist of conducting administrative hearings for inmates alleged to have committed rule violations established by BOP policy. The BOP has implemented policy and procedures for inmate discipline to promote a safe and orderly institution environment.

7. I am an impartial hearing officer who does not investigate or have any prior knowledge concerning an alleged rule violation before it is referred to me for consideration. My impartiality is determined by my status as one "who was not a victim, witness, investigator, or otherwise significantly involved in the incident." See Ex. A at 27.

8. The discipline process begins when a staff member witnesses or reasonably believes an inmate has committed a prohibited act. See Ex. A at 17 (citing 28 CFR § 541.5). Attached as Ex. B is a true and correct copy of incident

report number 3084272. This is the report that initiated the disciplinary process against Petitioner for BOP prohibited act code 111 (introduction of narcotics). See Ex. B at sections 9-10. On January 31, 2018, at 7:40 pm, Special Investigative Support (SIS) Technician S. Aguilar delivered the incident report to Petitioner. The report clearly identified the charges levied against Petitioner along with a description of the incident and evidence relied upon. Id. at sections 9-11.

9. A Unit Discipline Committee (UDC) will review the incident report once the staff investigation is complete. See Ex. A at 23 (citing 28 CFR § 541.7). Serious incidents will be referred to the DHO for further review. Id.

10. Attached as Ex. C is a true and correct copy of Notice of Hearing before the DHO, signed by Petitioner on February 5, 2018.

11. Attached as Ex. D is a true and correct copy of Inmate Rights at a Discipline Hearing, also signed by Petitioner on February 5, 2018.

12. Attached as Ex. E is a true and correct copy of my DHO report. I held the DHO hearing on February 13, 2018. See Ex. E at section I(B). Inmates are permitted to make a statement and present documentary evident to the DHO during the hearing. I documented Petitioner's oral statements in my report. Id. at section III(B) and V(2). I also considered Petitioner's prior statements to the UDC. Id. at V(3).

13. Attached as Ex. F is a true and correct copy of the supportive evidentiary materials I relied upon to make my decision. In addition to the oral statements made by Petitioner to me and the UDC, I considered a list of written objections provided to me by Petitioner at the hearing. See Ex. F at 17. I address all points raised by Petitioner in my report. See Ex. E at section V(7).

14. Based on my several years of experience as a correctional worker and the methods typically used by inmates to arrange introduction of drugs and other contraband, basic code is typically used to discuss logistical details in the belief it

will not garner the attention of BOP. As on the streets, illegal substances in prison are never discussed in such explicit terms.

15. Petitioner exchanged several email messages from his BOP inmate email account with "Lisa Rassmussen E S Q," allegedly regarding several eviction notices for various tenants in a series of homes purportedly owned by Petitioner. Id. at section V(1). Petitioner's messages with the sender repeatedly discuss and confirm payment being made to certain individuals. Id. The language is suspicious and clearly unrelated to any legal process: "Please resent that eviction again to the exact same tenant as you did last time. Go heavy! . . . Please take care of what I paid you to do and serve the guy." In response to a message from Petitioner, the sender states, "I reached out. 70171450000084946239" Id. On December 5, 2017 the FCC Lompoc mailroom received an envelope with the tracking number 70171450000084946239 containing (10) unusually thick pieces of paper which tested positive for amphetamines. See Ex. F at 5-9 (evidentiary photos). The pages were, indeed, heavily soaked with liquid narcotics. The key email communications between Petitioner and the sender on which I relied upon are included for the court's review. Id. at 10-16.

16. Petitioner appears to have raised an additional argument at the hearing he does not raise in the Petitioner. Specifically, Petitioner claimed the legal mail addressed to another inmate should not have been opened. Id. at ¶ 16. Although Petitioner was aware through the incident report the seized envelope purportedly originated from an attorney, he was not told the item was sent as legal mail or satisfied BOP's legal mail requirements. As stated in my report, the mail was not addressed to Petitioner, and Petitioner did not have standing to challenge or comment upon how mail to other inmates is handled. Indeed, Petitioner did not assert he was aware Inmate X objected to testing or opening of the envelope.

Steffey v. Salazar
Case No. 3:19-cv-00093-JR

Declaration of
William J. Chetwood

17.  In preparation for this declaration to the court I communicated with BOP agency counsel regarding the attorney who purportedly sent the legal mail to Inmate X. The sender was identified as "Law Offices of Leslie R. Ramos, 901 H. St., Sacramento, CA 95814." See Ex. E at Section V(1). Agency counsel notified me he had contacted Ms. Ramos by telephone on February 25, 2019 to inquire about this incident. Ms. Ramos stated she has never heard of Petitioner or any person named Lisa Rassmussen and sent no mail to FCI Lompoc. She practices exclusively in state court. Ms. Ramos also stated she had independently learned her name is being used by federal inmates as a false sender of bogus legal mail parcels. In the past, envelopes with inadequate postage have been returned to her and their suspicious nature has prompted her to immediately contact local law-enforcement for testing and disposal of the mail. Ms. Ramos has also notified the California State Bar Association of these events.

18.  Petitioner argues I was not impartial. My impartiality is determined by my status as one "who was not a victim, witness, investigator, or otherwise significantly involved in the incident." See Ex. A at 27. Petitioner claims I made an arrangement with the reporting officer to not sanction Petitioner severely if Petitioner would "take the shot on the chin . . . [and] not fight, [Petitioner] would get minimal sanctions . . ." See Petition at 7. Petitioner then argues:

> I received a ridiculously lenient punishment. I lost 41 good days and 180 days commissary. I did not lose my visits. I did not lose my email, I did not lose my phone. I did not have to serve any DS [disciplinary segregation] time nor did I receive any monetary fine. These sanctions show that there was definitely a pre-arranged deal between SIS Aguilar and DHO Chetwood.

Id. at 16.

19.     This is a bizarre and incorrect argument. As DHO I have several sanctions available based on the severity of the offense. My sanctions for Petitioner were consistent with other decisions for similar offenses and entirely permissible under the CFR and disciplinary policy. See Ex. A at 45-46. That I did not subject Petitioner to the harshest and full panoply of all disciplinary sanctions is not evidence of collusion between me and SIA Aguilar. In addition, Petitioner did not "take the shot on the chin" and articulated a host of objections at his hearing. Rarely do I see inmates come prepared with detailed and extensive written objections as Petitioner did at his hearing. Finally, despite claims from Petitioner he had no disciplinary segregation, he states clearly he was immediately placed in the Special Housing Unit (SHU) and remained there "for several weeks" prior to the hearing. See Petition at 16. I imposed a suspended sentence of 60 additional days of disciplinary segregation in SHU pending six months of clear conduct by Petitioner. See Ex. E at VI. I also imposed a suspended sentence of one year visitation privilege loss, also pending six months of clear conduct. Id. While these sanctions are fair, they are by no means "ridiculously lenient."

20.     As with all my DHO decisions, I attempted to impose a fair and appropriate penalty upon my finding Petitioner had committed the prohibited act as charged. I explained the reason for each sanction in my report. Id. at section VII.

21.     Petitioner argues he was sent the envelope tracking number by mistake. Id. at section V(7). atI found this argument incredible.

22.     Petitioner makes additional arguments about the NIK test itself. He claims the kit is not designed to test for the drugs attributed to him: amphetamines. See Petition at 7. The NIK test clearly describes its use for testing amphetamines. See Ex. F at 4 (table Test B summary).

23.     Petitioner also claims I failed to confirm the test was not expired. See Petition at 7. BOP inmates are regularly tested for drugs on a random basis and

23.     Petitioner also claims additional tests were conducted which exonerate Petitioner but were not provided to him nor considered by me as part of my decision. See Petition at 16. This is incorrect. No further testing was conducted nor would I fail to consider any test reflecting contrary results from the positive NIK result used to support my decision.

24.     Finally, Petitioner claims NIK results are "rampantly" falsified by BOP staff to torment the inmate population. Id. I have no information to support this claim nor do I believe it to be true.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed this 4th day of March 2019 at Lompoc, CA.

_____
William J. Chetwood