**Elizabeth G. Daily, OSB #111758**
**Assistant Federal Public Defender**
**Email: liz_daily@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**

**Attorney for Petitioner**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BILLY F. STEFFEY,** | Case No. 3:19-cv-00093-JR |
| Petitioner, | |
| v. | **BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241** |
| **WARDEN J. SALAZAR,** | |
| Respondent. | **Evidentiary Hearing Requested** |

**Introduction**

    This 28 U.S.C. § 2241 petition alleges that the Bureau of Prisons (BOP) unconstitutionally deprived petitioner, Billy F. Steffey, of 41 days of good conduct time credits with procedures that violated due process and without sufficiently reliable evidence that he committed the charged prohibited act of introducing narcotics into the prison.

    Mr. Steffey respectfully requests that the Court grant the petition and order that the disciplinary violation be expunged from his record and the lost good conduct time be restored.

**Page 1    BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

Disciplinary sanctions cannot rest on evidence that lacks indicia of reliability. Here, it is undisputed that the disciplinary sanction rested on the results of a chemical narcotics identification test conducted in contravention of the test manufacturer's instructions. Because the primary evidence was unreliable, the disciplinary sanction violated due process.

In the alternative, Mr. Steffey respectfully requests that the Court schedule this matter for an evidentiary hearing. The parties' pleadings present issues of disputed fact regarding both the procedural and substantive due process claims that require further development and resolution.

**Summary of Factual and Procedural History**

On December 5, 2017, while working in the mailroom at FCI Lompoc, Correctional Systems Officer B. McDaniel opened legal mail addressed to another inmate. CR 12-6 at 1. The documents inside the envelope appeared to be legal paperwork from an attorney. *Id.* However, the paper felt "unusually thick" to Officer McDaniel and appeared to have stains and discolorations. *Id.*

SIS Technician S. Aguilar tested the paper for drugs using a NIK brand chemical field testing kit. Aguilar cut a small piece of paper from the contents of the envelope and tested it with NIK Test A. CR 12-6 at 2. According to his report, the Test A result "had an immediate orange rapidly turning brown color, indicating Amphetamines." *Id.* Aguilar then cut another small piece of paper and tested it with Test U. Aguilar believed that the burgundy color he observed on the Test U result also "indicated a positive result for Amphetamines." *Id.*

Aguilar reviewed emails between Mr. Steffey and an unknown paralegal identified as "Lisa Rasmussen, Esq.," that led him to believe Mr. Steffey had arranged for the papers to be sent to the other inmate. CR 12-2 at 1. Although the emails did not reference illegal substance explicitly,

Aguilar believed that the emails' references to legal work for evictions were actually in code. The emails linked Mr. Steffey to the incoming package because, on the same day as the package was discovered by Officer McDaniel, Ms. Rasmussen sent Mr. Steffey an email with the package's tracking number, saying, "I reached out. 70171450000084946239." CR 12-6 at 13. At the conclusion of the investigation, Aguilar prepared an incident report alleging that Mr. Steffey committed a violation of Prohibited Act Code 111 for the "Introduction or making of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by medical staff." CR 12-2 at 1. The narrative stated that Mr. Steffey "was involved in the introduction and sale of designer drugs at FCC Lompoc-FCI (Low)." *Id.* Other documents in the investigation specify that the suspected drug was "Synthetic Marijuana also known as Spice." CR 12-6 at 9.

After Mr. Steffey was served with the incident report, the Unit Discipline Committee referred the matter to the Discipline Hearing Officer (DHO) for further hearing. CR 12-2 at 3. In its referral, the Committee recommended that, contingent on a finding of a violation, the DHO impose the following sanctions: 41 days loss of good conduct time, 60 days disciplinary segregation, one year loss of email and phone privileges, and disciplinary transfer. CR 12-2 at 3.

The hearing was held on February 13, 2018, before DHO Chetwood. CR 12-5 at 1. At the hearing, Mr. Steffey "neither admit[ted] nor denie[d] the charge." CR 12-5 at 1. He did not request a staff representative and neither called witnesses nor presented evidence in his defense. *Id.* However, he did provide a written document making several points about the improper opening of legal mail, the lack of evidence, and errors in the investigation. *Id.*

DHO Chetwood concluded that Mr. Steffey committed the Prohibited Act as charged. CR 12-5 at 4. However, the DHO did not follow the Committee's recommended sanctions. DHO

Chetwood imposed 41 days loss of good conduct time and 180-days loss of commissary privileges. CR 12-5 at 4. The DHO also imposed 60 days of disciplinary segregation and a one-year loss of visiting privileges, but suspended those sanctions pending 180-days clear conduct. The DHO did not impose any sanction on Mr. Steffey's access to email or phone privileges.

After exhausting his administrative remedies, Mr. Steffey filed a 28 U.S.C. § 2241 petition in this Court, asking that the disciplinary action be expunged from his record and that his 41 days of good conduct time be restored. CR 1. In his pro se petition, Mr. Steffey asserted that the DHO hearing was procedurally flawed because the hearing officer was not fair and impartial. CR 1 at 6-7. Specifically, Mr. Steffey argued that DHO Chetwood communicated with SIS Technician Aguilar in advance of the hearing and agreed to impose "minimal sanctions" if Mr. Steffey did not fight the charges. *Id.* Mr. Steffey also raised a number of issues related to the BOP's use of NIK tests. NIK tests are not able to detect "designer drugs," including K2 or Spice, which is what Mr. Steffey was told that he had brought into the institution. CR 1 at 7, 16-17. Moreover, Mr. Steffey asserted that NIK testing kits have a limited "shelf life," and the BOP had not shown that the kits used to test the paperwork in his case were not expired. CR 1 at 17. Finally, Mr. Steffey argued that NIK test kits have known reliability issues with respect to testing paper for "amphetamines." CR 1 at 8, 16.

**Argument**

Prisoners have a constitutionally protected liberty interest in good conduct time credits. *Wolff v. McDonnell*, 418 U.S. 539 (1974). That interest cannot be infringed without appropriate procedural protections and a sufficient quantum of proof. *Superintendent v. Hill*, 472 U.S. 445, 453-54 (1985). Procedurally, "the inmate must receive: (1) advance written notice of the

disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Id.* at 454. Substantively, the requirements of due process are satisfied only when the decision to revoke good time credits is supported by "some evidence." *Id.* at 455. "This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced . . . .'" *Id.* (quoting *United States ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 106 (1927)).

While minimally stringent, the "some evidence" standard is not an excuse for resorting to unreliable sources of information. *Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th Cir. 1987). The information that forms the basis for the prison disciplinary action must possess some indicia of reliability to satisfy due process. *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987).

In this case, Mr. Steffey has asserted that the BOP's deprivation of 41 days good conduct time credits violated his due process rights both procedurally and substantively. On either ground, the Court should grant the relief requested, or alternatively schedule this matter for an evidentiary hearing to resolve disputed facts.

> A. **The BOP Violated Mr. Steffey's Procedural Due Process Rights By Failing To Provide Either A Neutral Decisionmaker Or Fair Notice Of The Charges.**

The Supreme Court has long held that a "fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)). The rule applies to adjudications by administrative agencies as well as to courts. *Id.* "This most basic tenet of our judicial system helps to ensure both the litigants' and the public's confidence that each case has been adjudicated fairly by a neutral and detached arbiter." *Hurles v.*

*Ryan*, 752 F.3d 768, 788 (9th Cir. 2014). A violation of due process occurs not only when a litigant can show actual bias, but when there is "an intolerable risk of bias." *Id.*

Here, the government asserts that the hearing officer's impartiality is established "by his status as a person "who was not a victim, witness, investigator, or otherwise significantly involved in the incident." CR 11 at 5. However, Mr. Steffey has asserted that the DHO Chetwood was not impartial because he communicated in advance of the hearing with SIS Technician Aguilar and agreed to prearrange the result of the hearing and the sanctions to be imposed. Although the government's response asserts that Mr. Steffey's claim of bias in the proceedings is based on "dubious conjecture," CR 11 at 5, it is actually based on Mr. Steffey's recollection regarding his conversations with SIS Technician Aguilar, as set forth in Mr. Steffey's affidavit. CR 1 at 16. Aguilar told Mr. Steffey that he had spoken to DHO Chetwood by email and phone in advance of the hearing, and that it was agreed Mr. Steffey would receive less severe sanctions if he "t[ook] the shot on the chin." *Id.* While the government may not agree with the facts included in Mr. Steffey's affidavit, the government is not the arbiter of credibility in these proceedings.

The government further argues that Mr. Steffey's attempt to provide objective proof of what Aguilar told him is "unpersuasive" because the sanctions were not lenient and Mr. Steffey did not take the shot on the chin. However, the administrative record indicates that the sanctions imposed on Mr. Steffey were lighter than those recommended by the disciplinary committee. Two of the sanctions, including the 60-day disciplinary segregation period, were suspended. Additionally, contrary to the committee's recommendation, the DHO did not place any restrictions on Mr. Steffey's email or phone communications, even though the alleged violation involved using email to arrange the delivery of drugs into the prison. CR 12-2 at 3. In the end, Mr. Steffey only

lost 41 days of good conduct time and six months of commissary privileges. CR 12-5 at 4. The sanctions imposed were less severe than what Mr. Steffey had anticipated.

Moreover, although Mr. Steffey did not admit guilt, he also did not deny the allegations or present any witnesses or evidence in his own defense. CR 12-5 at 1. Pursuant to agency rules, the DHO was permitted to draw an adverse inference from Mr. Steffey's silence. In that sense, Mr. Steffey did take the shot on the chin by remaining silent and not presenting evidence to contest his guilt. The government contends that Mr. Steffey "lobb[ed] a host of objections at his hearing," but in fact the only objections were those included in the written note prepared by Mr. Steffey in advance of the hearing and attached to the hearing officer's report. It is not clear whether Mr. Steffey in fact raised those objections at the time of the hearing, given his oral statement that he was neither admitting nor denying guilt.

Finally, and most importantly, the facts regarding DHO Chetwood's neutrality are in dispute. While disagreeing with Mr. Steffey's characterization of the hearing and the sanctions, DHO Chetwood has not specifically denied that he communicated with Aguilar before the hearing about the incident itself or the sanctions to be imposed. The record contains no affidavit from Aguilar, and the government has declined to provide requested email communications between Aguilar and DHO Chetwood about this incident. The factual dispute should be resolved by an evidentiary hearing.

In addition to the denial of a neutral decisionmaker, the record also establishes that the BOP violated Mr. Steffey's right to fair notice of the charges against him. The record is ambiguous regarding the substance Mr. Steffey is alleged to have introduced into the prison. The incident report simply alleges that Mr. Steffey introduced "designer drugs." CR 12-2 at 1. The SIS

Investigation report states that the substance was suspected to be synthetic marijuana, known as Spice. CR 12-6 at 9. Mr. Steffey has continually asserted that the NIK tests cannot test for designer drugs and spice, the substances that he believed he was charged with introducing. The lack of fair notice that he was charged solely with introducing amphetamines, a testable substance, prejudiced his defense.

**B.    The BOP Violated Mr. Steffey's Substantive Due Process Rights Because The NIK Test Result Was Not Sufficiently Reliable To Establish That The Suspect Paperwork Contained Any Prohibited Substance.**

The crux of the disciplinary sanction in this case is for introducing illegal substances, purportedly amphetamines, into the prison. However, the result of the NIK chemical testing kit used to identify the paper as containing amphetamines lacks sufficient reliability to support the disciplinary sanction.

First, aside from any specific testing procedures used in this case, chemical field tests of the type used here are proven to be unreliable. Ryan Gabrielson and Topher Sanders, ProPublica, *Busted* (July 7, 2016) (available at https://www.propublica.org/article/common-roadside-drug-test-routinely-produces-false-positives). The Safariland manufacturer of NIK brand tests states that false positives are known to occur: "False positives are possible in field tests due to the limitations of the science, which is why we also clearly state in our training materials and instructions that they are not a substitute for laboratory testing." Ryan Gabrielson, ProPublica, *Unreliable and Unchallenged* (Oct. 28, 2016) (available at https://www.propublica.org/article/unreliable-and-unchallenged). "In a trial or other criminal procedure setting . . . field tests should not be used as evidence of the presence, or lack thereof, of any substance." *Id.*

Page 8   BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

According to ProPublica reporting, "There are no established error rates for the field tests, in part because their accuracy varies so widely depending on who is using them and how." *Busted*, *supra*. Anecdotally, the article indicates that a Florida laboratory found 21 percent of evidence police identified with field tests as methamphetamine was not methamphetamine. *Id.* In Harris County, Texas, hundreds of drug convictions were determined to be wrongful after laboratory testing revealed faulty chemical tests. *Id.* Because of their unreliability, the Department of Justice prohibited the use of chemical field tests for evidentiary purposes in 1978. *Id.*

Second, the BOP has provided no evidence to establish that the agent who conducted the testing procedure in this case was properly trained and conducted the procedure in accordance with his training. In other cases, courts have specifically considered the training and certification of the testing agent in upholding reliance on NIK test results. *Cf. Baker v. Lake*, No. 118CV01642SKOHC, 2019 WL 1455326, at *2 (E.D. Cal. Apr. 2, 2019), *reconsideration denied*, No. 118CV01642SKOHC, 2019 WL 2125458 (E.D. Cal. May 15, 2019). Relatedly, there is no evidence that the BOP took any steps to ensure that the NIK testing kits used here were properly stored and not expired. The NIK results were not subject to laboratory confirmation, and the papers themselves have not been provided to petitioner's counsel for inspection or testing.

Third, even if chemical narcotics identification tests are generally reliable when used by properly trained individuals in accordance with the manufacturer's instructions, the administrative record here establishes that the agent used the test kit improperly to test paper of unknown origin. The testing instructions included in the SIS investigation reports state that "it is important to classify the material" to be tested before testing can begin. CR 12-6 at 3. The listed types of material are: tablets, capsules, powders, plant material, suspected brown or black tar heroin, and

liquid. *Id.* Paper is not mentioned except as a means for testing liquid, which the NIK tests are "not designed" for. *Id.* And when testing liquids, "[t]he choice of paper is critical." *Id.*

> Liquid samples - *NIK tests are NOT designed for use with liquid samples.* However, liquids may be tested by placing the tip of an NIK SUBSTANCE LOADING DEVICE or a 1cm square (roughly 1/2" square) piece of paper into the liquid. Remove and allow to air dry. Place the dry paper into the test pack and proceed with the test as instructed. *The choice of paper is critical. Unscented, uncolored filter paper is ideal. NEVER use brown paper, hand towels or newsprint.*

*Id.* The instructions provide no authorized means for testing paper of unknown origin to determine whether the paper was previously soaked in any illegal substance. Yet the undisputed facts here establish that is exactly what occurred: the positive test result for amphetamines on Test A was produced by testing a small piece of the legal papers sent to another inmate. Because NIK tests are not designed to be used in that way, the result of the test is unreliable.

In addition to the fact that the NIK test is not designed to test paper, Aguilar misstated the import of the test results by claiming that Test U "indicated a positive result for Amphetamines." Test U is not a test for Amphetamines. CR 12-6 at 4. Test U solely tests for Methamphetamines or MDMA. *Id.* Any result other than a dark blue color is a negative result and cannot be used as evidence of the presence of any illegal substance. The hearing officer report indicates that DHO Chetwood relied on the results of *both* Test A and Test U in concluding that Mr. Steffey violated Prohibited Act Code 111. CR 12-5 at 2. The improper reliance on Test U undermines the result of the adjudication.

The "some evidence" standard requires indicia of reliability that are missing on this record. If the unreliability of the NIK test cannot be ascertained from the existing record, with the clear violation of testing procedures, then the factual dispute should be subject to a full evidentiary hearing with the opportunity to present expert testimony on the subject.

Page 10  BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

**Conclusion**

For the foregoing reasons, it is respectfully requested that the Court grant the petition and order that the disciplinary violation be expunged from Mr. Steffey's record and the lost good conduct time be restored. In the alternative, Mr. Steffey respectfully requests that the Court schedule this matter for an evidentiary hearing to resolve disputed issues of fact.

Respectfully submitted this 22nd day of July, 2019.

                                           */s/ Elizabeth G. Daily*
                                           Elizabeth G. Daily
                                           Attorney for Petitioner