**Elizabeth G. Daily, OSB #111758**
**Assistant Federal Public Defender**
**Email: liz_daily@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**

**Attorney for Petitioner**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BILLY F. STEFFEY,** | **Case No. 3:19-cv-00093-JR** |
| **Petitioner,** | |
| **v.** | **PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY** |
| **WARDEN J. SALAZAR,** | |
| **Respondent.** | |

**Introduction**

In *Harris v. Nelson*, the Supreme Court empowered the lower courts in habeas corpus proceedings to "authorize or use suitable discovery procedures . . . reasonably fashioned to elicit facts necessary to help the court to 'dispose of the matter as law and justice require." 394 U.S. 286, 290 (1969). The Court should authorize the discovery requested here because Mr. Steffey has made a prima facie case for relief and the request is reasonably fashioned to elicit facts relevant to his claim. Moreover, because the requested items are in the sole possession of the Bureau of Prisons

(BOP), Mr. Steffey is "handicapped in developing the evidence needed to support in necessary detail the facts alleged in his petition[.]" *Id.* at 292.

**Acknowledgement of Partial Responses and Proposal for Written Interrogatories**

As a preliminary matter, Mr. Steffey acknowledges that the government has partially responded to several of his discovery requests. For example, the government has provided copies of his administrative appeal records and stated that all chemical test results have been provided, responding to Requests No. 1 and 3. With respect to the administrative remedy documents, Mr. Steffey had hoped to gain access to the full history of CorrLinks emails to provide context for those selectively referenced in his disciplinary hearing. However, because CorrLinks does not permit inmates or their correspondents to archive emails past a certain period of time, that email history is no longer available to Mr. Steffey.

Additionally, although the government asserts that all chemical test results have been disclosed, Mr. Steffey asks the government to affirmatively determine whether any other division of the Department of Justice has tested the suspect legal paperwork. The basis of this request is Mr. Steffey's understanding that his case was investigated by the FBI for possible criminal prosecution, but that prosecution was eventually declined. Mr. Steffey inferred that the FBI's declination of prosecution was based on the fact that a later laboratory test had failed to confirm the presence of any controlled substances.

The government has also partially responded to the request for emails between DHO Chetwood and SIS Aguilar by stating that the BOP has no emails between those individuals relating to Mr. Steffey's alleged violation of Code 111. The government has not stated whether any emails exist relating to Mark Patrick Johnson about this same incident. Any such emails would be relevant to Mr. Steffey's claim of bias here because they could corroborate his understanding

**Page 2   PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY**

that SIS Aguilar and DHO Chetwood communicated about the need for someone to take blame and that it was decided Mr. Steffey rather than Mr. Johnson should be that person.

Finally, the government has suggested that written interrogatories would be a more appropriate and less burdensome method of discovery. Without waiving any discovery requested in his motion, Mr. Steffey is willing to frame as many of his discovery requests as possible as interrogatories to DHO Chetwood and SIS Aguilar to reduce the burden on the BOP; excepting, of course, physical inspection of the relevant evidence.

If the Court so orders, the proposed interrogatories directed to DHO Chetwood are as follows:

1. To your knowledge, did anyone in your agency or any another division of the Department of Justice, including the FBI, conduct any chemical tests or request that any chemical tests be conducted on the suspect legal paperwork at issue here, other than the NIK tests referenced in your hearing report?

2. To your knowledge, were any disciplinary proceedings brought against Mark Patrick Johnson, Reg. No. 68603-065, for any prohibited act based on the same act, transaction, or series of transactions for which Mr. Steffey was disciplined. If so, what was the result of those proceedings and what, if any, sanctions were imposed? If not, why not?

3. Did you communicate with SIS Aguilar about the alleged violation of Code 111 by Mr. Steffey or related acts by Mark Patrick Johnson, Reg. No. 68603-065, and/or the sanction to be imposed for such acts in any way before Mr. Steffey's disciplinary hearing?

4. In finding a disciplinary violation here, did you consider any evidence regarding the training or certification of the person who conducted the NIK tests on the suspect legal paperwork?

5. In finding a disciplinary violation here, did you consider any evidence regarding whether the NIK tests were used according to the manufacturer's instructions?

6. To your knowledge, has the BOP expunged disciplinary records of prisoners based on confirmatory laboratory testing that contradicted a positive NIK test?

7. Does the BOP have an established policy for the use of chemical field tests, storage of chemical field tests, required training to conduct field tests, or confirmatory laboratory testing of chemical field tests?

**Page 3   PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY**

The proposed interrogatories directed to SIS Aguilar are as follows:

1. To your knowledge, did anyone in your agency or any another division of the Department of Justice, including the FBI, conduct any chemical tests or request that any chemical tests be conducted on the suspect legal paperwork at issue here, other than the NIK tests referenced in your investigation?

2. To your knowledge, were any disciplinary proceedings brought against Mark Patrick Johnson, Reg. No. 68603-065, for any prohibited act based on the same act, transaction, or series of transactions for which Mr. Steffey was disciplined. If so, what was the result of those proceedings and what, if any, sanctions were imposed? If not, why not?

3. Did you communicate with DHO Chetwood about the alleged violation of Code 111 by Mr. Steffey or related acts by Mark Patrick Johnson, Reg. No. 68603-065, and/or the sanction to be imposed for such acts in any way before Mr. Steffey's disciplinary hearing?

4. Did you make any statements to Mr. Steffy implying that if he did not deny the violation that the sanctions would be more lenient?

5. Did you conduct the NIK tests referenced in your investigation?

6. If yes, what is your training and certification to conduct NIK tests?

7. If yes, did you conduct the NIK tests in accordance with your training and certification?

8. Is it your understanding that NIK tests do not provide evidence of the presence of controlled substances because they only test for the presence of chemical compounds similar to those that appear in controlled substances?

9. Are you aware that the NIK manufacturer's instructions do not provide any procedure for testing paper samples of unknown origin?

10. To your knowledge, has the BOP expunged disciplinary records of prisoners based on confirmatory laboratory testing that contradicted a positive NIK test?

11. Does the BOP have an established policy for the use of chemical field tests, storage of chemical field tests, required training to conduct field tests, or confirmatory laboratory testing of chemical field tests?

**Argument Supporting Requested Discovery**

**A.      Mr. Steffey Has Presented A Prima Facie Case Of Substantive Due Process Error For Insufficient Evidence.**

The government first responds that Mr. Steffey's discovery request should be denied because he has not made out a "prima facie case for relief." CR 24 at 3. To the contrary, Mr. Steffey has presented evidence in the form of factual allegations to support the conclusion that his due process rights were violated by (1) lack of a neutral decisionmaker to adjudicate his case, (2) lack of notice of the correct charge, and (3) imposition of sanctions without "some evidence" of wrongdoing—specifically without sufficiently reliable evidence that the suspect paper contained narcotics.

*1.      The Procedural Due Process Violation Involving Decisionmaker Bias Was Not Harmless.*

With respect to discovery requests aimed at eliciting facts regarding the claim of bias, the government argues that the claim is "implausible and inconsistent with the facts" and that, in any event, any violation is harmless. Mr. Steffey addressed the government's first response in his brief in support of the habeas corpus petition. CR 17 at 6-7. The claim of harmlessness makes little sense. If SIS Aguilar and DHO Chetwood collaborated in advance of the hearing for the purpose of ensuring that Mr. Steffey was found to have violated Code 111, there could not be a clearer example of a prejudicial due process violation. Because this claim involves disputed facts, it is precisely the type of claim where discovery is appropriate to give Mr. Steffey access to facts known to the government that would otherwise be beyond his reach.

2.    *Mr. Steffey Has Made Out A Prima Facie Claim That The Discipline Was Not Supported By "Some Evidence" Because The NIK Test Results Purporting To Identify Amphetamines In The Legal Paperwork Were Unreliable.*

With respect to the substantive due process claim, the government's position draws heavily on the "some evidence" standard articulated in *Superintendent v. Hill*, 472 U.S. 445 (1985). That standard is not as toothless as the government proposes. Rather, the Supreme Court's aim in *Hill* was to fashion a standard that provided flexibility while balancing "the interests affected by the relevant government action[.]" *Id.* at 454. On the one hand, the BOP has a strong interest in "avoiding burdensome administrative requirements that might be susceptible to manipulation" and in "act[ing] swiftly on the basis of evidence that might be insufficient in less exigent circumstances." *Id.* at 455-56. On the other hand, a prisoner's loss of good conduct time credits "threatens his prospective freedom from confinement by extending the length of imprisonment." *Id.* at 445. "Thus the inmate has a strong interest in assuring that the loss of good time credits is not imposed arbitrarily." *Id.* Under the Administrative Procedures Act, applicable to the BOP, agency action cannot be arbitrary, capricious, or an abuse of discretion. *See Tablada v. Thomas*, 533 F.3d 800, 805 (9th Cir. 2008) (citing 5 U.S.C. § 706(2)(A)).

With these considerations in mind, the "some evidence" standard is a flexible standard that cannot be reduced to a strict formula. Evidence proffered as sufficient should be judged based on its ability to prevent arbitrary deprivations of liberty and the risk of administrative burden.

In this case, the critical question is whether the DHO erred in relying on the NIK test results. The government does not attempt to argue that the disciplinary sanction would have been valid if the NIK test results were discounted entirely. Here, none of the other evidence points specifically to the conclusion that the paper contained drugs. The administrative record does not

suggest that Mr. Steffey has any history of drug use or drug dealing. Nor was there any suggestion that money had been transferred or that there had been a spike in the number of prisoners found to be under the influence of drugs. Thus, without the NIK test results, the remaining pieces of the puzzle did not evidence a disciplinary violation involving importing drugs into the prison.

Instead, the government argues that the NIK tests merely corroborated other indicators of suspicious activity, and therefore the reliability of those tests is not significant to the outcome. However, case law confirms that prison officials cannot blindly rely on unreliable testing procedures, even when the evidentiary standard is only "some evidence." *See, e.g., Higgs v. Bland*, 888 F.2d 443, 449 (6th Cir. 1989) (noting that "a test which produced *frequent incorrect results* could fail to constitute 'some evidence' under the *Hill* standard"); *Henson v. U.S. Bureau of Prisons*, 213 F.3d 897, 898 (5th Cir. 2000) (denying claim that BOP must retest suspected marijuana pipe because the defendant had not shown "*that the test is unreliable or that it was improperly administered*"); *see also Peer v. Denham*, No. 15-CV-00754-GPG, 2015 WL 5579654, at \*6 (D. Colo. Sept. 23, 2015) ("The Court recognizes that, in the context of a prison disciplinary hearing, prison officials generally are entitled to rely on institutional test results, such as the NIK field test, *absent any evidence of unreliability or irregularity in conducting the tests*." (emphasis added)). In *Spence v. Farrier*, cited by the government, the Eighth Circuit held that unconfirmed urinalysis testing was reliable enough to use in prison disciplinary hearings because that type of test has a low margin of error: "Although it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, *the margin of error is insignificant in light of institutional goals*." 807 F.2d 753, 756-57 (8th Cir. 1986) (emphasis added).

Contrary to the cases cited above, Mr. Steffey has raised considerable question that the NIK test is unreliable because it produces "frequent incorrect results" it was "improperly

administered," and the "margin of error [is not] insignificant." Case law and news reports establish

that false positive results occur with regularity:

- In *Peer v. Denham*, No. 15-CV-00754-GPG, 2015 WL 5579654 (D. Colo. Sept. 23, 2015), a federal prisoner was disciplined for dietary supplements that tested "positive" for amphetamines with a NIK test. Confirmatory laboratory testing was ordered—the result: "Controlled substances were not detected." *Id.* at *3.

- In *Terry v. Dep't of Pub. Safety & Corr. Servs.*, No. 11-CV-01686, 2012 WL 2564779 (D. Md. June 29, 2012), *aff'd sub nom. Terry v. Middleton*, 499 F. App'x 264 (4th Cir. 2012), a Maryland state prisoner was disciplined after correctional officers found a "black like tar substance wrapped in saran wrap" that the prisoner claimed was coffee. *Id.* at *1. The NIK field test "first change[d] to orange and then further change[d] from orange to brown" indicating a "positive" result for the presence of amphetamines. *Id.* The officer "ha[d] been trained and certified to perform NIK field tests since 2006, [and] averred that 'he followed the NIK kit directions.'" *Id.* The substance was eventually sent for confirmatory testing—the result: "No [Controlled Dangerous Substances] Detected." *Id.* at *2.

- In *Blasirue v. Jones*, No. 1:16-cv-00288-TH-KFG (E.D. Tex.) (2017), an inmate lost 41 days good time credit after plant material in a package around his neck yielded a "positive" result on a NIK test. However, confirmatory laboratory testing showed it was simply organic plant material; the result—no controlled substances. The BOP expunged Blasirue's disciplinary violation and restored his good conduct time credit.

- In *Michel v. United States*, No. 16CV277-GPC(AGS), 2017 WL 4922831, (S.D. Cal. Oct. 31, 2017), Customs and Border Protection officers obtained a "positive" NarcoPouch result for methamphetamine from suspicious liquids that the plaintiff attempted to bring over the border. *Id.* at *2. She asserted that the liquid was "cuajo," a substance used to make cheese. *Id.* at *3. Later laboratory testing was performed on the suspected liquids—the result: "negative for methamphetamine." *Id.* at *1.

- In *Fincher v. Monroe Cty. Bd. of Commissioners*, No. 5:18-CV-00424-TES, 2019 WL 510448, at *1 (M.D. Ga. Feb. 8, 2019), plaintiff Dasha Fincher spent 94 days in jail after being arrested for allegedly trafficking methamphetamines after a field drug test yielded a "positive" result. *Id.* The substance in question (which later turned out to be nothing more than blue cotton candy) was later sent to a laboratory for confirmation testing. *Id.* at *2. The result: "[n]o controlled substances." *Id.*

- In *Jenkins v. Fed. Bureau of Prisons*, No. 2:17-CV-1951-AKK-JEO, 2018 WL 992057, at *1 (N.D. Ala. Jan. 11, 2018), *report and recommendation adopted*, No. 2:17-CV-1951-AKK-JEO, 2018 WL 985763 (N.D. Ala. Feb. 20, 2018), a federal

prisoner was disciplined based on a "NIK" test performed on a piece of brown paper soaked in some substance, which was discovered during a random search of his cell. The prisoner claimed that the substance was merely Vaseline. Although the case does not report any confirmatory laboratory testing, the BOP later moved to expunge the disciplinary violation and restore the good conduct time credits, rendering the prisoner's § 2241 petition moot.

**Outside of the courts but in the news**:

- A woman was wrongfully jailed after a field drug test indicated a "positive" test result for crack cocaine; the actual substance—a small crumb of an over-the-counter pain relief medicine. Tim Cushing, *Field Drug Tests: The $2 Tool That Can Destroy Lives*, TECHDIRT (Jul 18, 2016), https://www.techdirt.com/articles/20160712/15543134951/field-drug-tests-2-tool-that-can-destroy-lives.shtml.

- A man received a settlement for an arrest predicated on a drug field test that indicated a "positive" result for methamphetamine; the actual substance—Krispy Kreme donut crumbs. Tim Cushing, *Man Gets $37,500 Payout After Field Drug Test Says Donut Crumbs Are Methamphetamines*, TECHDIRT (Oct 31, 2017), https://www.techdirt.com/articles/20171024/16042838475/man-gets-37500-payout-after-field-drug-test-says-donut-crumbs-are-methamphetamines.shtml.

- In the same state, a man was arrested after a drug field test indicated a "positive" result for cocaine; the actual substance—drywall residue. Laurel Wamsley, *Florida Man Awarded $37,500 After Cops Mistake Glazed Doughnut Crumbs for Meth*, NPR: THE TWO WAY (Oct 16, 2017), https://www.npr.org/sections/thetwo-way/2017/10/16/558147669/florida-man-awarded-37-500-after-cops-mistake-glazed-doughnut-crumbs-for-meth.

- In a highly-publicized August 2019 incident, Georgia college football player Shai Werts was arrested after a substance on the hood of his car tested "positive" for cocaine. Confirmatory laboratory testing was conducted with the result: no controlled substances. Charges were dropped and the player was reinstated to the team after submitting to drug testing. Radley Balko, The Washington Post, *Opinion: A young black football player was arrested after claiming 'cocaine' on his car was bird poop. It was bird poop* (Aug. 9, 2019), https://www.washingtonpost.com/opinions/2019/08/09/young-black-football-player-was-arrested-after-claiming-cocaine-his-car-was-bird-poop-it-was-bird-poop/).[1]

---

[1] The Washington Post opinion piece cited 24 other substances that had produced false positive results in field tests, including: "Sage, chocolate chip cookies, motor oil, spearmint, Dr. Bronner's Magic Soap, tortilla dough, deodorant, billiards chalk, patchouli, flour, eucalyptus,

These are among countless nationwide reports of false positive field drug test results harming citizens and prisoners alike. A 2016 investigation by ProPublica and *The New York Times* found that tens of thousands of people are sent to jail each year based on the kits' results, which often generate false positives:

> Some tests . . . use a single tube of a chemical called cobalt thiocyanate, which turns blue when it is exposed to cocaine. But cobalt thiocyanate also turns blue when it is exposed to more than 80 other compounds, including methadone, certain acne medications and several common household cleaners. Other tests use three tubes, which the officer can break in a specific order to rule out everything but the drug in question—but if the officer breaks the tubes in the wrong order, that, too, can invalidate the results. The environment can also present problems. Cold weather slows the color development; heat speeds it up, or sometimes prevents a color reaction from taking place at all.

Ryan Gabrielson & Topher Sanders, *Busted*, PROPUBLICA (Jul 7, 2016), https://www.propublica.org/article/common-roadside-drug-test-routinely-produces-false-positives.

The high incident of false positives for NIK tests is partially due to the subjective nature of the tests and the high risk of user error, but it is also attributable to the fact that NIK tests are not *intended* to provide any evidence of the presence of controlled substances. NIK tests simply indicate the presence of chemical structures that exist within the same family of compounds that can include both controlled and non-controlled substances. For example, the same chemical structure (a primary amine) that exists in coffee, as in *Terry*, also exists in amphetamines. It is no coincidence that both coffee and amphetamines are types of stimulants since they have similar

---

breath mints, loose-leaf tea, Jolly Ranchers, vitamins, Krispy Kreme doughnut glaze, air, Tylenol, just about every brand of chocolate at your local convenience store, dry wall, BC powder, cotton candy, powdered sugar and, now, bird poop."

**Page 10 PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY**

chemical structures; the difference—one is a controlled substance and one is not. However, both will indicate a "positive" result on a NIK test.

Safariland's training material states that a color test alone is not sufficient to arrest, and it is only one factor among others in determining whether there is probable cause to arrest. *Michel*, No. 16CV277-GPC(AGS), 2017 WL 4922831, at *5. The district court's opinion in *Michel* establishes relevant context for the appropriate use and proper scope of field drug kits. Drawing from the Safariland self-instruction course: "The training material further states that a 'positive predictable color change is only a *presumed* positive result for the suspected compound; in no way should the test results be considered a confirmation of identification. Many man-made and natural chemicals could produce a positive indication for the presence of an illicit substance.'" 2017 WL 4922831, at *5 (emphasis in original).

A presumptive test such as the one used here tests for a family of chemical compounds, or a series of related chemical structures—some of which may be illegal but many of which are not. *Michel*, at *3 (internal citations omitted). If the chemical reaction with a substance produces a color change, as in *Michel* and like here, it simply means that the testing reagent has reacted with a similar chemical structure within the family of compounds the test indicates for. In *Michel*, the NarcoPouch tested "positive" for a liquid used to make cheese, not a controlled substance. *Id.* at *1. According to the Safariland NIK test training materials, "*all test results*, positive or negative should be confirmed by the crime laboratory." *Id.* at *5 (emphasis added; internal citations omitted). The instructions direct users to "[a]lways retain sufficient sample of suspect material for evidential analysis by the forensic laboratory." *Id.* at *5.

Aside from serious questions regarding unreliability, and the fact that Mr. Steffey has already shown the test here diverged from protocol, the "some evidence" standard also takes into

**Page 11 PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY**

account the administrative burden attendant on requiring confirmatory testing. *See, e.g.*, *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992) (retest not required for some evidence standard because of significant administrative burden). Confirmatory laboratory testing of disputed NIK test results would not place an undue administrative burden on the BOP. In fact, the BOP already requires such confirmation through a contractor for all urine testing. *See* BOP Program Statement 6060.08, *Urine Surveillance and Narcotic Identification* at 5 (stating that the urinalysis contractor must screen samples and that "[a]n initial positive test [must be] confirmed by a second test before it is reported to the institution."). This policy establishes both that requiring laboratory confirmation of a screening test would not be unduly burdensome, but also that it would not unduly delay the exigencies of prison discipline.

By contrast to the careful procedures for urine testing, the program statement addressing narcotics identification does nothing to safeguard against arbitrary deprivation of good conduct time credits. It states simply, "All lieutenants will be proficient in using the Narcotic Identification Kit and ordinarily are responsible for testing unknown substances." *Id.* at 8. The policy does not state what tests shall be used, how those tests shall be stored, what training and certification is required to demonstrate "proficiency," and what procedures will be used to mitigate instances of false positives.

Because NIK tests are known to provide false positive results, and in fact are not designed to test for the actual presence of controlled substances, in addition to the fact that Mr. Steffey has established that the NIK test here was conducted improperly, the prima facie case standard is met. Therefore, discovery is warranted, and the Court should order a hearing and further briefing on the disputed evidentiary issues.

**Page 12 PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY**

**B.      The Discovery Requested Is Reasonably Fashioned To Elicit Facts Necessary To The Disposition Of This Matter "As Law And Justice Require."**

It appears that the Bureau of Prisons regularly deprives prisoners of good conduct time credit, thereby lengthening their time in prison, based on a testing protocol known for its high rate of error, without even minimal procedures to ensure that the tests are conducted appropriately and that questionable test results are subject to confirmation. Each of Mr. Steffey's discovery requests, other than those related to his procedural due process claims, are reasonably fashioned to elicit facts related to how the BOP use of NIK tests fails to guard against arbitrary deprivations of liberty:

- Access to the suspect legal paperwork would allow Mr. Steffey to independently test the paper with reliable laboratory protocols, at his own expense, and would put to rest any question about the NIK test result in this case. Moreover, allowing petitioner's counsel and the Court to see the paper would permit independent assessment of the subjective claims that the paper felt unusually thick and appeared to have stains, all with minimal administrative burden to the BOP.

- Producing the native digital photographs of the NIK tests results would allow petitioner to digitally analyze the colorimetric makeup of the NIK test results, with minimal administrative burden to the BOP. The same analysis cannot be conducted with visual inspection of PDF copies.

- The government has provided no information about the BOP's training or policies regarding NIK tests. That information is patently relevant to the reliability of NIK test results. Manufacturer training materials indicate that test kits do not have a set "shelf life," but that chemicals can degrade with improper storage. Moreover, there is a substantial question in this case as to whether the agent who conducted the NIK tests knew that the testing protocol employed was contrary to the manufacturer's instructions.

**Conclusion**

For all of the foregoing reasons, the Court should order the government to comply with petitioner's requests for discovery to ensure that this Court can correctly adjudicate the claims and dispose of the matter as law and justice require. Mr. Steffey has previously submitted a motion

seeking additional time to submit an expert affidavit regarding the reliability of the NIK test protocols employed in this case.

Respectfully submitted this 27th day of September, 2019.

_/s/ Elizabeth G. Daily_
Elizabeth G. Daily
Attorney for Petitioner

**Page 14 PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY**