**Elizabeth G. Daily, OSB #111758**
**Assistant Federal Public Defender**
**Email: liz_daily@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**

**Attorney for Petitioner**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BILLY F. STEFFEY,** | **Case No. 3:19-cv-00093-JR** |
| **Petitioner,** | |
| **v.** | **PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION** |
| **WARDEN J. SALAZAR,** | |
| **Respondent.** | |

**Introduction**

Pursuant to 28 U.S.C. 636(b)(1)(C), Billy F. Steffey, through counsel, objects to Magistrate Judge Russo's findings and recommendation that his petition for writ of habeas corpus be denied. CR 30. On de novo review, this Court should reject the findings and recommendation and grant the petition for writ of habeas corpus. The loss of good conduct time in this case was premised on allegations that Mr. Steffey arranged for papers soaked with "liquid narcotics" to be introduced into prison through purported legal mail. But the narcotics identification kit (NIK test) used to test the paper is a test that lacks sufficient indicia of reliability to contribute to the "some evidence"

**Page 1    PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION**

standard. Not only is the test scientifically invalid and unreliable generally, it was used in this case in express contravention of the manufacturer's directions, producing an invalid result.

The Court should grant the habeas corpus petition, and order the Bureau of Prisons (BOP) to expunge the disciplinary action and restore Mr. Steffey's 41 days of good conduct time credit.

**Custody Status**

Mr. Steffey is in prerelease custody of the Bureau of Prison on home confinement. His projected release date from the present term of imprisonment is September 9, 2020.

**Argument**

**A.    The "Some Evidence" Standard For Substantive Due Process Requires Reliable Evidence.**

Prisoners have a constitutionally protected liberty interest in good conduct time credits. *Wolff v. McDonnell*, 418 U.S. 539 (1974). That interest cannot be infringed without appropriate procedural protections and a sufficient quantum of proof. *Superintendent v. Hill*, 472 U.S. 445, 453-54 (1985). Substantively, the requirements of due process are satisfied only when the decision to revoke good time credits is supported by "some evidence." *Id.* at 455.

The "some evidence" standard articulated in *Hill* is not toothless. While the BOP has a strong interest in "avoiding burdensome administrative requirements that might be susceptible to manipulation" and in "act[ing] swiftly on the basis of evidence that might be insufficient in less exigent circumstances," *id.* at 455-56, those interests must be balanced against the prisoner's important liberty interest in good conduct time. A prisoner's loss of good conduct time credits "threatens his prospective freedom from confinement by extending the length of imprisonment." *Id.* at 445. Under the Administrative Procedures Act, applicable to the BOP, agency action cannot

be arbitrary, capricious, or an abuse of discretion. *See Tablada v. Thomas*, 533 F.3d 800, 805 (9th Cir. 2008) (citing 5 U.S.C. § 706(2)(A)).

Thus, "some evidence" does not mean "any evidence." Rather, the law is well established that evidence must bear "some indicia of reliability" to satisfy due process. *Castro v. Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013) (quoting *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990)); *Sira v. Morton*, 380 F.3d 57, 82 (2d Cir. 2004) (due process requires an independent assessment of the confidential informant's credibility). When evidence is not shown to be reliable, the court must disregard that evidence to determine whether the disciplinary action is supported. *Broussard v. Johnson*, 253 F.3d 874, 877 (5th Cir. 2001) (disregarding informant's tip and holding that bolt cutters found in area where prisoner worked with others, standing alone, did not provide some evidence that the prisoner intended to escape).

**B.     The Results Of The NIK Test Should Have Been Disregarded Because NIK Tests Are Not Reliable Indicators Of The Presence Of Controlled Substances.**

Magistrate Judge Russo erred in allowing any consideration of the NIK test results, even as corroboration of other evidence. Case law confirms that, even under the "some evidence" standard, prison officials cannot blindly rely on unreliable testing procedures. *See, e.g.*, *Higgs v. Bland*, 888 F.2d 443, 449 (6th Cir. 1989) (noting that "a test which produced frequent incorrect results could fail to constitute 'some evidence' under the *Hill* standard"); *Henson v. U.S. Bureau of Prisons*, 213 F.3d 897, 898 (5th Cir. 2000) (denying claim that BOP must retest suspected marijuana pipe because the defendant had not shown "that the test is unreliable or that it was improperly administered"); *see also Peer v. Denham*, No. 15-CV-00754-GPG, 2015 WL 5579654, at *6 (D. Colo. Sept. 23, 2015) ("The Court recognizes that, in the context of a prison disciplinary hearing, prison officials generally are entitled to rely on institutional test results, such as the NIK

field test, *absent any evidence of unreliability or irregularity in conducting the tests*." (emphasis added)). In *Spence v. Farrier*, the Eighth Circuit held that unconfirmed urinalysis testing was reliable enough to use in prison disciplinary hearings because that type of test has a low margin of error: "Although it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, *the margin of error is insignificant* in light of institutional goals." 807 F.2d 753, 756-57 (8th Cir. 1986) (emphasis added).

Chemical field tests of the type used here are not reliable indicators of the presence of controlled substances. A 2016 investigation by ProPublica and The New York Times found that tens of thousands of people are sent to jail each year based on the kits' results, which "routinely" generate false positives. Ryan Gabrielson & Topher Sanders, *Busted*, PROPUBLICA (Jul 7, 2016), https://www.propublica.org/article/common-roadside-drug-test-routinely-produces-false-positives. According to the reporting, "There are no established error rates for the field tests, in part because their accuracy varies so widely depending on who is using them and how." *Id.* Anecdotally, the article indicates that a Florida laboratory found 21 percent of evidence police identified with field tests as methamphetamine was not methamphetamine. In Harris County, Texas, hundreds of drug convictions were determined to be wrongful after laboratory testing revealed faulty chemical tests. *Id.* Because of their unreliability, the Department of Justice prohibited the use of chemical field tests for evidentiary purposes in 1978. *Id.*

Even the Safariland manufacturer of NIK brand tests states that false positives are known to occur: "False positives are possible in field tests due to the limitations of the science, which is why we also clearly state in our training materials and instructions that they are not a substitute for laboratory testing." Ryan Gabrielson, *Unreliable and Unchallenged*, PROPUBLICA (Oct. 28, 2016), https://www.propublica.org/article/unreliable-and-unchallenged). "In a trial or other criminal

**Page 4   PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION**

procedure setting . . . field tests should not be used as evidence of the presence, or lack thereof, of any substance." *Id.*

The high incident of false positives for NIK tests is partially due to the subjective nature of the tests and the high risk of user error, but it is also attributable to the fact that NIK tests are not *intended* to provide any evidence of the presence of controlled substances. NIK tests simply indicate the presence of chemical structures that exist within the same family of compounds that can include both controlled and non-controlled substances. *Michel v. United States*, No. 16CV277-GPC(AGS), 2017 WL 4922831, at \*3 (S.D. Cal. Oct. 31, 2017). If the chemical reaction with a substance produces a color change, it simply means that the testing reagent has reacted with a similar chemical structure within the targeted family of compounds. According to the Safariland NIK test training materials, "*all test results*, positive or negative should be confirmed by the crime laboratory." *Id.* at \*5 (emphasis added; internal citations omitted). The instructions direct users to "[a]lways retain sufficient sample of suspect material for evidential analysis by the forensic laboratory." *Id.* at \*5.

Case law and news reports establish that NIK tests and other similar colorimetric field tests produce false positive results with regularity:

**Case Reports**

- In *Peer v. Denham*, No. 15-CV-00754-GPG, 2015 WL 5579654 (D. Colo. Sept. 23, 2015), a federal prisoner was disciplined for dietary supplements that tested "positive" for amphetamines with a NIK test. Confirmatory laboratory testing was ordered—the result: "Controlled substances were not detected." *Id.* at \*3.

- In *Terry v. Dep't of Pub. Safety & Corr. Servs.*, No. 11-CV-01686, 2012 WL 2564779 (D. Md. June 29, 2012), *aff'd sub nom. Terry v. Middleton*, 499 F. App'x 64 (4th Cir. 2012), a Maryland state prisoner was disciplined after correctional officers found a "black like tar substance wrapped in saran wrap" that the prisoner claimed was coffee. *Id.* at \*1. The NIK field test "first change[d] to orange and then further change[d] from orange to brown" indicating a "positive" result for the

presence of amphetamines. *Id.* The officer "ha[d] been trained and certified to perform NIK field tests since 2006, [and] averred that 'he followed the NIK kit directions.'" *Id.* The substance was eventually sent for confirmatory testing—the result: "No [Controlled Dangerous Substances] Detected." *Id.* at *2.

- In *Blasirue v. Jones*, No. 1:16-cv-00288-TH-KFG (E.D. Tex.) (2017), an inmate lost 41 days good time credit after plant material in a package around his neck yielded a "positive" result on a NIK test. However, confirmatory laboratory testing showed it was simply organic plant material; the result—no controlled substances. The BOP expunged Blasirue's disciplinary violation and restored his good conduct time credit.

- In *Michel v. United States*, No. 16CV277-GPC(AGS), 2017 WL 4922831, (S.D. Cal. Oct. 31, 2017), Customs and Border Protection officers obtained a "positive" NarcoPouch result for methamphetamine from suspicious liquids that the plaintiff attempted to bring over the border. *Id.* at *2. She asserted that the liquid was "cuajo," a substance used to make cheese. *Id.* at *3. Later laboratory testing was performed on the suspected liquids—the result: "negative for methamphetamine." *Id.* at *1.

- In *Fincher v. Monroe Cty. Bd. of Commissioners*, No. 5:18-CV-00424-TES, 2019 WL 510448, at *1 (M.D. Ga. Feb. 8, 2019), plaintiff Dasha Fincher spent 94 days in jail after being arrested for allegedly trafficking methamphetamines after a field drug test yielded a "positive" result. *Id.* The substance in question (which later turned out to be nothing more than blue cotton candy) was later sent to a laboratory for confirmation testing. *Id.* at *2. The result: "[n]o controlled substances." *Id.*

- In *Jenkins v. Fed. Bureau of Prisons*, No. 2:17-CV-1951-AKK-JEO, 2018 WL 992057, at *1 (N.D. Ala. Jan. 11, 2018), *report and recommendation adopted*, No. 2:17-CV-1951-AKK-JEO, 2018 WL 985763 (N.D. Ala. Feb. 20, 2018), a federal prisoner was disciplined based on a "NIK" test performed on a piece of brown paper soaked in some substance, which was discovered during a random search of his cell. The prisoner claimed that the substance was merely Vaseline. Although the case does not report any confirmatory laboratory testing, the BOP later moved to expunge the disciplinary violation and restore the good conduct time credits, rendering the prisoner's § 2241 petition moot.

### News Reports

- A woman was wrongfully jailed after a field drug test indicated a "positive" test result for crack cocaine; the actual substance—a small crumb of an over-the-counter pain relief medicine. Tim Cushing, *Field Drug Tests: The $2 Tool That Can Destroy Lives*, TECHDIRT (Jul 18, 2016), https://www.techdirt.com/articles/20160712/15543134951/field-drug-tests-2-tool-that-can-destroy-lives.shtml.

- A man received a settlement for an arrest predicated on a drug field test that indicated a "positive" result for methamphetamine; the actual substance—Krispy Kreme donut crumbs. Tim Cushing, *Man Gets $37,500 Payout After Field Drug Test Says Donut Crumbs Are Methamphetamines*, TECHDIRT (Oct 31, 2017), https://www.techdirt.com/articles/20171024/16042838475/man-gets-37500-payout-after-field-drug-test-says-donut-crumbs-are-methamphetamines.shtml.

- In the same state, a man was arrested after a drug field test indicated a "positive" result for cocaine; the actual substance—drywall residue. Laurel Wamsley, *Florida Man Awarded $37,500 After Cops Mistake Glazed Doughnut Crumbs for Meth*, NPR: THE TWO WAY (Oct 16, 2017), https://www.npr.org/sections/thetwo-way/2017/10/16/558147669/florida-man-awarded-37-500-after-cops-mistake-glazed-doughnut-crumbs-for-meth.

- In a highly-publicized August 2019 incident, Georgia college football player Shai Werts was arrested after a substance on the hood of his car tested "positive" for cocaine. Confirmatory laboratory testing was conducted with the result: no controlled substances. Charges were dropped and the player was reinstated to the team after submitting to drug testing. Radley Balko, *Opinion: A Young Black Football Player Was Arrested After Claiming 'Cocaine' on His Car Was Bird Poop. It Was Bird Poop*, THE WASHINGTON POST (Aug. 9, 2019), https://www.washingtonpost.com/opinions/2019/08/09/young-black-football-player-was-arrested-after-claiming-cocaine-his-car-was-bird-poop-it-was-bird-poop/).[1]

- A school resource officer in Washington received a positive result for PCP after testing suspiciously-packaged gumballs handed out on Halloween. Confirmatory testing at the state crime lab determined the candy did not contain any controlled substances. Police explained the mistake as due to the unreliability of the test: "[F]alse positives can happen with sugar-laced items because of the chemical reaction." *'Suspicious' Candy Handed Out in Lake Stevens Did Not Contain PCP, Tests Confirm*, KING 5 NEWS (Nov. 1, 2019), https://www.king5.com/article/news/local/lake-stevens-halloween-candy-preliminary-test-results-pcp/281-1897f704-8365-491d-bc8c-5345f899d6fd.

---

[1] The Washington Post opinion piece cited 24 other substances that had produced false positive results in field tests, including: "Sage, chocolate chip cookies, motor oil, spearmint, Dr. Bronner's Magic Soap, tortilla dough, deodorant, billiards chalk, patchouli, flour, eucalyptus, breath mints, loose-leaf tea, Jolly Ranchers, vitamins, Krispy Kreme doughnut glaze, air, Tylenol, just about every brand of chocolate at your local convenience store, dry wall, BC powder, cotton candy, powdered sugar and, now, bird poop."

These are among countless nationwide reports of false positive field test results harming citizens and prisoners alike. In *People v. Chacon*, No. JCF36904 (Apr. 24, 2018) (slip opinion attached), the Superior Court of California after a thorough scientific review concluded that NIK test results were not sufficiently reliable to be offered as evidence before the grand jury. The court noted that "the test does not work as marketed by Safariland," and it has "never "been validated[.]" *Id.* at 25-26. Rather, Safariland only tests its kits against "known, pure controlled substances," and has not "conducted testing with any of its kits . . . with real world drug samples under conditions that actually exist." *Id.* at 26. The court found "[m]ultiple examples" of the tests identifying non-controlled substances, like the sugar substitute Equal, which mimics methamphetamine. *Id.* at 27. "The NIK color testing methods fall far short of meeting minimum scientifically acceptable criteria," the court held. *Id.* at 28. "Over all the evidence presented before the court throughout the hearing suggests that colorimetric tests are not accepted by the relevant scientific community as [a] reliable scientific method to identify an illegal drug, presumptive or otherwise." *Id.* at 30.

The "some evidence" standard takes into account not only indicia of reliability for testing procedures, but also the administrative burden attendant on requiring confirmatory testing. *See, e.g.*, *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992) (retest not required for some evidence standard because of significant administrative burden). Confirmatory laboratory testing of disputed NIK test results would not place an undue administrative burden on the BOP. In fact, the BOP already requires such confirmation for all urine testing. *See* BOP Program Statement 6060.08, *Urine Surveillance and Narcotic Identification* at 5 (stating that the urinalysis contractor must screen samples and that "[a]n initial positive test [must be] confirmed by a second test before it is reported to the institution."). This despite the fact that urine testing methods are much more reliable than colorimetric field tests. *See Spence*, 807 F.2d at 756 (discussing error rate); *Proposed*

**Page 8   PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION**

*Revisions to Mandatory Guidelines for Federal Workplace Drug Testing Programs*, 69 Fed. Reg. 19673-01 (Apr. 13, 2004) (describing validation). This BOP policy establishes that requiring laboratory confirmation of a screening test would not be unduly burdensome nor would it unduly delay the exigencies of prison discipline.

By contrast to the careful procedures for urine testing, the program statement addressing narcotics identification does nothing to safeguard against arbitrary and erroneous deprivation of good conduct time credits. It states simply, "All lieutenants will be proficient in using the Narcotic Identification Kit and ordinarily are responsible for testing unknown substances." *Id.* at 8. The policy does not state what tests shall be used, how those tests shall be stored, what training and certification is required to demonstrate "proficiency," and what procedures will be used to mitigate instances of false positives.

Because NIK tests are known to provide false positive results, have no established error rate to assess their reliability, and in fact are not designed to test for the actual presence of controlled substances, the NIK test results here did not have sufficient indicia of reliability to be considered in the "some evidence" analysis.

**C.    The NIK Test Results Should Have Been Disregarded Because The Tests Were Conducted In Contravention Of The Manufacturer's Directions And Because The Results Were Misinterpreted.**

Even if the NIK colorimetric tests' general lack of reliability would not be sufficient to preclude their use in BOP disciplinary hearings across the board without confirmatory testing, the results in *this* case should have been disregarded because the administrative record definitively establishes that the tests were conducted in contravention of the manufacturer's instructions.

The testing instructions included in the SIS investigation reports state that "it is important to classify the material" to be tested before testing can begin. CR 12-6 at 3; *see also* Ex. A at 1-2

**Page 9   PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION**

(excerpt from NIK self-training course). The approved types of material are: tablets, capsules, powders, plant material, and suspected brown or black tar heroin. *Id.* The tests kits are not approved for testing paper. In fact, paper is not mentioned at all except as a means for testing liquid, which the NIK tests are "not designed for." *Id.* And when testing liquids, "[t]he choice of paper is critical." *Id.*

> **Liquid samples** - NIK tests are NOT designed for use with liquid samples. However, liquids may be tested by placing the tip of an NIK SUBSTANCE LOADING DEVICE or a 1cm square (roughly 1/2" square) piece of paper into the liquid. Remove and allow to air dry. Place the dry paper into the test pack and proceed with the test as instructed. *The choice of paper is critical. Unscented, uncolored filter paper is ideal.* NEVER use brown paper, hand towels or newsprint.

*Id.* (emphasis added).

The undisputed facts here established that the disciplinary action in this case was based on a NIK test conducted on paper of unknown origin, contrary to the limitation of suitable testing materials. The testing officer took a small piece of legal papers that had been sent from an unknown source through the postal service and that had been processed through the institution's mail processing room, offering numerous sources of potential contamination. The "positive" result obtained through this impermissible procedure lacks any indicia of reliability.

In addition to the fact that the NIK test is not designed to test paper, the fact finder also misunderstood that Test U "indicated a positive result for Amphetamines." In fact, Test U is not a test for amphetamines. CR 12-6 at 4. The Test U instructions and the NIK self-training course clearly state that Test U solely identifies the presence of methamphetamines or MDMA. Ex. A at 3-5; Ex. B. "Test U will turn a burgundy color *all by itself* when the ampoules are broken with substance placed in the pouch. This is the nature of the chemicals." Ex. A at 5 (emphasis added). Thus, any result other than a dark blue color is a *negative* result and cannot be used as evidence of

**Page 10 PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION**

the presence of any illegal substance. However, the hearing officer report indicates that DHO Chetwood relied on the results of *both* Test A *and* Test U in concluding that Mr. Steffey violated Prohibited Act Code 111. CR 12-5 at 2. The misunderstanding of the Test U results further undermines the result of the adjudication.

The multiple errors in the use and reliance on the NIK testing system in this case underscores the fact that the BOP has offered no evidence regarding the training or expertise of the personnel who are charged with conducting and interpreting the results of NIK chemical tests or the hearing officers who are charged with applying those results to infringe on prisoners' liberty interests. In other cases, courts have specifically considered the training and certification of the testing agent in upholding reliance on NIK test results. *Cf. Baker v. Lake*, No. 118CV01642SKOHC, 2019 WL 1455326, at *2 (E.D. Cal. Apr. 2, 2019), *recons. denied*, No. 118CV01642SKOHC, 2019 WL 2125458 (E.D. Cal. May 15, 2019).[2]

A chemical test that has been performed incorrectly and interpreted incorrectly by officers of unknown expertise does not have any "indicia of reliability." The results should have been disregarded as invalid in the "some evidence" analysis.

**D.    The Remaining Evidence Was Insufficient To Support The Disciplinary Violation.**

In the findings and recommendation, the Magistrate Judge did not directly address the petitioner's challenge to the reliability of the NIK test. Instead, the Magistrate Judge simply noted

---

[2] The petitioner's filed a discovery motion seeking to produce, among other things, the BOP's training protocol for chemical testing and other information that would go to the reliability of the NIK test results. CR 20. The petitioner also sought additional time to offer an expert affidavit as to the errors in the testing procedures employed here. CR 21. But the Magistrate Judge denied the discovery motion and declined to permit further evidentiary development regarding the NIK test reliability. CR 30. To the extent that the Court does not find that the NIK test result so unreliable that it should have been disregarded entirely, then the petitioner would ask the Court to order discovery and allow further development of the evidence on that issue.

**Page 11 PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION**

that the hearing officer "relied upon multiple sources of evidence to determine Petitioner violated prison rules[.]" CR 30 at 10. However, only *reliable* evidence can be considered in the "some evidence" analysis, and the NIK test results do not meet that standard. The government has never argued that the disciplinary sanction would have been permissible if the NIK test results were discounted entirely. The other sources of evidence linked Mr. Steffey to the mail, but did not point to the presence of narcotics. If the suspect paper did not contain narcotics, then no violation occurred. Since the NIK test was the only evidence that the papers contained narcotics, the unreliability of the NIK test invalidates the discipline.

**Conclusion**

For the reasons stated herein and in the petitioner's other pleadings (CR 1, 17), this Court should reject the magistrate judge's findings and recommendation and instead grant the writ of habeas corpus, order the BOP to expunge the disciplinary infraction, and grant such other and further relief as law and justice require pursuant to 28 U.S.C. § 2243.

Respectfully submitted this 23rd day of April, 2020.

*/s/ Elizabeth G. Daily*
Elizabeth G. Daily
Attorney for Petitioner

**Page 12 PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION**