**FILED**

APR 2 4 2018

SUPERIOR COURT
COUNTY OF IMPERIAL
CLERK
DEPUTY
**T. Escalera**

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF IMPERIAL

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>RANDY CHACON,<br><br>Defendant, | Case No. JCF36904<br><br>**STATEMENT OF DECISION AND ORDER RE: MOTION TO SET ASIDE, DISMISS, GRAND JURY INDICTMENT [Pen. Code, § 995]** |
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY MOORE,<br><br>Defendant, | Case No. JCF36709 |
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>SHARREL ANN MYERS,<br><br>Defendant, | Case No. JCF36710 |
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>OSCAR MARTINEZ,<br><br>Defendant. | Case No. JCF37344 |

1

JCF37344          STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

## INTRODUCTION

Imperial County, California, has two prisons Calipatria State Prison and Centinela State Prison. Both prisons are under the jurisdiction of the California Department of Corrections and Rehabilitation (hereinafter "CDCR"). Three of the four defendants in this case, Randy Chacon ("Chacon"), Gregory Moore ("Moore"), and Oscar Martinez ("Martinez"), are currently serving state prison sentences. Defendant Sharrel Ann Myers ("Myers"), has been indicted on felony charges.

The Imperial County District Attorney has established a prison unit that prosecutes crimes committed on the grounds of Calipatria and Centinela State Prisons. The District Attorney has authorized that unit to proceed either by way of Grand Jury Indictment or by way of complaint. As a matter of policy, the unit has chosen to proceed by way of indictment in the majority of cases it prosecutes, including the cases at issue here.

In the instant consolidated cases defendants were each arrested for possession of suspected heroin within Calipatria or Centinela State prison. The principal issue in each case is the scientific validity of a color test, commercially known and marketed as the "Narcotics Identification Kit" (hereafter referred to as the "NIK" test) used to identify heroin and other seized drugs.

CDCR Correctional Officers, who were trained by CDCR personnel to use the NIK test in the fashion recommended by Safariland, LLC ("Safariland"), its manufacturer routinely testify before the Imperial County Grand Jury, resulting in criminal indictments. No published California case has addressed a scientific challenge to a NIK color test or any similar color test. Color tests oftentimes referred to as "field tests" are routinely used by police officers in the field as part of an illegal drug investigation before making an arrest decision.

The court conducted more than 7 days of hearings, at which six Correctional Officers, three expert witnesses, and a representative of Safariland testified, during which it admitted over 112 exhibits all focused on the ability of the NIK color change test to correctly identify heroin as a suspected seized drug. Suspected heroin, a federally scheduled one (1) narcotic drug derived and illicitly manufactured from the opium poppy, is typically manufactured in

2

clandestine laboratories. Illicit drugs are frequently diluted (cut) with a variety of materials prior to sale or resale to bulk up the product and increase profit. Adulterants are generally selected due to their physical resemblance to a drug, low cost, or added physiological effects. Cutting agents are constantly changing over time.

With the NIK color field test in question, a small portion of the suspected substance is placed in a clear vinyl pouch containing glass vials with chemical reagents using a device provided with the NIK testing kit. The reagent identified and used with the test for heroin is known as the "Mecke modified" test, where the sample is mixed with the reagents and is agitated. If the reagent solution turns green, the test is positive for heroin.

The Imperial County District Attorney's office regularly calls CDCR officers as expert witnesses before the criminal Grand Jury to testify as to NIK drug identification test results. Such officers testify that precautions are taken to avoid cross-contamination, that the test procedures prescribed by Safariland are followed, and that although false positives could occur that in the officer's experience no false positive has ever been experienced. CDCR officers before this court testified, consistent with training and educational materials from the manufacturer, that the NIK test was reliable and according to the testifying officers in sworn testimony, was "100%" accurate.

GRAND JURY PROCEEDINGS

Statement of the Cases:

RANDY CHACON

Correctional Officer Alejandro Paniagua (Paniagua), while conducting a clothed body search on Chacon, discovered a small object in the inmate's right pocket. The item was wrapped in clear plastic and contained what appeared to be a tar-like substance. Paniagua transferred the item to correctional Sergeant Alejandro Gonzalez (Gonzalez) for chemical testing. Gonzalez, an eight and a half year veteran of CDCR, subjected the contents of the item to an examination utilizing the Narcotics Identification Kit (NIK). Gonzalez testified before the Imperial County Criminal Grand Jury that he conducted a NIK color test for heroin. Gonzalez testified that the way the NIK test works is that depending on the color, it will be

3

positive or negative. When asked what was the result was of the substance found on Chacon that he conducted the NIK color test on was that it tested "positive for heroin". Gonzalez was also asked before the grand jury,

"Q. Have you ever heard of what a false positive is?

A. Yeah, but I never had it.

Q. What is a false positive?

A. I guess when you get mixed readings when you conduct a test. It's not clear.

Q. Was there a false positive?

A. No."

The bindle weighed .4 grams and Gonzalez also testified before the Imperial County Criminal Grand Jury that, based upon his training and experience and on multiple conversations he has had with both Correctional Officers and inmates, this was a usable quantity of heroin. The Grand Jury indicted Chacon on one felony count of custodial possession of contraband (heroin) in violation of Penal Code section 4573.6.

GREGORY MOORE & SHARREL ANN MYERS

Correctional Officer Waymond Fermon (Fermon) was watching from his office activities in one of Calipatria State Prison's visiting rooms via surveillance monitor when he noticed Myers exit the women's restroom and returned to her assigned table where she sat down next to Moore. Shortly thereafter, the couple stood up from the table and walked over to the area in the visiting room designated for the taking of photographs. As Fermon watched, he saw the visiting room porter, Inmate Lamar Williams (Williams), purportedly taking a photograph of Moore and Myers. Moore is standing behind Myers and Fermon sees the inmate taking something from Myer's right-side waistband area and keeping it in his hand.

After taking the photo, Williams walks up to the couple to show them the photograph and Moore is then seen taking the unknown object from his own hand and placing it inside Williams's right rear pants pocket. Fermon, along with his supervisor, Sgt. Robert Moore (no relation to defendant Moore) went to the visiting room and made contact with all three individuals. Sgt. Moore escorted Inmate Moore to the inmate strip room. Fermon, meanwhile,

4

JCF36904          STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

made contact with Williams, and after placing him in handcuffs, escorted him to the strip room where he performed a clothed body search on the inmate. During the search, Fermon located two items in Williams's right rear pants pocket. No contraband was found on Inmate Moore.

Fermon then contacted Myers in the prison's Main Visiting Processing Area. Myers agreed to an unclothed body search by two female Correctional Officers; no contraband was found during this search. Fermon then left Myers with the female officers and went to an evidence room where he tested the contents of the two using a NIK color test for herion test. The tests resulted in a positive result for heroin. Both bindles had a combined gross weight of 157 grams which Fermon testified that, based upon his training and experience, along with conversations he has had with both other Correctional Officers and inmates, that was a usable quantity of heroin. Fermon and another Correctional Officer later interviewed Myers, during which, she admitted to bringing the bindles into the prison where Moore took them from her waistband area. Because of this testimony, the Grand Jury indicted both Moore and Myers on July 29, 2016.[1] Inmate Williams was not indicted.

OSCAR MARTINEZ

Correctional Sergeant John Truchanovich (Truchanovich) exited the Facility C Program Office at Centinela State Prison and observed Inmate Martinez (Martinez) walking towards him. Martinez was heading for the inner perimeter. As he walked towards Truchanovich, he noticed that Martinez kept his hand closed in an awkward fashion. Truchanovich ordered Martinez to "cuff up." At this point, Martinez opened his left hand and Truchanovich could see that he held a clear, small plastic object with a dark brown substance inside. Truchanovich took possession of the object and later gave it to Correctional Officer Ricardo Estrada for a "field test"..., "in order to determine whether it is indeed a controlled substance".

After taking possession of the object, Officer Estrada weighed it (determined to be 0.1 grams gross weight), opened it and observed a dark brown substance. Estrada told the

---

[1] Meyer's disputes the evidence testified to before the Grand Jury that she confessed. In her Penal Code section 995 motion Myers counsel quotes the actual transcript of her recorded interview with Correctional Officers that does not show she made any such admissions.

5

JCF36904          STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

Imperial County Criminal Grand that he utilizing the NIK test that he had been trained to use and had utilized over 50 times determined that the substance was heroin. Estrada told the Grand Jury that the results, depending on the color the results will be positive or negative. Estrada testified the NIK test was "positive for heroin". Also, that he knew what a false positive was, "when the substance is not – it doesn't come up positive or results of the test are not what you expected". He later opined based upon his training and experience, and based upon conversations he has had with both Correctional Officers and inmates, that the item contained .1 grams, a usable quantity of heroin. Based on this testimony, the Grand Jury indicted Martinez on one felony count of custodial possession of contraband (heroin) in the state prison in violation of Penal Code section 4573.6.

## ISSUES PRESENTED

1. Whether or not Narcotics Identification Kit ("NIK") color test result is legally admissible evidence for purposes of finding probable cause by a Grand Jury;

2. If the answer to question 1. Is "yes", what the appropriate parameters are for administration of such test and the presentation of the results of same to the Grand Jury;

3. Whether California Department of Corrections officers are qualified to testify as experts as to the results of the NIK test and the accuracy of such results before the Grand Jury; and

4. Whether probable cause existed for the indictment in the cases before the court were it to decline to consider the evidence of the NIK test and the Correctional Officer's interpretation of its results.

## LEGAL ANALYSIS

The defendants are asking this court to rule the NIK color test was legally inadmissible before the Grand Jury and therefore the indictments should be dismissed.

In considering a motion to dismiss charges brought in a Grand Jury indictment pursuant to Penal Code section 995 the Superior Court sits as a reviewing court. (*People v. Block* (1971) 6 Cal.3d 239, 245.) The role of the Grand Jury in issuing an indictment is to "determine whether probable cause exists to accuse a defendant of a particular crime."

6

(*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026.) Probable cause "means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (*Cummiskey v. Superior Court, supra*, 3 Cal.4th at p. 1029.) As with a preliminary hearing where a magistrate presides, the Grand Jury must determine whether sufficient evidence has been presented to support holding a defendant to answer on an indictment. In the usual case "The duty of determining whether or not an indictment should be found is lodged exclusively in the Grand Jury and not in the courts," and the court's duty is to determine whether the defendant has been committed without reasonable or probable cause. (*Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 55.) The reviewing court does not substitute its judgment as to the weight of the evidence for that of the Grand Jury, and upon a review the court must draw all reasonable inferences in favor of the indictment. (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1148.) The evidence presented to the Grand Jury need not be sufficient to support a conviction beyond a reasonable doubt; there must however be some factual showing as to each element of the crime. Such a showing may be made by circumstantial evidence supportive of reasonable inferences. *(Ibid.)*

The defendants in the instant cases have raised legal and evidentiary issues that were not addressed in the Grand Jury proceedings. In effect defendants have made a pretrial non-statutory motion to dismiss. This procedure is an appropriate way to raise a variety of defects in preliminary hearings. (See, e.g., *People v. McGee* (1977) 19 Cal.3d 948; *People v. Superior Court (Hartway)* (1977) 19 Cal.3d 338; *People v. Durrett* (1985) 164 Cal.App.3d 947]; *Lockwood v. Superior Court* (1984) 160 Cal.App.3d 667]; People v. Smith (1984) 155 Cal.App.3d 1103; *People v. Crudgington*, (1979) 88 Cal.App.3d 295.)

The Supreme Court has approved the Superior Court's receipt of evidence outside the record of the preliminary examination when reviewing a claim of violation of a substantial right. *People v. Coleman* (1988) 46 Cal.3d 749 [testimony on whether counsel was effective]; *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 263 n.5 [potential bias or appearance

/////

7

of conflict of prosecutor at preliminary examination]; *People v. Pennington* (1991) 228 Cal.App.3d 959, 964 [conflict of interest of defense counsel].

In *People v. Laney* (1981) 115 Cal.App.3d 508, 513, the appellate court held:

> "We conclude and hold that the rule announced in *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529, with regard to irregularities in preliminary examination procedures applies also to grand jury proceedings. Consequently the irregularities, if any there be, require reversal only if an accused can show he was deprived of a fair trial or otherwise suffered prejudice. Relief without showing of prejudice is limited to pretrial challenges."

In *People v. Towler* (1982) 31 Cal.3d 105, 123, the Supreme Court concurred, holding: "The reasoning in *Pompa-Ortiz* applies with equal force in the grand jury context."

In the case of *Stanton v. Superior Court* (1987) 193 Cal.App.3d 265 ("*Stanton*"), at page 271 the court held that the prosecution's duty to disclose material evidence that is favorable to the defense (commonly referred to as a *Brady* [2] obligation) applied to preliminary hearings. In *Stanton* the court struck an element of the charged offense because of the prosecution's failure to disclose evidence material to defense cross-examination of eyewitnesses at a preliminary hearing.

The People have objected to the court allowing any evidence to be considered outside of the Grand Jury record and have argued that the *Stanton* decision does not apply to a Grand Jury indictment case being challenged by a motion to dismiss pursuant to Penal Code section 995. However several case decisions have referred with approval to a trial Court receiving evidence outside the record of a Grand Jury proceeding when reviewing a claim of violation of a substantial right. In *Cumminskey v. Superior Court, supra,* 3 Cal.4th 1018, at page 1022 the defendant asserted that the District Attorney failed to present exculpatory evidence at Grand Jury proceedings. *Berardi v. Superior Court* (2007) 149 Cal.App.4th 476, held at page 481 that in assessing substantial prejudice under Penal Code section 939.71 the test is whether, evaluating the entire record, it is reasonably probable that a result more favorable to the defendant would have been reached if the exculpatory evidence had been disclosed to the Grand Jury. Neither of these Grand Jury cases directly refer to *Stanton*;

[2] *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215

8

however, the only manner to adjudicate errors outside of the record, just like with respect to a preliminary hearing, is to allow in evidence during a pretrial motion proceeding.

Thus a *Brady* violation claim and inadmissible scientific evidence claim, as being made herein, could be raised in a non-statutory motion to dismiss, distinguishing Penal Code section 995 motions, which are confined solely to the record. The trial court has authority, because of the constitutional nature of the issue and would be obligated, based upon due process and equal protection principles, to allow the defense to raise such claims.  In *Stanton*, at page 272, the Court stated "Nondisclosure of evidence impeaching eyewitnesses on material issues is the deprivation of a substantial right". In a Grand Jury proceeding, there is no meaningful way to reach the issue because *Brady* and improper admission of scientific evidence claims are inherently always outside the record.  Also, by statute the prosecution's failure to inform the Grand Jury of exculpatory evidence of which it is aware is grounds for dismissal if that failure results in substantial prejudice. (Penal Code section 939.71.)

The standard of the review is the same under a statutory or non-statutory motion to set aside the information.  (*People v. Woods* (1993) 12 Cal.App.4th 1139,1147.)

## THE LAW AS TO WHAT EVIDENCE IS ADMISSIBLE
## IN A GRAND JURY PROCEEDING.

The rules of evidence that apply to a criminal trial are statutorily applicable in Grand Jury proceedings. (Penal Code section 939.6. subdivision (b).) A Grand Jury indictment predicated on evidence that is legally inadmissible at a trial is subject to dismissal (*People v. Barkus* (1979) 23 Cal.3d 360, 393; *Cook v. Superior Court* (1970) 4 Cal.App. 3d 822.) Evidentiary objections may be properly raised by a defendant in a Penal Code section 995 motion to dismiss an indictment due to the inability to object beforehand. (*Dong Haw v. Superior Court* (1947) 81 Cal.App.2d 153.)

The question herein raised by defendants is whether evidence of a color change field test that identifies heroin, the modified Mecke "L" "Narcotics Identification Kit" ("NIK"), is admissible before a Grand Jury over a multiple prong scientific validity challenge. The admissibility of the NIK "L" test for heroin must be determined under the trial evidence

9

standard of *People v. Kelly* (1976) 17 Cal.3d 24 ("*Kelly*"), and *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"). Admissibility of a NIK color "L" test under *Kelly* or *Sargon* is dependent on proof of a "preliminary fact" as a foundation to each. (Cal. Evid. Code §§ 400-401.) Any evidence is excluded if the foundation is not made. (Cal. Evid. Code §702(a).) The People have the burden of establishing the reliability of the color drug field test for heroin and the validity of the underlying principles upon which it is based both under a *Kelly* or *Sargon* analysis.

Correctional Officers testify to the results of the NIK "L" test used in the field to identifying herion before the Grand Jury. The Correctional Officers do not know anything as to how the chemical features of the NIK field colorimetric tests work or why they produced or fail to produce a certain color that either identifies or fails to identify a suspected substance as heroin. The evidence presented during the hearing was that Correctional Officers do not know about the overall reliability or accuracy of the color field test. It is unknown to them, except what the Correctional Officers learn from their Safariland training. The Correctional Officers acknowledged in testimony that they are not experts in identifying seized drugs, they just follow the directions that come with the NIK kit.

By their very nature, the People have impliedly conceded that NIK field colorimetric tests lack the reliability necessary to make their results proof beyond a reasonable doubt. The People only use the NIK colorimetric test at Grand Jury and always send the drug evidence to the California Department of Justice if a case proceeds to trial. A question is raised as to whether a lay witness can testify to the results of a scientific test as evidence before a Grand Jury that the material tested, as they did in these consolidated cases, is a controlled substance, specifically heroin. The testimony by Correctional Officers about the performance and results of a field test is expert testimony. Therefore to be admissible at a trial over objection the NIK L heroin field test would have to be admissible as expert witness evidence. (Evid. Code, §§801, 802.) CDCR officers a typically testify: (1) they are trained to administer the field test; (2) they follow the proper procedures and instructions for the test; (3) they /////

10

Attachment
Page 10 of 36

explain what they did; and (4) the NIK field test is used routinely by the California Department of Corrections and Rehabilitation.

There is now an extensive record before this court as to the nature and performance of NIK tests. The NIK modified Mecke "L" color test for heroin (3, 6-Diacetylmorphine) as with all color tests is sensitive; hence, very small quantities of sample are used. Generally, from a chemistry standpoint, color testing can be used for a variety of purposes, including as a field test for suspected drugs. NIK testing is based on color testing principles known and used in basic chemistry.

The chemistry discipline examines the way atoms and molecules interact with each other ("chemical reactions"). All chemical compounds have chemical signatures or functional groups, a set of characteristics that determine the type of interactions a molecule will be amenable to. All chemical compounds have functional groups, some more than others, and many share common chemical groups. The latter are sometimes classified in terms of chemical classes.

In simple terms, functional groups are the parts of a molecule that extend beyond the "core" body of the molecule. Certain chemicals called reagents can cause a color change when a substance, a chemical compound, is added and a reaction occurs. Color reactions have been used by chemists for hundreds of years. A visible color change when a reagent is mixed with a substance is evidence of a chemical reaction. A color change reaction occurs when there is a change in the environment surrounding the chemical compound, for example via chemical bonding. A color change is viewed by the naked eye. An average human being can discriminate from up to one million different colors from the seven basic colors of red, orange, yellow, green, blue, indigo and violent. The human eye can perceive 142,000 shades of Green. (Bell, Forensic Chemistry, (2nd ed., 2013) p. 228.)

The Narcotic Identification Kit, NIK test, is manufactured and sold only by Safariland and is distributed worldwide primarily to military and civilian law enforcement agencies. Safariland manufactures a test kit plastic pouch that contains sealed ampule(s) containing color reagents. The type of color reagent contained varies depending on the type of drug

11

JCF36904    STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

being tested for. The ampules are systematically broken after a measured amount of a suspected material is added to the pouch. The pouch is re-sealed and then agitated. If no color change occurs, according to the manufacturer Safariland, the drug being tested for is not identified and the test result is considered negative for its presence. If a color change occurs, a color chart known as the "IDENTIDRUG™ CHART" [Exhibit 3] that comes with each kit, is referenced by the user of the test and the illicit drug, according to the manufacturer Safariland, is identified.

Safariland, in addition to selling the NIK kit, also markets to law enforcement a "NIK public safety basic competency training coarse" for use with its "NIK Polytesting system" that teaches law enforcement how to use its color test kits. Safariland offers a certificate of completion for officers who pass a self-guided test after 4 hours of training given by a master trainer who is also certified by Safariland using a PowerPoint-based training program. [Exhibit 70, CD-ROM] The master trainer certification takes four hours and allows the master trainer to instruct others on how to conduct drug identification testing using the NIK Polytesting system. Part of the training is hands-on so that the students can learn how to use the pouches and break the ampoules.

Terry Allen Miller, called as a witness by the People, has a bachelor's degree in chemistry. Miller testified that he has been employed for 17 years by an entity based in Florida, by the name of Safariland LLC (manufacturer of the NIK tests) as its product manager. Prior to his employment with Safariland Miller was a senior crime scene analyst at the Florida Department of Law Enforcement Jacksonville Regional Crime laboratory for 21 years. Safariland has DEA and ISO certifications for the manufacturing of the NIK and other color tests. Only informal unpublished studies have been done in Virginia and Nevada as part of the bid process for public entities to purchase the test kits. NIK tests are sold to the FBI, DEA, ATF, Customs and Border Patrol, U.S. embassies around the world, Army, Navy, and Coast Guard, as well as entities in Germany, Italy, France, Spain, England, the Netherlands, South America, South Africa, the Middle East, and the Pacific Rim.

/////

12

JCF36904    STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

The court finds that Miller is a properly qualified expert on color tests based upon his degree in chemistry. The court however finds that Miller is not a qualified expert in making an identification of an illegal controlled substance (seized drug) due to him not ever having engaged in identifying such other than supervising the quality control of the NIK test manufacturing process. The court notes that Miller has never worked as a criminalist in a crime laboratory. Miller demonstrated his lack of knowledge of seized drug chemistry when he testified that the Scientific Working Group for Drug (SWIGDRUG) was started by the Federal bureau of Investigation (FBI) when the record herein shows that the group was started and is administered by the Drug Enforcement Administration (DEA).[3] As a product manager Miller overseas the manufacturing and product training for Safariland. The NIK color test kits, also known as colorimetric tests, are marketed for use as an in the field test to aid law enforcement officers in making an arrest decision. Safariland does not train police officers on the color tests chemistry because it is not within the law enforcement officer's purview of what they are doing, they are required to follow directions and look for a specific color change, only if it happens or if it does not. Why the color change occurs is not knowledge they need to know, according to Miller.

Miller explained the reasons for a color change, noting that the kits are set up to find classes of chemicals, and are labeled based on the chemical family to which the specific drug belongs, with the idea being that based on the circumstances of the discovery of the substance to be tested, the law enforcement personnel already have an idea of what they think the drug is.  Miller testified that it is possible for a test to come up presumptively positive for a substance that is not an illegal drug but belonged to the same chemical family as an illegal drug.  Miller testified that the tests are marketed as presumptive identification tests, as not being able to actually identify a controlled substance, and that the actual existence of an illegal drug must always be confirmed in a laboratory. For example it does not identify cocaine, the test just tells you that it has the components of cocaine.  The NIK colorimetric

---

[3] See Exhibit 49, Letter by Scott R. Olton, Secretariat an Chair, Drug Enforcement Administration, Washington, D.C.

13

STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

Attachment
Page 13 of 36

tests should be the last item to be checked off the probable cause list, not the first, second, or even third. Miller also stated there are plenty of instances that can be found where colorimetric tests were used to wrongly detain a suspect only to have the compound or substance test negative in the laboratory. According to Miller the Safariland field tests are manufactured as presumptive for the determination of probable cause to effect confiscation and/or arrest or a detainment. Safariland maintains a list of 50 to 60 non-illicit substances that, based on NIK test user customer information, have yielded presumptive positive for controlled substance results using the NIK type colorimetric tests.

Allison Baca was called by the People as an expert criminalist who is employed by the California Department of Justice (DOJ) As a DOJ criminalist Baca is experienced in doing confirmatory testing for suspected controlled substances. Her DOJ laboratory in Riverside is accredited.

The court found Ms. Baca's testimony to be entirely credible.

Ms. Baca works in the DOJ laboratory in Riverside where she receives and processes evidence from all different police agencies. She was the criminalist that processed the evidence in the *Chacon* case. The prosecution asked Ms. Baca whether she could tell by observation as to what she was looking at when she first opened the envelope relating to the *Chacon* case. Ms. Baca responded she does not guess on what something is by what it looks like. Ms. Baca explained that the procedure in her DOJ lab is to first weigh the substance and then take a small sample to do a presumptive color screen. Baca defined a "presumptive color screen" (also sometimes referred to in laboratories as a "spot test") as just a test that she runs on a sample using a combination of reagents that may possibly produce a color change that can indicate what type of drug it possibly could be, like what family of drugs it could possibly be. The color screen test she used in the *Chacon* case was the Marquis reagent which is usually the color-screening test that she starts with just because it covers a wide variety of possible controlled substances. Ms. Baca described the results of the Marquis Color screen as "purple" and that purple is "indicative of an opiate". She also described the reporting of results of any color test as "very subjective" and it is DOJ protocol to always

14

STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

document exactly what is observed. So, if the color reaction observed is yellow-green, a DOJ analyst would not just record that as "green" and if it was a faint purple, it would be recorded exactly as that, not just "purple."

Ms. Baca indicated in her training at DOJ she is made aware that there are substances other than controlled substances that will turn a color test screen similar to that of a controlled substance. The DOJ has list of some of these items in a training binder in the lab but it is not an exhaustive list because there are millions of compounds. After concluding the color screen, the next step is to prepare a sample for a confirmatory analysis on a gas chromatograph mass spectrometer (GC/MS). A sample is prepared for a GC/MS by placing the substance in a solution that reduces it to liquid form which is called an extraction. The extracted solution is then injected into a GC/MS instrument where it is analyzed. Ms. Baca defined a confirmatory test one that gives a complete result. It gives an exact result that it is this and no other, a complete structural analysis done on that piece of evidence, a result enabling a forensic chemist to make an identification of an illegal drug. Ms. Baca stated that without a confirmatory test result you cannot identify an unknown suspected drug.

Ms. Baca explained the color screen testing is only for the extraction process to determine the most efficient method for extracting the sample to put in the GC/MS. If the laboratory did not use a color screen test or if all of the color screen tests showed no color result, a GC/MS could still be completed but it would just involve more extractions. For her and the DOJ laboratory the color screen does not contribute in any way to the confirmatory answer of if a controlled substance is present in a sample. The color test essentially tells the criminalist what to do next as far as the analytical scheme. Color tests are never used to make any type of an identification of a specific drug. Baca also explained that all DOJ criminalist's work is reviewed by two peer reviewers.

Ms. Baca understands the concept of a "false positive". As to color tests the DOJ does not use the term "false positive" or "presumptive false positive" because they do not consider a color test to be either positive or negative. When recording the result of a color test, they write the color, not positive or negative, because they never make a determination based

15

JCF36904                    STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

upon the color spot test. Ms. Baca said the use of the term "false positive," is not a proper scientific conclusion with color tests. Baca is familiar with scientific standards and protocols to test for seized drugs. She agreed with the scientific bases of the SWIGDRUG guidelines [Exhibit 49] and the consensus standard published by the ASTM ("ASTM") International E-30 Committee on Forensic Science – E2329-14 "*Standard Practice for Identification of Seized Drugs.*" [Exhibit 48] Although her laboratory uses a different standard (ISO 17025[4]) she agrees with the SWIGDRUG and ASTM E2329-14 minimum standards for making drug identification decisions.

Ms. Baca conducted the testing on suspected heroin that was collected and tested positive as heroin from Correctional Officer Jose Espinoza using the NIK test. She conducted several color screens on the substance and noted that there was no color change on any of them. [Exhibit 59] Ms. Baca also took a photograph of the evidence. [Exhibit 60] After completing the GC/MS, the conclusion was that the suspected heroin was identified as being caffeine. [Exhibit 58]

The people called expert witness Dr. Hanoz Santoke a professor at California State Bakersfield in the department of chemistry. Although not an expert in testing controlled substances Dr. Santoke is a qualified expert in colorimetric tests of the type used in the NIK kit. The court found Dr. Santoke to be, within the scope of his academic experience a credible expert witness.

Dr. Santoke testified that colorimetric tests are "preliminary" because they are a first indication, not definitive, so you have to be followed up with more accurate tests. It was Dr. Santoke's expert opinion that he would not base a decision solely on a colorimetric spot test. Dr. Santoke testified, consistently with the other experts, that a "false positive" is possible when someone is testing for a particular compound, because the test is for "functional groups" which could also occur in other compounds, which would produce the exact same

---

[4]ISO 17025 is a Forensic Scientific standard promulgated by the International Organization for Standardization ("ISO"). Standard 17025 specifies the general requirements for the competence to carry out tests and/or calibrations, including sampling. It covers testing and calibration performed using standard methods, non-standard methods, and laboratory-developed methods.

16

color change, and that it would not be used to determine a substance is a controlled substance because of the false positive potential, but is useful as a preliminary indicator. Dr. Santoke testified that the exact amount of reagent is not significant when you are doing a qualitative analysis, as to whether the substance is there, as opposed to a quantitative analysis regarding the amount of a substance. It was Dr. Santoke's opinion that the NIK test has not gone through any validation studies, hence there would be no error rate known. Dr. Santoke does believe it has errors. According to Dr. Santoke "scientific reliability" depends on the intended application. If it's 99 percent, then it does not meet that standard, referring to spot tests in general. Dr. Santoke further testified that "presumptive positive" as used by the chemist, product manager Terry Miller from the Safariland Corporation, with whom he spoke about the NIK tests, is not a scientific term that all positive results would properly be submitted to a laboratory for confirmation, and that NIK tests are not a confirmation of a controlled substance.

A scientifically reliable analytical testing technique should ideally have a high probability of a "true" result, and minimize the probability of a false positive. The NIK field color tests are not specific as they fail in discriminating between controlled substances and other compounds. As with all color testing that are used for drug identification, it is not uncommon for there to be a false positive. Limitations with color tests including: (1) they are not specific tests, (2) the possibility of using of too much sample, thereby overwhelming the chemical reagent, and (3) contribution to the color change from other components within in the sample. Opium, "black tar" heroin, and samples containing dyes can produce problematical color test results. (Lerner, *New Color Test for Heroin,* (February 1960) Analytical Chemistry, vol.32, no. 2, 198).

The court has been unable to find any California case that discusses the sufficiency of the use of the "NIK" or similar color tests as used in this case. *People v. Bautista* (2014) 223 Cal.App.4[th] 1096 involved the use of the Valtox color test, which is similar to the NIK heroin test used in the instant case, by an officer on a substance suspected to be heroin. However, /////

17

that case involved analysis as to whether the substance in question was held for personal use, as opposed to sale, and a qualified expert testified at the preliminary hearing.

The U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, in its publication "Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse NIJ Standard–0604.01" (2000) includes in its list of "requirements" item 4.1.4 General, which provides:

    a) A statement that the kit is intended to be used for presumptive identification purposes only, and that all substances tested should be subjected to more definitive examination by qualified scientists in a properly equipped crime laboratory.

    b) A statement that users of the kit should receive appropriate training in its use and should be taught that the reagents can give false-positive as well as false-negative results.

    c) A discussion of the possibility of reagent and/or sample contamination and consequent misleading results.

    d) A discussion of proper kit storage in buildings and vehicles.

If there is no California legal authority that has approved of a scientific test method the court may to look to precedent from other jurisdictions for guidance in determining whether the theoretical or technical methodology underlying an analytical technique is accepted as scientifically reliable. With un-established techniques the court may look to indices of reliability, to determine whether the expert's proffered scientific or technical method is sufficiently reliable. Several jurisdictions have looked at color tests of the nature used in the consolidated cases being litigated herein. In *State v. Carter*, 765 S.E.2d 56 (2014) the North Carolina Court of Appeals found that a trial court abused its discretion by admitting an officer's testimony that narcotics indicator field test kits ("NIK" tests) indicated the presence of cocaine on various items. *Carter* cited the case of *State v. Ward*, 364 N.C. 133, 142, 694 S.E.2d 738, 744 (2010) which held that "expert witness testimony required to establish that the substances introduced . . . are in fact controlled substances must be based on a scientifically valid chemical analysis" (Id.) In *Carter*, a sheriff's deputy tested for the presence of cocaine on various items in a residence using a NIK test. As in the instant cases involving the defendants herein, the CDCR officers did not introduce evidence about what the color

18

change was or how the color change chemical analysis worked or any testimony about the test's reliability apart from personal experience with the NIK kits.

In *State v. Morales*, 45 P.3d 406, 411 (N.M.App. 2002) the court held that the State has the burden of establishing the reliability of the drug field test and the validity of the underlying principles upon which it is based. In *Morales*, like the instant case with the CDCR officers, the deputies did not know or explain the chemical features of the field test or how it produced a certain color that identified the substance as heroin.  No evidence was presented as to the level of reliability of the field test. The *Morales* court therefore held the results of the test were inadmissible.

In *State v. Hagberg*, 703 N.E.2d 973, 976 (Ill. App. 1998) the court held that a field test, without more, is insufficient to prove beyond a reasonable doubt that substance tested is a controlled substance. "[B]y their very nature, [field tests] lack the reliability necessary to make their results proof beyond a reasonable doubt absent sufficient foundational evidence establishing their reliability beyond something more than the probable presence of a narcotic".

*Smith v. State*, 874 S.W.2d 720, 721 (Tex. App. 1994) held that testimony about the performance and results of a field test must be given by an expert. In *Meister v. State*, 864 N.E.2d 1137 (Ind. Ct. App. 2007) the court found a field test admissible under Rule 702 where the officer testified:  (1) he had been trained to administer the field test; (2) he followed the proper procedures for the test; (3) how the field test worked . . . ; and (4) that the field test was used routinely by the Sheriff's Department.

Similar testimony was presented to the Grand Jury by Correctional Officers in this case. No case has been found by the court that actually explores or evaluates what illegal drug identification color test do, how they work, there validation, the error rate or there scientific reliability. There is no evidence in the Grand Jury records as to the reliability of the NIK color test.

/////

/////

JCF36904            STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

**SARGON**

Defendants' motions to dismiss the indictment because of faulty scientific evidence testimony in this case involves the "interplay" between the California Supreme Court's decision in *Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th 747, and a defendant's constitutional right to a lawful probable cause determination by a Grand Jury. In *Sargon*, the Supreme Court held that trial courts have a gatekeeper role on the question of the admissibility of expert witness testimony. The Supreme Court identified the statutory bases for the trial court's gatekeeper function as Evidence Code sections 801 and 802, which provide that an expert's testimony must be based on matter "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . ." Thus *Sargon* operates as a paradigm for a trial court's exercise of discretion regarding admission of expert opinion testimony. It holds: "Under California law, trial courts have a substantial 'gate keeping' responsibility." (*Id.*, at p. 769.)

Evidence Code section 802 provides: "A witness testifying in the form of an opinion may state ... the reasons for his opinion and the matter ... upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. *Sargon* also states speculative testimony should be excluded. (*Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th 747, 770.)

While Evidence Code section 801 tests the acceptability of the type of matter the expert relies upon, section 802 tests the expert's reasoning from the data to support his/her opinion (*Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th 747, 771). This means trial courts are obligated to critically evaluate any challenged expertise to determine if it meets the *Sargon* evidentiary standards for admission.

Does the *Sargon* expert witness opinion gatekeeper standard apply to a court reviewing the sufficiency of evidence of a Grand Jury record? The People argue it does not while the defendants argue that it does.

Recently the Fourth District Court of Appeal addressed the question of the applicability of *Sargon* to the use of expert opinion evidence in the context of a pre-trial Class Certification

20

STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

decision being made by a trial court. (*Apple Inc. v. Superior Court* (2018) 19 Cal, App.5th 1101 ("*Apple*").) The court in *Apple* held that a trial court may consider only admissible expert opinion evidence in deciding class certification. Although *Sargon* involved expert opinion evidence presented at trial, the Supreme Court's discussion was not so limited. The *Apple* court held:

> *Sargon* interpreted the relevant provisions of the Evidence Code. Its interpretation therefore applies wherever the Evidence Code does. For example, courts have applied Sargon to declarations submitted in connection with motions for summary judgment and summary adjudication. (See, e.g., *Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 156; *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 253.)

Therefore there is no reason why *Sargon* should not apply with its full force and effect in the review of a Grand Jury indictment through a Penal Code section 995 or non-statutory motion to dismiss. This court must apply the evidence code standard for admissibility of any expert opinion evidence, and *Sargon* describes that standard. All trial courts are bound to adhere to the *Sargon* and *Apple* decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Even if this court were we free to disregard *Sargon* (as the People argue), this court concludes that its standards for admissibility must apply to protect the defendants' due process rights to a fair Grand Jury probable cause determination.

Although a Penal Code section 995 motion is a pretrial motion and not a determination on the merits, it has consequences for the litigation and the due process rights of the parties. Grand Jury indictments based on unfounded scientific and therefore improper expert opinion testimony should be not be permitted. The trial court's gatekeeping role required by *Sargon* serves a purpose in each of these consolidated cases.

Applying the *Sargon* standard in a Penal Code section 995 review of probable cause is a limited scope of inquiry, when compared with an inquiry at trial. Opposing this conclusion, the People object to a hearing claiming that applying *Sargon* would require the trial court to hold evidentiary hearings under Evidence Code section 802 for every expert who provides evidence at a Grand Jury proceeding. The People seem interpret *Sargon* primarily as describing the "process" for admitting expert evidence at trial, which the People assert then

21

STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

and only then requires a hearing under Evidence Code sections 801 and 802 hearing. This court disagrees. *Sargon's* discussion of admissibility is a requirement, and nothing in the Supreme Court opinion directs holding a hearing for every expert, at trial or otherwise. Whether to hold a hearing is in the trial court's discretion. *Sargon's* substance is to ensure that expert opinion evidence is reasonable, reliable, and logical. The court concludes that *Sargon* applies to the admissibility of the NIK modified Mecke "L" color tests for heroin that was proffered as evidence to the Grand Jury in each of the consolidated defendant's cases.

### *KELLY-FRY*

A significant issue being raised with the disputed NIK color test for heroin drug identification evidence is an objection under the standard of *People v. Kelly, supra*, 17 Cal.3d 24. The defendants argue that the NIK modified Mecke "L" heroin test Grand Jury evidence was not admissible because the scientific method employed is not generally accepted in the scientific community. The People contend that *Kelly* does not apply to Grand Jury proceedings.

At a trial the admissibility of the NIK heroin color field test would depend on whether it was derived from a method that is generally accepted to be reliable. To make this determination, a trial court would apply the standard set forth in *Kelly*.[5] The *Kelly* standard has three "prongs": (1) It must be established, usually by expert testimony, that the scientific methods utilized are generally accepted as reliable by the relevant scientific community, (2) The witness furnishing such testimony must be properly qualified as an expert to give an opinion on the subject, and 3) the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. (*Id.*, at p. 30.)

/////

/////

---

[5]In *Kelly*, the California Supreme Court adopted a test for the admissibility of scientific evidence that was first articulated in *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013. Hence, the test has long been known as the *Kelly-Frye* rule. In 1993, the United States Supreme Court held that *Frye* had been superseded by the Federal Rules of Evidence, so *Frye* is no longer the rule in federal courts. *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 113 S.Ct. 2786 (1993). Nevertheless, *Kelly* remains the law in California. (*People v. Venegas, supra*, 18 Cal 4th 47, at p.76 n.30)

JCF36904          STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

Attachment
Page 22 of 36

Important for the litigation of the NIK "L" color test in the instant case is *People v. Venegas, supra,* 18 Cal.4th 47 ("*Venegas*"), where the California Supreme Court clarified, at page 78, that

> The *Kelly* test's third prong does not apply the *Frye* requirement of general acceptance--it assumes the methodology and technique in question has already met that requirement. Instead, it inquiries into the matter of whether the procedures *actually utilized in the case* were in compliance with that methodology and technique, as generally accepted by the scientific community. The third prong inquiry is thus case specific; 'it cannot be satisfied by relying on a published appellate decision. (Citations omitted, emphasis theirs.)[6]

Nevertheless, as *Venegas* requires the court herein, "(I)n determining the question of general acceptance, courts must consider the quality, as well as quantity, of the evidence supporting *or opposing* a new scientific technique." (*Id.*, at p. 85) *Venegas* requires the trial court's role in the inquiry not to be one of abdication to the scientists.  The point being is that the court's role in the inquiry is not passive acceptance. *Kelly* requires that each step of a NIK testing procedure be generally accepted as reliable by the scientific community.

## RULING

In reaching its decisions in this case the court has not considered the case of *People v. Rios*, Superior Court of California, County of Imperial case number JCF35453. The Rios case is not a published opinion and does not involve a commonality of parties that would make it relevant to the instant case.  The court expresses a serious concern that a decision by any counsel to cite the decision, relate the facts of or result of a case that does not appear in the Official Reports and does not involve the exact same parties could be viewed as a violation of California Rules of Court rule 8.1115, and, concomitantly, of California Rules of Professional Conduct rule 5-200.

The legal burden of proof and persuasion applicable to a case presented to a Grand Jury pertains to a level of subjective confidence that is reasonably based on the evidence.

/////

---

[6]When evaluating whether a new scientific technique is generally accepted, the Court may take judicial notice of transcripts of scientific testimony in previous hearings. (Cal.Evid.Code, § 452(d).)  The Court may also consider scientific and legal articles and judicial opinions from other jurisdictions. (*People v. Brown* (1985) 40 Cal.3d 512, 530; *People v. Smith* (1989) 215 Cal.App.3d 19, 25.) The parties have provided numerous such publications that have all been marked and for the most part been admitted into evidence.

JCF36904                    STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

Attachment
Page 23 of 36

In *Santosky v. Kramer*, 455 U.S. 745 (1982), the Supreme Court, citing earlier cases, observed that:

> The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.

Although the burden of proof before a Grand Jury to sustain an indictment is relatively low, the defendants nonetheless have an important due process right that the Grand Jury process complies with statutory and constitutional legal requirements.

## *SARGON*

The court, in compliance with its gatekeeping role under *Sargon*, is required to exclude invalid and unreliable expert opinion. In short, the gatekeeper's role is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. The NIK colorimetric test or any similar color test does not meet the admissibility requirements of *Sargon*. The People argue that the NIK tests, that were testified to by Correctional Officers as positive for heroin are a valid "presumptive test". In fact the NIK test is not presumptive in nature because it identifies other compounds other than controlled substances. The training received by CDCR Officers was evidenced in detail in the instant hearing. The marketing by Safariland that suggests that the NIK "modified Mecke L" color test for heroin is presumptive is incorrect. The full name of the test itself, "Narcotics Identification Kit" ("NIK") is misleading because it uses the word "Identification".

The term "presumptive," although very frequently used in the American legal system is scientifically a dubious term. Some forensic scientists argue that there is really no such thing as a "presumptive" test. When the forensic science community uses the term "presumptive," it usually means that a test method has high sensitivity but low specificity. "Presumptive" also suggests that the test method is designed to be used as a preliminary screening tool, usually not in a laboratory.

/////

24

STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

Attachment
Page 24 of 36

The term "confirmatory" is used to describe a scientific test method that has high specificity. It suggests that the test method is used in a forensic laboratory setting by a criminalist were the test method has been validated for use and determined to be fit for purpose. An unfortunate consequence of the use of the term "presumptive" in the legal system and in this case in particular is that its use created a false sense that an identification of a seized drug was made and that it was valid and accepted in the forensic science discipline of forensic chemistry; it's not.

Accuracy can only be demonstrated thorough validation studies for any test method used for making a drug Identification. A valid qualitative identification method should clearly describe its sensitivity and specificity. Words like "sensitivity" and "specificity" are better able to describe the performance of a scientific test method. These terms provide an accurate description about the accuracy of conclusions in terms of Type I Errors (False Positive) and Type II Errors (False Negative) and allows for an evaluation of the uncertainty that comes with any scientific measurement.

Although the chemical reagents used in the color testing process by Safariland have been in use within the field of general chemistry for hundreds of years for a variety of purposes they were not developed or designed to identify any controlled substance. The experts who testified in the hearing all agreed that colorimetric tests in general are not specific for a controlled substance.

Testimony presented at the hearing of this motion shows that the test does not work as marketed by Safariland or that it has ever been validated for use specifically in identifying the chemical compound structure of heroin. Exhibit 75, a chapter from *Clarke's Analysis of Drugs and Poisons,*[7] *Fourth Edition,* Chapter 30 at page 471: Colour Tests states:

> Colours exhibited by these tests cannot be described with any accuracy. They may vary in intensity or tincture with the concentration of compounds in the test samples and the presence of extraneous material. In addition, their assessment is always a subjective one, even in people with normal colour vision. Some of the complexes formed are unstable such that the colour changes or fades with time.

---

[7] *Clarke's Analysis of Drugs and Poisons* is considered an authoritative reference in the field of Drug Chemistry.

25

Attachment

Page 25 of 36

> For some of the tests, the colour reactions can be correlated with certain aspects of the chemical structure of a compound or group of compounds. However, anomalous responses often occur that cannot be explained on that basis…

The NIK color drug field test kits, specifically the "Modified Mecke L" test for heroin, does not comply with any recognized standard for drug identification nor is it part of an analytical scheme that is a validated test method. All scientific tests should, to comply with the requirements of *Sargon*, incorporate methods that are validated or verified to demonstrate that they perform reliably in the operational environment used and are done by individuals who are qualified to use the test method in casework. In order for the NIK heroin test to be *Sargon* admissible it would have to be demonstrated to be valid and reliable. Reliability, scientifically and statistical would require consistency of results as demonstrated by reproducibility or repeatability. Evidentiary or legal reliability implies credibility and trustworthiness of proffered evidence. The NIK test satisfies neither definition of reliability.

The NIK test has not been validated. Validation is a process of evaluating a system or component, through objective evidence, to determine that requirements for an intended use or application have been fulfilled. According to the peer reviewed publications admitted into evidence and the expert testimony presented at the hearing colorimetric field tests such as the one used in this case has never been subject to scientific peer review. Peer review would require a competent independent party's evaluation of a work product to evaluate the methods, claims, and conclusions before dissemination in a scientific or academic publication.

The only testing that Safariland does with its NIK color test kit products is against known, pure controlled substances. Safariland has never conducted testing with any of its kits actual tests with real world drug samples under conditions that actually exist. Testing of actual samples as encountered in the field is needed to determine an error rate. Known sample testing of pure controlled substances against the reagents is a quality control measure. Safariland's product manager Alan Miller testified that Safariland's testing does not replicate testing in the field with variables such as testing samples with adulterants or cutting

26

JCF36904    STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

agents that are commonly in controlled substances. Safariland has not conducted any controlled validation study with regard to its color testing products.

Multiple examples have been evidenced to the court that the NIK colorimetric test will identify non-controlled substances. For example, with the NIK colorimetric test used for identifying methamphetamine the master trainer will use the sugar substitute "equal" to simulate methamphetamine as it mimics the same exact color change as the one that occurs with the illicit substance. [Exhibit 102]

It is clear from the Grand Jury records put into evidence that the People regularly seek and obtain Grand Jury indictments relying on NIK testing even though the manufacturer states the tests are not evidentiary and that a confirmatory test should always be done. When confirmatory testing is done by the Department of Justice some Grand Jury charged cases there turns out to be no controlled substances. One of the many examples of the NIK testing errors was a case were heroin was identified using a NIK colorimetric test and a second Valtox colorimetric test. The substance was determined to be chocolate. So, if one were to accept the logic proffered by the People that the NIK heroin test is presumptive for heroin it would also be true that it is a presumptive test for chocolate. Likewise, if the NIK colorimetric test for methamphetamine is presumptive the same colorimetric test would also be a presumptive test for "equal", the sugar substitute.

The NIK Color test for heroin does not meet any recognized forensic scientific standard. Criminalist Allison Baca, from the California Department of Justice (DOJ), whose laboratory follows a recognized scientific standard protocol, ISO 17025, does not recognize color testing as valid for any use other than assisting the drug laboratory chemist in evaluating a drug sample for more definitive testing done by a GC/MS method. A recognized standard practice for doing seized drug testing, ASTM Designation E2329-14: *Standard Practice for Identification of Seized Drugs* [Exhibit 48] has incorporated the recommendations from the DEA sponsored Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG). [Exhibit 49] These standards describe minimum test criteria for the qualitative analysis (identification) of seized drugs.

27

JCF36904    STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

Ms.Baca, as the Peoples expert criminalist from the DOJ, acknowledged SWGDRUG as a reputable scientific group that produces credible forensic science. She also explained that SWGDRUG was a "minimum standard" and emphasized that her laboratory has even higher standards. ASTM E2329-14 Standard 4.2 Practice for Identification of Seized Drugs, section 4.2 [Exhibit 48] states: "Correct identification of a drug or chemical depends on the use of an analytical scheme based on validated methods." The NIK color testing methods fall far short of meeting minimum scientifically acceptable criteria.

The People contend that the Safariland NIK color test at issue is validated as explained and demonstrated in a scientific publication. In a peer reviewed article, O'Neala, et. al., *Validation of twelve chemical spot tests for the detection of drugs of abuse,* Forensic Science International 109 (2000) 189–201, [Exhibit 47A] color spot tests were evaluated and reported upon. In this peer reviewed publication validation procedures were described for 12 separate chemical spot tests, using similar reagents as the NIK test kits that are used within a crime laboratory. Each laboratory had done validation on their methods and procedures for color testing, including specificity and the limits of detection of each color spot test utilized. Each of the 12 chemical spot tests the final colors resulting from positive reactions with known amounts of analytes (controlled substances) were compared to two reference color charts used for the identification of unknown drugs. The centroid color charts, were published by the Inter-Society Color Council and the National Bureau of Standards. These laboratory based chemical spot tests were found to be sensitive depending on the drug (analyte) being tested. The color test procedures for conducting the chemical spot tests included using porcelain plates with wells, glass culture tubes using a known control and a negative control. The article notes that the validated chemical spot tests were described as presumptive and provided information that would allow the analyst to select the appropriate testing procedure to confirm the result.

Unlike the peer reviewed study described, in the NIK color testing method used by CDCR, the color change was matched to the pouch that it was tested in or a chart provided by Safariland. No controls, positive or negative are used in NIK colorimetric testing. Allison

28

Attachment
Page 28 of 36

Baca testified that her DOJ laboratory would not do any type of test without a negative and positive control. The Study does not support the People's view that the NIK testing system was found to be scientifically reliable. A careful review of spot test study actually contradicts the validity of NIK color testing.

### KELLY-FRY

The defendants contend that allowing the NIK "Modified Mecke L" color test result for heroin to be evidenced before the Grand Jury because was erroneous because the People have failed to satisfy the *Kelly* three-prong test for admission of the NIK test scientific results. Under the *Kelly* analysis, the first prong of *Kelly* requires proof that the technique is generally accepted as reliable in the relevant scientific community. The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. The third prong requires proof that the person performing the test in the particular case used correct scientific procedures. (*People v. Bolden* (2002) 29 Cal.4th 515, 544–545; *People v. Lucas* (2014) 60 Cal.4th 153, 244.)

Hanoz Santoke, Ph.D., the People's retained expert testified that he became familiar with the NIK tests by doing internet research and through discussions with Alan Miller, the product manager from the Safariland Corporation. Dr. Santoke found the NIK tests to be scientifically valid in his opinion, because the chemistry behind the tests is well understood and the reaction that takes place can be predicted. The chemistry according to Dr. Santoke has been studied, as long as you understand the limitations of the test, "I think that they are valid tests".

There was no evidence, by way of opinion or otherwise, that the relevant scientific community would agree that NIK color testing as use in this case by CDCR is scientifically acceptable for making a determination that a substance is a controlled substance. The People have failed in their burden to satisfy the *Kelly* standard because the People's retained expert, who apparently was not knowledgeable about the relevant scientific community, did not qualify or attempt to testify as an expert about the general acceptance of the NIK test within the relevant scientific community, Dr. Santoke did not offer any opinion on the subject.

29

Over all the evidence presented before the court throughout the hearing suggests that colorimetric tests are not accepted by the relevant scientific community as reliable scientific method to identify an illegal drug, presumptive or otherwise. The weight of evidence presented is that colorimetric testing is sometimes unreliable. At best color tests are an indication that an illegal drug may be present that would inform a chemist to proceed and do additional testing. The limits of the NIK color testing is well known to the manufacturer. Exhibit 72 was admitted into evidence and was described as a correspondence from an agent of Safariland wherein the limits of the NIK color testing products were described:

> The Safariland Group's training materials, instructions and labeling for its field test kits clearly state that the tests are presumptive aids, to be used only as a piece of information in helping an officer to determine if probably cause exists. False positives are possible in field tests due to the limitations of the science, which is why we also clearly state in our training materials and instructions that they are not a substitute for laboratory testing. Importantly, field tests are specifically not intended to be used as a factor in the decision to prosecute or convict a suspect, and our training materials and instructions make it clear that every test kit, whether positive or negative, should be confirmed by an independent laboratory.

> The implication that our testing equipment could give rise to reasonable doubt in criminal cases ignores the fact that these tests are not dispositive, are presumptive in nature and should be used only in the field. In a trial or other criminal procedure setting, field tests should not be used as evidence of the presence, or lack thereof, of any substance.

The goal of the *Kelly* decision requiring general acceptance standard was to "forestall the jury's uncritical acceptance of scientific evidence or technology that is as foreign to everyday experience as to be unusually difficult for lay persons to evaluate." (18 Cal.4th at p.80) It was felt that such scientific evidence would be overvalued by the jury due to an "aura of infallibility" that goes with scientific evidence. (*In re Amber B.* (1987) 191 Cal.App.3d 682, 690-91) With traditional jury trials there was a further concern that efforts to challenge controversial scientific evidence through cross-examination and expert testimony would consume inordinate amounts of time and raise issues outside of the abilities of average juror. Time would not be a concern with a Grand Jury; however, the danger of an "aura of infallibility" arises with even greater force and effect when scientific evidence is presented before a Grand Jury that will listen to it without the benefit of the expert witness being cross

30

JCF36904                STATEMENT OF DECISION AND ORDER [PEN. CODE §995]

examined. The aura of infallibility goes unchecked as it did in the Grand Jury determinations in each of the consolidated cases. In fact, color drug identification testing by its inherent design is quite fallible, when a critical analysis and understanding of the reliability of the technique is understood.

Therefore, the Grand Jury finding on possession of heroin must be reversed based on a failure of proof of general scientific acceptance of the NIK modified Mecke "L" test for heroin as required by *People v. Kelly* (1976) 17 Cal.3d 24. The People have failed to prove any of the *Kelly's* three prongs as required.

**INADMISSABLE HEARSAY**

In each of the consolidated cases, Correctional Officers gave expert witness testimony to the Grand Juries that the substances recovered were identified as heroin. The basis of this expert testimony was the written material published by Safariland and provided with its NIK test kits. The colorimetric tests required an observation of a color change when a portion of the suspected seized drug was placed in the sample pouch. The Correctional Officers were not, by their own admission, qualified as expert witnesses in drug identification. According to the testimony given at the evidentiary hearing the Correctional Officers are trained by materials provided exclusively by Safariland to observe whether there is or is not a color change and then follow the written directions given in the NIK kit manufacture and interpret the result. The "IDENTIDRUG™CHART" [Exhibit 3] contains detailed instructions for the use of the test and explains how make a controlled substance drug identification. Specifically, the instructions on use for the Mecke test "L" for heroin, state: "Modified MECKE's reagent-a test for heroin, including white, brown and black tar, and MDMA (ecstasy), as well as certain dye combinations designed to give false positive with test A." The instruction for use, in the column interpreting a "POSITIVE RESULTS" states as follows, "A purple color after breaking the first ampoule indicates Ecstasy (MDMA). A green color after breaking the second ampoule that intensifies with prolonged agitation indicates Heroin."

Essentially, what the Correctional Officers are doing is viewing a color change, referencing the instructions, and reporting a test result consistent with what is written by

31

Attachment
Page 31 of 36

Safariland. The Correctional Officers, not being experts, are simply relating hearsay information provided by the manufacture to the trier of fact, which in this case is the Grand Jury. In some instances, the Correctional Officers testify that they look at the color on the outside of the NIK pouch and compare that to what is inside the pouch. On the outside of the NIK "Test L" pouch is a green colored box and beside it says it says "Heroin". The word "Heroin" is a hearsay statement printed by the Safariland manufacturer. (Samples of the actual NIK color testing pouches, including color test kit "L", the modified Mecke for heroin, were admitted into evidence, [Exhibit 2])

In the case of *People v. Stamps* (2016) 3 Cal.App.5th 988 the defendant was pulled over by police because her car did not display a license plate. Her car was searched, and suspected drugs were discovered. Stamps was convicted of multiple drug possession offenses. At trial the prosecution called an expert witness who identified pills found in the defendant's possession by comparing them to pills pictured on a website called "Ident-A-Drug." In reversing the multiple convictions for drug possession, the Court found that there was no hearsay exception that permitted such evidence. It further noted the recent case of *People v. Sanchez* (2016) 63 Cal.4th 665, in which the California Supreme Court limited what hearsay may be conveyed to the jury as a basis for an expert's opinion. The court of appeal reversed in *Stamps* finding that the trial court improperly admitted the testimony of an expert criminalist who identified the drugs in pill form as controlled substances (oxycodone and dihydrocodeineone) solely by comparing their appearance to pills pictured on a Web site called "Ident-A-Drug." The expert's testimony was based solely on unreliable and inadmissible hearsay from a Web site and did not involve the use of the witness's expertise.

What happened before the Grand Jury in each of the consolidated cases is that a non-expert Correctional Officer, testified as an expert, who referred to the Safariland "IDENTIDRUG™CHART" or NIK test pouch and conveyed a drug identification opinion based upon the hearsay provided by the manufacturer of the NIK kit. This testimony was inadmissible hearsay. Because the NIK color test kit does not meet a scientific admissibility

/////

32

standard on its own and is therefore not independently admissible, it does not support the Grand Jury indictment.

### *BRADY* ERROR

When the NIK color tests are testified to by Correctional Officers the Grand Jurors are usually told that that although the test could yield a false positive, the testifying witness has never experienced one. Officer Gonzalez, testified that he knew what a false positive is, but had never had it in his experience. He further testified to the Grand Jury that a "False Positive was "when you get mixed readings when you conduct a test. It's not clear", and there was no false positive in this case.

Officer Michael Ramirez testified that he was a Lieutenant at Centinela State Prison for 24 years, he qualified as Master Trainer for the NIK test which is a presumptive test for the presence of any particular drug, and the California Department of Justice (DOJ) performs the confirmatory test. He testified he is not a chemist and that is why he only performs presumptive tests. He estimated he had performed over 100 NIK tests, described the NIK test procedure, and testified he had never had a "false positive".

A false positive is a test result that states that an analyte (suspected seized drug) is present, when, in fact, it is not present or, is present in an amount less than a threshold or designated cut-off concentration. Correctional Officers do not understand what a false positive is and therefore incorrectly testified before the Grand Jury. The Correctional Officer testimony was consistent with other Correctional Officers' testimony in the Grand Jury proceedings that were lodged as exhibits. In each case the Correctional Officer did not understand what a false positive was. The officers' Safariland education and training from Safariland seems to be deficient.

A prosecutor is duty bound to turn over exculpatory evidence within his or her possession. *Brady v. Maryland* (1963) 373 U.S. 83, 87 says: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad

33

faith of the prosecution." Prosecutors are responsible not only for what they know and what they have in their files but also for all the files and records in the files of the "team" that works with the prosecutor including law enforcement agencies involved in investigating the case.

The Supreme Court has clearly held,

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, [citation]), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable. (*Kyles v. Whitley* (1995) 514 U.S. 419, 437–438.)

A leading California case explaining the reach of the Brady obligation is *In re Brown* (1998) 17 Cal.4th 873. Brown secured habeas corpus relief due to the nondisclosure of a portion of toxicology blood test results on his blood (a radioactive immunoassay). The test was positive for PCP (a fact the defense wanted to establish) whereas other results presented at trial (gas chromatography mass spectrometry [GC/MS]) were negative for PCP. (*Id.* at p. 877.) The California Supreme Court held that a crime laboratory assisting the District Attorney's office in prosecution of case was "part of the investigative 'team.'" Failure to provide the toxicology test result showing PCP in the blood was *Brady* error because it was relevant to the defendant's defense. As to the issue of the *Brady* team concept, *Brown* held,

> Courts have thus consistently 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel."' [Citation.] 'A contrary holding would enable the prosecutor "to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial," [citation].' [Citations.] (*Id.,* at page 879.)

"In *Brady*, the high court announced a rule, founded on the due process guarantee of the federal Constitution that requires the prosecution to disclose evidence that is favorable and 'material' to the defense." (*Ibid.*) The prosecution's failure to inform the Grand Jury of exculpatory evidence of which it is aware is grounds for dismissal if that failure results in substantial prejudice. (Penal Code section 939.71.) Although Penal Code section 939.71 does not define "exculpatory evidence," it expressly codifies the holding in *Johnson v Superior Court* (1975) 15 Cal.3d 248, which described such evidence as evidence that tends

34

to explain away the charges and as evidence that reasonably tends to negate guilt (*Cummiskey v Superior Court, supra,* 3 Cal.4th 1018, 1033.).

Since the adversary system does not extend to Grand Jury proceedings if the District Attorney does not bring exculpatory evidence to the attention of the Grand Jury, it is unlikely to learn of it. Therefore, when a District Attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the Grand Jury of its nature and existence, so that the Grand Jury may exercise its power under the statute to order the evidence (*Johnson v. Superior Court* (1975) 15 Cal.3d 248, 255.)

The prosecution was required to inform the Grand Jury of exculpatory evidence but failed to do so when Correctional Officers testified to incorrect definitions of a false positive. What Correctional Officers described is a failed or negative test result; when the NIK test is unable to render a clear answer, no result or a test result that is actually negative for a controlled substance.[8]

A false positive, on the other hand is when the NIK test indicates the substance is a controlled substance when it is fact not. Correctional Officers should not be allowed to testify that there was no false positive in any Grand Jury case because they don't know what it is. A *Brady* violation occurred when the People, who were aware of the many instances were true false positives have occurred using the NIK testing system, did not present that information to the Grand Jury. Essentially the Grand Jury was told a half truth, that a Correctional Officer has never had a false positive, yet the NIK colorimetric test used in fact can and does produce false positive results. This was well known to the prison investigators and the People. Half the truth is not the truth. *Brady* was violated.

It should be emphasized that the purpose of the hearings the court held in these matters was limited to the propriety of having the prosecution offer the chemical reagent test results as ultimate proof of the existence of a controlled substance into evidence for the purpose of obtaining an indictment in the context of a Grand Jury proceeding. The court

---

[8]  Correctional Officer Ricardo Estrada told the Grand Jury in the Oscar Martinez case that the NIK test was "positive for heroin". Also, that he knew what a false positive was, "when the substance is not – it doesn't come up positive or results of the test are not what you expected".

35

expresses no opinion whatsoever that these color tests would not have utility in the context of field testing for the purpose of determining whether or not to proceed with further investigation or an arrest decision, by law enforcement or Department of Corrections and Rehabilitation personnel. It is clear that such tests, when properly administered, have utility as a tool to rule in or out the existence of a controlled substance, along with other case specific facts for purposes of determining whether further investigatory action is appropriate.

## ORDER

In light of the foregoing, the court finds that as to each defendant in the consolidated cases there was insufficient legally admissible evidence before the Grand Jury to give it reasonable or probable cause to sustain the Indictment as to any count. Defendants' Penal Code section 995/non-statutory motions are therefore granted.

All Counts of each Grand Jury indictment as to each defendant are dismissed.

IT IS SO ORDERED.

Dated: April 24, 2018

CHRISTOPHER J. PLOURD
Judge of the Superior Court

JCF36904          STATEMENT OF DECISION AND ORDER [PEN. CODE §995]