*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

# EXHIBIT 1

## DECLARATION OF ERIC FORSYTH

Pursuant to 28 U.S.C. § 1746
Dated May 10, 2026

Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR

Billy F. Steffey, Self-Represented Petitioner
455 Capitol Mall, Suite 802
Sacramento, California 95814
Telephone: (916) 955-6332
Email: bsteffey@mac.com

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| BILLY F. STEFFEY, | ) | Case No. 3:19-cv-00093-JR |
| | ) | |
| Petitioner, | ) | DECLARATION OF ERIC FORSYTH |
| | ) | PURSUANT TO 28 U.S.C. § 1746 |
| v. | ) | IN SUPPORT OF PETITIONER'S |
| | ) | MOTION TO ALTER OR AMEND |
| WARDEN, FCI LOMPOC, | ) | JUDGMENT UNDER RULE 59(e) |
| | ) | |
| Respondent. | ) | The Honorable Michael H. Simon |
| | ) | |

### DECLARATION OF ERIC FORSYTH PURSUANT TO 28 U.S.C. § 1746

I, ERIC FORSYTH, declare under penalty of perjury under the laws of the United States of America that the following is true and correct based on my personal knowledge:

1. I am over the age of 18, am competent to make this Declaration, and have personal knowledge of the matters stated herein. If called as a witness, I could and would testify competently to each of them.

2. From approximately May 2015 through approximately late 2023, I was a federal inmate at the Federal Correctional Institution at Sheridan, Oregon ("FCI Sheridan"), with Bureau of Prisons register number 76501-065. I am no longer in Bureau of Prisons custody. I am not on probation or supervised release.

3. While at FCI Sheridan, I knew Billy F. Steffey, BOP Register No. 68463-097, as a fellow inmate. During the period covered by this Declaration, Mr. Steffey and I were cellmates and shared a cell in our housing unit at FCI Sheridan. I was known to other inmates and to Mr. Steffey at that time as "Frankie." I considered Mr. Steffey a friend.

Page 1 of 3

Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR

4. On two occasions in or around late October 2019 and late November 2019, I personally accompanied Mr. Steffey to the Special Investigative Services Lieutenant's office at FCI Sheridan and was physically present during conversations between Mr. Steffey and SIS Lieutenant Carter. Mr. Steffey requested that I accompany him because of the inmate practice of not meeting with prison staff alone, which inmates follow in order to avoid appearing to other inmates to be informants or to be cooperating with staff.

5. The first such meeting took place in or around late October 2019, near the Halloween holiday.

6. During that first meeting, Lt. Carter was, in my observation, visibly confrontational with Mr. Steffey regarding certain internal Bureau of Prisons emails that Mr. Steffey had obtained. Lt. Carter and the staff who interacted with us were, as I would describe it, "real adamant" about not wanting Mr. Steffey to have those emails.

7. I personally heard Lt. Carter communicate to Mr. Steffey, in substance, that if Mr. Steffey did not turn the emails over and disclose how he had obtained them, Mr. Steffey would be placed in the Special Housing Unit. I understood Lt. Carter's communication to be a threat of disciplinary segregation directed at obtaining the emails from Mr. Steffey and at identifying Mr. Steffey's source for them.

8. I recall that the emails at issue concerned a matter Mr. Steffey was pursuing involving the Federal Bureau of Prisons and what I understood at the time to be a company that manufactured drug-testing kits used in federal prisons.

9. The second meeting took place approximately one month after the first, in or around late November 2019, near the Thanksgiving holiday. I again accompanied Mr. Steffey to Lt. Carter's office and was physically present throughout the meeting.

10. During that second meeting, I personally heard Lt. Carter state, in substance: "We know that. We know that that's a false reading. We know that. We all know that." Lt. Carter went on to communicate, in substance, that it was known among Bureau of Prisons staff that inmates were being placed in the Special Housing Unit on the basis of false evidence when staff "wanted to" do so, and that the false evidence in question was the practice of treating a burgundy color result on the NIK Test U drug-testing pouch as a positive result for drugs.

11. During the same second meeting, Mr. Steffey asked Lt. Carter whether Lt. Carter would speak with Mr. Steffey's case manager to support Mr. Steffey's request for additional

Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR

halfway-house time, on the ground that the disciplinary finding against Mr. Steffey should not have been imposed. I personally heard Lt. Carter respond that he would do so.

12. During the period I was incarcerated with Mr. Steffey at FCI Sheridan, I am aware that Mr. Steffey had obtained printed materials from the company that manufactured the NIK drug-testing kits used by the Bureau of Prisons. I personally saw at least one such document, and that document represented that the burgundy color reading on NIK Test U was not a positive drug result.

13. Mr. Steffey spent a substantial portion of his time during the period I was incarcerated with him at FCI Sheridan researching his case in the law library and pursuing his federal habeas corpus petition.

14. The statements made in this Declaration are based on my own recollection of events that I personally witnessed at FCI Sheridan in or around October and November 2019. I have not been provided with specific words or phrasing to use in this Declaration. No one has promised me anything in exchange for executing this Declaration, and I have not been compensated for it. The statements herein reflect my own independent memory of what I saw and heard.

15. I am willing to testify to the matters set forth above in court or by deposition if called to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __10th__ day of May, 2026, at ___Portland 7:30pm EAF___, Oregon.

_Eric Allen Forsyth_

ERIC FORSYTH, Declarant

State of Florida    County of Okaloosa

Sworn to (or affirmed) and subscribed before me by means of online notarization, this 05/10/2026 by Eric Allen Forsyth.

_Ozella Mae Moore_
OZELLA MAE MOORE

Type of Identification Produced __OR DL__

OZELLA MAE MOORE
Notary Public - State of Florida
Commission # HH 732997
Expires on June 13, 2027

Notarized remotely online using communication technology via Proof.

Page 3 of 3

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

# EXHIBIT 2

## DECLARATION OF BILLY F. STEFFEY

Authenticating Supplemental Exhibits 3 and 4

Dated May 11, 2026

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

Billy F. Steffey, Self-Represented Petitioner
455 Capitol Mall, Suite 802
Sacramento, California 95814
Telephone: (916) 955-6332
Email: bsteffey@mac.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| BILLY F. STEFFEY,<br>　　　　　　Petitioner,<br><br>　　　　　v.<br><br>WARDEN, FCI LOMPOC,<br>　　　　　　Respondent. | Case No. 3:19-cv-00093-JR<br><br>**DECLARATION OF BILLY F.<br>STEFFEY AUTHENTICATING<br>SUPPLEMENTAL EXHIBITS**<br><br>The Honorable Michael H. Simon |

## DECLARATION OF BILLY F. STEFFEY
## PURSUANT TO 28 U.S.C. § 1746

I, BILLY F. STEFFEY, declare under penalty of perjury under the laws of the United States of America that the following is true and correct based on personal knowledge:

1. I am the Petitioner in this action. I am over the age of eighteen, am competent to testify to the matters stated in this Declaration, and have personal knowledge of the matters stated herein.

2. I submit this Declaration to authenticate two contemporaneous documentary exhibits, marked Exhibit 3 and Exhibit 4, attached to Petitioner's concurrently filed Notice of Supplemental Evidence in Support of Pending Rule 59(e) Motion.

3. Exhibit 3 is a true and correct copy of a letter that I personally composed at the Federal Correctional Institution at Sheridan, Oregon ("FCI Sheridan") using the Bureau of Prisons TRULINCS electronic-correspondence system, dated November 26, 2019, with a TRULINCS system timestamp of December 7, 2019 at 7:22 p.m. The letter was thereafter printed from TRULINCS and mailed by me from FCI Sheridan via the United States Postal Service to Magistrate Judge Jolie A. Russo, United States District Court for the District of Oregon. The letter was composed by me from my BOP TRULINCS account assigned to

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

BOP Register No. 68463-097 while I was in the custody of the Federal Bureau of Prisons. The TRULINCS print-out reproduced as Exhibit 3 preserves the system-generated header identifying the sender, date, time of composition, and subject line of the message.

4. Exhibit 4 is a true and correct copy of a letter that I personally composed at FCI Sheridan using the BOP TRULINCS electronic-correspondence system, dated December 18, 2019, with a TRULINCS system timestamp of December 19, 2019 at 11:06 a.m. The letter was thereafter printed from TRULINCS and mailed by me from FCI Sheridan via the United States Postal Service to United States Senator Lindsey Graham. The TRULINCS print-out reproduced as Exhibit 4 preserves the system-generated header identifying the sender, date, time of composition, and subject line of the message. I addressed the letter to Senator Graham because, in December 2019, Senator Graham was a United States Senator from South Carolina and the Chairman of the United States Senate Committee on the Judiciary, which has oversight jurisdiction over the United States Department of Justice and its component agency the Federal Bureau of Prisons.

5. Exhibits 3 and 4 are exact reproductions of the originals as they appeared in my BOP TRULINCS account at the time of their composition and transmission. I have not altered, edited, or modified the content of either letter for purposes of this filing.

6. Both letters were composed while I was confined at FCI Sheridan and contemporaneously with the events they describe. The Russo letter (Exhibit 3) was composed within days of the second of two meetings I had with SIS Lieutenant Carter at FCI Sheridan in November 2019, the second of which is described in paragraph 10 of the Declaration of Eric Forsyth filed as Exhibit 1 to the Notice of Supplemental Evidence.

7. For clarity of the record concerning my housing arrangements at FCI Sheridan: Mr. Forsyth and I had been assigned to the same cell at FCI Sheridan for a period of approximately one year during our overlapping incarceration at that institution. During the approximately eighteen-month period preceding my release from BOP custody in January 2020, including the October and November 2019 meetings with Lt. Carter described in Mr. Forsyth's Declaration, I was housed in FCI Sheridan's Residential Drug Abuse Program ("RDAP") unit and Mr. Forsyth and I were no longer assigned to the same cell during that later period. Mr. Forsyth and I remained friends and in regular contact within the institution throughout my time at FCI Sheridan. Bureau of Prisons housing records reflect my respective cell and unit assignments throughout my confinement at FCI Sheridan.

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

8. Within the federal correctional system, inmates do not meet with Special Investigative Services staff or other prison investigators alone. This is an established inmate practice that protects the inmate from later allegations by other inmates that the meeting involved cooperation with prison staff against fellow inmates. Consistent with that practice, I specifically requested that Mr. Forsyth accompany me to each of my October 2019 and November 2019 meetings with SIS Lieutenant Carter at FCI Sheridan. Mr. Forsyth's presence at both meetings was therefore neither unusual nor arranged for any purpose other than ordinary institutional self-protection; it reflected the standard inmate practice that I had been taught and followed throughout my federal incarceration.

9. In composing the letter reproduced as Exhibit 3, I included a request that the Court contact Lt. Carter at FCI Sheridan to verify the matters set forth in the letter. I included that invitation in good faith and with the contemporaneous expectation that the Court would or might do so. I included it because, at the time, I had no other practical means of compelling Lt. Carter's testimony before this Court while I was confined at FCI Sheridan, and I believed Lt. Carter would, if asked directly by the Court, confirm to the Court the matters he had stated in substance to me in Mr. Forsyth's presence.

10. The BOP TRULINCS system permits BOP staff to monitor inmate electronic correspondence in real time. Accordingly, the content of the letters reproduced as Exhibits 3 and 4 was visible to BOP staff at the time I composed each letter on the TRULINCS system at FCI Sheridan in November and December 2019, prior to my printing the letters from TRULINCS and depositing them in the United States Mail.

11. At the time I composed Exhibits 3 and 4 in late 2019, my understanding of the burgundy NIK Test U result was based on (a) the Safariland "Identidrug" chart and Test U Instructions for Use available to me within the BOP law library; (b) Lt. Carter's verbal in-substance acknowledgment to me as described above; (c) my own research within the BOP law library while incarcerated; and (d) certain internal Bureau of Prisons emails I had obtained while at FCI Sheridan relating to coordination between Special Investigative Services investigators and Discipline Hearing Officers, possession of which was the subject of the late-October 2019 meeting with Lt. Carter described in paragraphs 6 and 7 of Mr. Forsyth's Declaration. At the time I composed Exhibits 3 and 4, however, I did not have access to and was not aware of: (i) the Bureau of Prisons Central Office "SIS Advisory" dated January 18, 2017, signed by Brad Trate, M. Wade Jensen, and Kevin Schwinn and marked "Law Enforcement Sensitive"; (ii) any communications between Safariland, LLC and the Bureau of Prisons Central Office regarding NIK Test U interpretation; (iii)

Safariland's subsequent federal-court representations concerning the chemistry of NIK Test U; or (iv) any other documents establishing Safariland's institutional role in the practice of treating burgundy NIK Test U results as positive for controlled substances. I did not learn of the existence or content of those documents until after my release from the custody of the Federal Bureau of Prisons.

12. I have repeatedly sought the institutional Bureau of Prisons documents referenced in the preceding paragraph through formal FOIA requests submitted over a period of more than nine years. I personally submitted earlier FOIA requests to the Bureau of Prisons in 2017 and 2018 seeking related NIK Test materials. I no longer retain copies of those specific requests because, during my federal incarceration, my personal papers — including legal correspondence, mail, personal photographs, and FOIA-related materials — were periodically confiscated or destroyed by Bureau of Prisons staff during routine cell searches (commonly referred to as "shakedowns") as purported "excess property." The Bureau of Prisons itself, however, would have records of those FOIA requests within its own FOIA tracking system under my BOP Register Number 68463-097. While still incarcerated at FCI Sheridan, on or about August 28, 2019, I submitted a written FOIA request to the Bureau of Prisons seeking all instructions and flowcharts from Safariland, LLC concerning NIK Test procedures, including procedures for testing of buprenorphine (Suboxone), K2, and Spice. The Bureau of Prisons assigned that request FOIA/PA Request Number 2019-06228. By letter dated September 27, 2019, the Bureau of Prisons informed me that it had located four (4) pages of responsive records but had determined the four pages "must be withheld in their entirety" under FOIA Exemption (b)(7)(E), 5 U.S.C. § 552(b)(7)(E). The letters reproduced as Exhibits 3 and 4 were composed approximately two months later, after the Bureau of Prisons had confirmed in writing that responsive Safariland-related records existed but would be withheld from me in their entirety. Following my release from BOP custody, I continued to seek these records, including through FOIA/PA Request Number 2020-02370 (acknowledged February 18, 2020); a further FOIA request submitted in the period between 2020 and 2025 that the Bureau of Prisons did not substantively answer during the time it was pending (further addressed in the next paragraph); FOIA/PA Request Number 2026-00947 (acknowledged in late 2025, presently pending after the Bureau of Prisons demanded additional identity documentation on Form DOJ-361); and FOIA/PA Request Number 2026-04268 (acknowledged April 29, 2026, with expedited processing denied and the request placed on the "complex track" with stated processing of up to nine months). My 2026 FOIA requests included a request, by name and approximate date, for the Bureau of Prisons SIS Advisory dated in or about

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

March 2017 concerning NIK Test U, which has been referenced in other federal-court proceedings addressing the same Bureau of Prisons drug-testing practice.

13. With respect to the FOIA request I submitted between 2020 and 2025 to which the Bureau of Prisons did not respond during the time it was pending: when I made an inquiry to the Bureau of Prisons in 2025 about the lack of response, the Bureau of Prisons produced within approximately twenty-four hours a letter purporting to respond to that request. The letter contained no responsive content and constituted further refusal to disclose. I captured a contemporaneous screenshot of the Bureau of Prisons' online FOIA tracker showing that the Bureau had administratively closed that request several days before the date on the letter the Bureau of Prisons claimed to have sent in response. I retain that screenshot and can produce it if requested by the Court.

14. In addition to the formal FOIA requests described above, I have undertaken extensive non-FOIA efforts to obtain the documents and information addressed in the preceding paragraphs and to expose the underlying conduct to public scrutiny. I made repeated efforts to contact Safariland, LLC directly by email and telephone. Safariland personnel engaged with me until they ascertained that I am a former federal inmate, at which point Safariland ceased responding to my communications. I engaged a working journalist who, after his own investigation, published a multi-page article concerning the NIK Test U burgundy-as-positive practice in *Reason* magazine and in its online edition in approximately July 2021. I corresponded with the American Civil Liberties Union and other civil-rights and inmate-advocacy organizations concerning these matters. I have published multiple public posts on the social-media platform now known as X (formerly Twitter), including posts directly tagging or transmitting documents to the United States Department of Justice, the Department of Justice Office of the Inspector General, the Office of the Attorney General of the United States, and the Federal Bureau of Prisons, and I have paid to amplify the reach of those posts.

15. In total, over the period from 2017 through 2026, I have submitted approximately ten or more FOIA requests to the Bureau of Prisons seeking the institutional documents identified in the preceding paragraphs, and I have not received a single responsive document from any of those requests. Through a combination of administrative delay, non-response, full redaction, backdated correspondence, withholding under FOIA Exemption (b)(7)(E), and the imposition of additional procedural requirements such as the demand for Form DOJ-361 identity documentation, the Bureau of Prisons has produced zero responsive records over the course of nearly a decade. As of the date of this Declaration, I have not received

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

any unredacted copy of the Central Office "SIS Advisory" dated January 18, 2017; any unredacted Bureau of Prisons SIS Advisory dated in or about March 2017 concerning NIK Test U; any unredacted Bureau of Prisons communications with Safariland, LLC concerning NIK Test U interpretation; or any official acknowledgment by the Bureau of Prisons that any of those documents exist. The first documented federal-court confirmation I obtained of Safariland's institutional position — that burgundy is the baseline color of NIK Test U and only blue indicates a positive result — was Safariland counsel's judicial admission filed in *Steffey v. Peters*, No. 2:25-cv-11105-VBF-SK (C.D. Cal.) (Dkt. 23-2), in late 2025. Despite my continuous diligence over more than nine years, the institutional architecture of the matters described in this Declaration could not have been pled with documentary support consistent with Federal Rules of Civil Procedure 9(b) and 11 before that date.

16. I make this Declaration in support of Petitioner's Notice of Supplemental Evidence in Support of Pending Rule 59(e) Motion. The statements above are true and correct of my own personal knowledge.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

**Executed on May 11, 2026, at Sacramento, California.**

**BILLY F. STEFFEY**
Petitioner, Self-Represented

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

# EXHIBIT 3

## LETTER TO MAGISTRATE JUDGE RUSSO

Dated November 26, 2019
Sent via BOP TRULINCS December 7, 2019

---------------------------------------------------------------------------------

FROM: 68463097
TO:
SUBJECT: New Information re: 2241 Motion
DATE: 12/07/2019 07:22:22 PM

>
November 26, 2019

Billy Steffey 68463-097
FCI - Sheridan Unit 1B
PO Box 5000
Sheridan, OR 97378

Re: Case 3:19-cv-00093-JR

Your Honor,

I have tried to reach my attorney in the above case, but have had no luck. I am due to be released in less than 60 days, and if I win this case, it would mean immediate release.

Since my initial filing of the above case, I have learned that there never was a "false positive" as I originally thought. I found out that there never was a positive AT ALL. ONLY the Bureau of Prisons would like you to believe that a "burgundy" color in Test U is a positive result. It is not. ONLY, Blue is a positive result. This has been unchallenged for about a decade. I have been the only inmate as of yet that has been able to have a lawyer assigned and been able to prove my thoughts via the investigator and the chemical expert that Mrs. Daily has hired. Two NIK tests were used. Test A was initially used which is used in EVERY case, no matter the drug. It is not a confirmation test, but a test that tells the tester which test to go to next for confirmation of the substance. In my case Test A indicated that the tested material should be tested with Test U, which is a test used to detect the presence of MDMA or Methamphetamines. Test U uses sodium nitroprusside, known as Simon's Reagent Test and is manufactured by Safariland LLC. The test is a stupid chemical test and can only turn one of two colors, blue or burgundy. Only blue represents a positive test for, "secondary amines". Burgundy is the color of a negative test. If you believed the logic of Bureau of Prisons, BOTH, blue and burgundy represent a positive test. If that was the case, how can ANYTHING, EVER BE NEGATIVE? My lawyer has in her possession several of the NIK tests, including Test A and Test U. I am willing to put my entire case on the line by asking you to have my lawyer demonstrate how following the instructions and breaking the 3 vials and shaking them up will result in a burgundy result EVERY TIME. You can use nothing, just air if you'd like, or feel free to drop any random item in from your desk area. A piece of white paper as was used in my case, a paperclip...anything. Watch the test turn burgundy, as it should. This is the "evidence" that the DHO relied on in my case to say that I was introducing narcotics. A test that worked as it should, displayed a NEGATIVE result and yet Bureau of Prisons and ONLY Bureau of Prisons, claims was POSITIVE.

I have found countless cases, filed Pro Se by inmates in all Circuits regarding this exact issue, with the exact same tests, Test A and Test U. They all claimed that there was a "false positive" in their case and that the item tested was not "amphetamines". In all those cases, the Judge ruled against them, claiming that because the test was positive, that satisfied the, "some evidence" requirement. What these Judge's in ALL these cases did not know was that the test was never positive! The Judge believed it was positive because the BOP said it was. This case literally affects a huge number of inmates over the past 10 years. I'd say in the thousands. We are unfairly sanctioned, moved to a higher security prison, away from our families in some cases, we lose our visits, our phones and the small liberties we have here. All based on a test that is negative.

The Bureau of Prisons knows about this exact issue and these tests. I have had Lieutenants, Assistant Warden's, and SIS staff all admit, "we know", but nobody will come forward to back up an inmate and be a whistle blower of this behavior and tactic. I have been told by several high ranking staff that they know, but for me not to involve them. I can guarantee you that if you made a phone call here to the Special Investigative Services, Lt. Carter and you asked him, off the record if what I am claiming is true, he has the integrity to tell you, "yes". He actually sat with me and went over this case and said, "Steffey, you are right. You have these days coming to you". He called my case manager and asked her to increase the halfway house I was getting by 41 days, the amount that was taken for this shot. My case manager unfortunately is not cooperating, won't do anything if I don't have something in writing, official. She even seemed upset by the fact that I had these days coming to me,

TRULINCS 68463097 - STEFFEY, BILLY - Unit: SHE-A-R

---

implying that if she has to redo my paperwork, "I'll probably lose all my halfway house". That's how these people work, you may win at some point, but at another point they will make sure you lose.

I have enclosed another case that has a close relation to mine. In this case, the US Customs and Border Protection agents used a NIK test, manufactured by the same manufacturer, Safariland. It is another line of NIK test called the NarcoPouch. The NarcoPouch 923 as used in this case is the exact, identical test. It uses the EXACT same chemical reagent, sodium nitroprusside, the same as Test U in my case. They detail specifically how it detects the presence of MDMA and methamphetamines by detecting, "secondary amines" and turning a color that reacts with the presence of these secondary amines and another color when no secondary amines are present. This drug test and standard is certified and used by the Drug Enforcement Agency (DEA) as well as the United Nations and The Scientific Working Group for the Analysis of Seized Drugs, an organization that has been formed by the Drug Enforcement Agency and the Office of National Drug Control Policy. I highlighted the parts that apply to my case and well, I'll let the experts testimony speak for itself. It is irrefutable proof that the test that the Bureau of Prisons claims to be POSITIVE, is in fact NEGATIVE. This proof, along with Lt. Carter if you decide to call him and the demonstration of the actual test done at your desk should be all you need to see to know this whole thing is a sham. I expect that the Bureau of Prisons and the AUSA will want to move to settle this case, expunge the shot and ask for this case to be moot, because they will fear that once it is published and available to the entire inmate population, this will open the flood gates of inmate appeals that have been wrongfully sanctioned and found guilty of drug violations that were all based on a dirty secret. Please keep in mind that Test A is not and does not claim to confirm the presence of drugs. It's only purpose is to be used as a starting point to guide the tester to the correct tests for a confirmation. Test A alone will NEVER result in a substance be confirmed as a drug. Multiple steps are required. I say this because I do not want the AUSA to claim that even without Test U, there was already one positive test when Test A was used. This is not true and as the Identidrug Chart shows that was submitted with Chetwood's Declaration, Test A is always the starting point to a multi-step testing process. Without this falsified, positive test, there is nothing. There were no informants used saying I was doing any wrong-doing, there were no indicators of prison drug dealing found such as large amounts of stamps (prison currency) or commissary. If staff are willing to knowingly falsify the record and lie about a drug test being positive, they are willing to lie about more.

I have 55 days today until my release to the halfway house, January 23, 2020. If I win this shot, I'd be out the door immediately, 41 days sooner. I've suffered a transfer away from my wife and son in California because of this, I was sent to a medium security prison from a low security, I would of been at camp these last 2 years. I also sat in the SHU for about 4 months, lost privileges, etc, behind this. All of this based on malicious tactics used by the BOP, claiming that a negative drug test was in fact a positive test. There was no lab involved, no outside agency. BOP had full control of the situation and never thought in a million years I'd figure out their scam and underhanded tactic they've used for a decade or more. I implore you, please look into what I have said here. I will put my entire case on the line. The sample tests will speak for themselves. If you don't want to use the ones my family bought and sent to my lawyer, ask the AUSA to have BOP provide you a few samples of Test U and you can literally recreate this at your desk. Drop ANY paper in that test, or put NOTHING in it and watch the result turn burgundy....negative. Time is of the essence for me, but I can assure you that if you contacted Lt. Carter here at Sheridan Federal Correctional Institution, he WILL confirm to you what I am saying. He won't lie nor will he mislead a Federal Judge. Trust me when I say that Lt. Carter as well as other high ranking staff are very aware of this case and are watching it closely. They know the cat is out of the bag now.

I am also concerned that because I am exposing this, that I will suddenly become a target of BOP staff and that they will try to prevent my upcoming release. I just want that on the record. I guess there is nothing else I can do about it. This case will open the BOP to a ton of litigation and the very real possibility that they are going to have to reverse sanctions and give back time taken from thousands of inmates over the years. If you rule in my favor, is it possible to order that BOP immediately release me to the halfway house in San Francisco, CA that I am currently scheduled to go to January 23, 2020? I fear that if not, they will intentionally drag their feet and make it so that I don't benefit from the restored time.

Respectfully

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

# EXHIBIT 4

## LETTER TO U.S. SENATOR LINDSEY GRAHAM

Dated December 18, 2019
Sent from FCI Sheridan

TRULINCS 68463097 - STEFFEY, BILLY - Unit: SHE-A-R

----------------------------------------------------------------------------------------

FROM: 68463097
TO:
SUBJECT: Senator Lindsey Graham
DATE: 12/19/2019 11:06:40 AM

>

December 18, 2019


Billy Steffey 68463-097
FCI - Sheridan
PO Box 5000
Sheridan, OR 97378

Re: Bureau of Prisons maliciously taking away THOUSANDS of inmates good time

Dear Senator Graham,

My name is Billy Steffey. I am an inmate in federal prison, here in Sheridan, Oregon. I need your help, in the past you have always been responsive and helpful and went to bat for me. What I am going to explain to you, it is not wild allegations from an angry inmate. I can PROVE to you what I am saying and alleging here.

Let me give you some history. In late 2017, I was at Lompoc low facility prison. I have been in federal prison since 2013 for fraud. In all of this time, I have received only 2 disciplinary write-ups. The one at hand I am here to discuss, being false. I was accused of introducing "narcotics" via mail to the facility. The alleged narcotics I was accused of introducing was "K2", synthetic marijuana. The SIS (Special Investigative Service) officer claimed that I had a package sent to another inmate and it was soaked in an illegal substance. I'd like to mention that not once in my life have I ever been accused of using or selling drugs, ever. No arrests, nothing. I fought these allegations through the BOP process, but was found guilty in the kangaroo court they have and sent away from my family in California and sent to a higher security prison, here in Oregon. I also lost 41 days of my good time for this and several sanctions. I would be home already had this not happened. Since this happened, I have made it my life to learn everything I possibly can about the testing process that BOP uses to test for illegal drugs. I was found guilty of this offense based on only ONE thing, a NIK test that was negative that BOP claimed was positive.

The Bureau of Prisons uses what is known as a NIK (narcotics identification kit) kit. This is a small pouch that contains chemicals that react with different illegal substances. By no means is it definitive, and in fact the test instructions clearly say this. However the BOP relies on case law that says that as inmates we are not allowed to request lab results from a lab, nor can we challenge the NIK results. By law, the BOP only need to meet, "some evidence" requirement. These NIK tests are made from a company that BOP has signed a long term contract with named, Safariland LLC. The NIK Polytesting kit that BOP deploys can test for not only your major drugs such as cocaine, methamphetamines, marijuana, heroin, etc. The test can also test for some other substances, but they require a much more thorough, multi-step procedure. I will enclose the instructions from the actual manufacturer for your review. These NIK tests have been around for at least 20 years and have not changed. I mention this because the drugs that are most prevalent in the BOP (K2, and Suboxone) are newer drugs and are both synthetic type drugs. Neither of these can be detected by the NIK kits that BOP uses, but that does not stop them from using them.

What I have found out over these last 2 years after talking to numerous BOP staff, including Wardens, Assistant Warden's, Lieutenants, etc is that BOP staff are all well aware that these tests cannot detect the substances they are trying to detect, but because they are in a long term contract with Safariland, they have made up a set of procedures to make it look as if they can detect these substances. Drugs in the BOP are 80% synthetic. It is either K2 or Suboxone. Hard drugs like cocaine, heroin, etc are not as common. This contract with the vendor Safariland, it is almost worthless because the tests that they make cannot detect K2 or Suboxone. Instead, what is happening is they are creating a fake process to claim they can detect these drugs. I know you have numerous contacts in the DEA, ask them if a NIK test can detect K2 or Suboxone. They cannot. You'll also notice on the Identidrug chart I included from the manufacturer that Suboxone (bupenepherine) nor K2 is a substance that can be detected. But because BOP is basically helpless to detect these with the product from Safariland, they instead lie and make up a fake procedure so they can write us inmates shots and hold us accountable. When they use Test U, it's always to test something crazy like paper, ink pens, random liquids, etc. Things that don't make any

TRULINCS 68463097 - STEFFEY, BILLY - Unit: SHE-A-R

--------------------------------------------------------------------------------------------

sense, but they claim it is always "amphetamines", not methamphetamines. Test U is not even made to detect amphetamines. It can only detect "secondary amines".

Let me get to the good stuff. I'll explain how they do it. All I ask is you follow up. What I am telling you is 100%, spot on and the tests will speak for themselves.

In my case they tested white paper that was mailed in with a letter. To use the NIK test, the tester starts with Test A in all cases. This test will never be the final test, all it does it tell the tester what kind of substance it could be, and tells the tester where to go next for confirmation of the alleged drug. In my case, Test A indicated the paper contained, "amphetamine type compounds" and Test U was next to confirm. Test U is a test that is certified by the DEA, and used by many police departments. It is sodium nitroprusside and it is used only, "to detect secondary amines". This includes methamphetamines and MDMA (ecstasy). The testing packet and the manufacturer clearly indicate the Test U is a test to detect methamphetamines and MDMA. This test is a dumb chemical test and can only turn one of 2 colors. If the test detects, "secondary amines" it turns dark blue as the instructions say, if no secondary amines it turns burgundy for a negative test. This is where things get messy. The BOP and ONLY the BOP claim that burgundy is also a positive test for "amphetamines". This is absolutely, not true. How can both colors represent a positive test? If that was the case, NOTHING could ever be negative. I have argued this to so many BOP staff members I lost count. I explained this to the DHO (disciplinary hearing officer) and he won't hear it. Trust me when I tell you, he knows the truth. They just won't admit to it because they would have to undo 10 years of violating our due process all over a test that was never positive to begin with. I personally know at least 30 inmates who have lost good time that cannot be restored, been fined, moved to a higher security prison, moved away from family, visits taken for years, etc all over a test that was negative. Until I came along, no inmate has ever been able to explain what is happening here. When I look up cases online, it always involves the same test, Test U and it's always a burgundy result, NEGATIVE. Yet, the BOP claims it to be positive. They even misrepresent this to numerous federal judges when inmates appeal via 2241.

This is the absolute best part, I can prove this without a shred of a doubt. You can pick up the phone and ask any of your law enforcement contacts at the DEA and ask them what it means if NIK Test U for meth and MDMA turns burgundy. They'll confirm, it's negative. Better yet, ask BOP to provide you samples of these NIK tests. I can assure you this, you can place ANYTHING in that pouch, white paper, a paperclip, just air and break the 3 vials and every single time that test will turn burgundy, as it should. NEGATIVE. There is NO WAY the BOP can lie there way out of this. I have appealed this to the Region and to Washington DC BOP office to the Appeals Coordinator, but nobody cares. BOP is taking months away at a time from thousands of inmates across the US all over a test that was never positive. Because BOP can't be challenged on this, and inmates have no right to fight it, they get away with it. I beg of you to follow up. This will be one of the biggest scams you have seen if you see it through. You don't know me obviously, but when I tell you that I would not waste your time with crap, I mean it. All you have to do is read some of the write ups that I have enclosed of different inmates, always being hit for drug charges based on Test U turning burgundy. BOP keeps color copies of these results for each inmate. This affects so many of us. I beg you, just get your hands on a few samples of the Test U pouch and test paper from any of your stationary, or test nothing in it. It will turn burgundy. This is what BOP is claiming is positive for drugs and taking our time and our privileges and punishing us for. They all know. If you call up here to this prison, Sheridan Federal Correctional Institution and you ask for the SIS Lt., Carter, I assure you that he will tell you what I am claiming is true. He will tell you. I should be home right now, but nobody cares. I should of been at camp the past 2 years, but nobody cares. This can be proven so easily. All I need is you to verify what I am saying, send this letter to the Director of BOP and make them accountable. FACTS are on my side and they can't change those. Please, Senator. I beg of you to help end this. It still goes on everyday. They will try to give you some generic answer, that they follow instructions. Don't accept this. Burgundy in Test U is NEGATIVE, that is a fact. Call Lt., Carter, he won't lie.

Respectfully