*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

Billy F. Steffey, Self-Represented Petitioner
455 Capitol Mall, Suite 802
Sacramento, California 95814
Telephone: (916) 955-6332
Email: bsteffey@mac.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| BILLY F. STEFFEY, | Case No. 3:19-cv-00093-JR |
| Petitioner, | PETITIONER'S FURTHER AMENDED MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60(d)(3); MEMORANDUM IN SUPPORT |
| v. | |
| WARDEN, FCI LOMPOC, | The Honorable Michael H. Simon |
| Respondent. | Request for Oral Argument |

TABLE OF CONTENTS

MOTION...............................................................................................................................5
MEMORANDUM.................................................................................................................5
I.  INTRODUCTION...........................................................................................................6
II.  PROCEDURAL POSTURE...........................................................................................8
III.  RULE 60(d)(3) STANDARD.......................................................................................8
IV.  THE NON-TEST EVIDENCE PROVED ASSOCIATION WITH A PACKAGE, NOT THE DRUG ELEMENT OF CODE 111...............................................................................11
V.  THE NIK TEST U EVIDENCE WAS MATERIALLY MISDESCRIBED..........................14
VI.  THE MISDESCRIPTION WAS MATERIAL TO THE JUDGMENT...............................22
VII.  THE "ONE TEAM" EMAILS INDEPENDENTLY SHOW A NEUTRAL-DECISIONMAKER DEFECT............................................................................................23
VIII.  WITHHELD BOP RECORDS SUPPORT DISCOVERY WITHOUT EXPANDING THIS MOTION BEYOND THE AMPHETAMINE NO-EVIDENCE DEFECT.................................26
IX.  THE MONTHS-LONG SHU CONFINEMENT AND THE ABANDONED CRIMINAL REFERRAL REQUIRE DISCOVERY....................................................................................27
X.  THE RECURRING § 2241 PATTERN CONFIRMS THE MATERIALITY OF THE "POSITIVE NIK" LABEL....................................................................................................28
XI.  THE PRESENT RECORD ESTABLISHES FRAUD ON THE COURT AND WARRANTS VACATUR........................................................................................................................ 30
XII.  IF THE COURT DOES NOT VACATE ON THE PRESENT RECORD, GOOD CAUSE EXISTS FOR LIMITED DISCOVERY AND AN EVIDENTIARY HEARING.......................32
XIII.  RELIEF REQUESTED...............................................................................................33
XIV.  CONCLUSION...........................................................................................................34

TABLE OF CASES AND AUTHORITIES

**Cases**

Alejandro v. Fikes, 2021 U.S. Dist. LEXIS 106365 (D. Minn. Apr. 19, 2021)............................28

Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769 (9th Cir. 2003).......................................9

Baltazar v. Barnhart, 2019 U.S. Dist. LEXIS 180532 (E.D. Ky. Oct. 17, 2019), aff'd, 2020 U.S. App. LEXIS 18724 (6th Cir. June 12, 2020)...............................................................................29

Bracy v. Gramley, 520 U.S. 899 (1997)..........................................................................................32

Bullock v. Reckenwald, 2016 U.S. Dist. LEXIS 114253 (S.D.N.Y. Aug. 24, 2016).......................9

Burnsworth v. Gunderson, 179 F.3d 771 (9th Cir. 1999)................................................................11

Chambers v. NASCO, Inc., 501 U.S. 32 (1991).................................................................................9

Cloud v. Lepe, No. 2:25-cv-05671-FLA-JC, 2025 U.S. Dist. LEXIS 271768 (C.D. Cal. Dec. 7, 2025)............................................................................................................................................. 29

Dean-Mitchell v. Reese, 837 F.3d 1107 (11th Cir. 2016)................................................................10

Edwards v. Balisok, 520 U.S. 641 (1997)........................................................................................10

Fenner v. Ebbert, 2014 U.S. Dist. LEXIS 154440 (M.D. Pa. Oct. 31, 2014)................................29

Fuller v. Rich, 2025 U.S. Dist. LEXIS 13989 (E.D.N.C. Jan. 27, 2025).......................................29

Goodloe v. Sage, 2024 U.S. Dist. LEXIS 5577 (M.D. Pa. Jan. 10, 2024).....................................28

Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)..............................................8

Honesty v. Joyner, 2024 U.S. Dist. LEXIS 187158 (E.D. Ky. Oct. 15, 2024)...............................30

Jenkins v. United States, 2024 U.S. Dist. LEXIS 160629 (N.D. Ala. Sept. 6, 2024).....................18

Mahasin v. Warden, USP Atwater, 2025 U.S. Dist. LEXIS 196514 (E.D. Cal. Oct. 3, 2025).….29

Meyers v. Alldredge, 492 F.2d 296 (3d Cir. 1974)..........................................................................24

Miley v. Warden, 2023 U.S. Dist. LEXIS 135822 (E.D. Tex. July 7, 2023) (R. & R.), adopted, No. 1:22-cv-00243 (E.D. Tex. Aug. 2, 2023)............................................................................. 28

Ortiz-Negron v. Baltazar, 2019 U.S. Dist. LEXIS 80314 (M.D. Pa. May 10, 2019)....................29

Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128 (9th Cir. 1995)...........................................9

Riley v. Entzel, 2026 U.S. Dist. LEXIS 88288 (E.D. Ky. Apr. 22, 2026)......................................17

Rodriguez v. Gutierrez, 2023 U.S. Dist. LEXIS 83381 (D. Ariz. Apr. 4, 2023)...........................30

Robbins v. Christianson, 904 F.2d 492 (9th Cir. 1990)....................................................................5

Schreane v. Watson, 2021 U.S. Dist. LEXIS 96463 (S.D. Ind. May 20, 2021)............................28

Smith v. Ives, 275 F. Supp. 3d 1219 (D. Or. 2017).........................................................................10

Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445 (1985)......................................10

United States v. Estate of Stonehill, 660 F.3d 415 (9th Cir. 2011)...................................................9

United States v. Sierra Pacific Industries, Inc., 862 F.3d 1157 (9th Cir. 2017).............................9

Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575 (1946)...........................................9

Vasquez-Maldonado v. Salazar, 2020 U.S. Dist. LEXIS 24837 (D. Or. Feb. 12, 2020)...............28

Wilson v. Fikes, 2021 U.S. Dist. LEXIS 117733 (D. Minn. May 18, 2021)...................................28

Wolff v. McDonnell, 418 U.S. 539 (1974).......................................................................................13

Wyckoff v. White, 2020 U.S. Dist. LEXIS 105781 (M.D. Pa. June 17, 2020)................................9

**Statutes, Rules, Regulations, and Other Authorities**

28 U.S.C. § 2241.......................................................................................................................passim

28 C.F.R. § 541.3, Table 1...............................................................................................................13

28 C.F.R. § 541.8(b)........................................................................................................................24

Fed. R. Civ. P. 60(c), 60(d)(3)............................................................................................... passim
BOP Program Statement 6060.08, Urine Surveillance and Narcotic Identification......................22
NIK System of Narcotics Identification Training, 1005991 rev.-0517........................................15
NIK IDENTIDRUG Chart, PART# 190-601 REV 0907 (ECF 37-3) and REV 2021 (Ex. L); Test U instructions (ECF 37-3 at 1)...............................................................................................passim

MOTION

**Certification of Conferral (LR 7-1(a)).** Petitioner, who is self-represented, certifies that he conferred in good faith with counsel for Respondent concerning the relief sought in this motion, including in the parties' conferral on the briefing schedule ordered at ECF 63 and by email and telephone with Assistant U.S. Attorney Joshua Keller; the parties were unable to resolve the issues this motion presents, and Petitioner understands that Respondent opposes the relief requested.

Petitioner Billy F. Steffey respectfully moves under Federal Rule of Civil Procedure 60(d)(3) for relief from the May 18, 2020 judgment denying his 28 U.S.C. § 2241 petition. ECF 39, 40. This motion is filed pursuant to the Court's June 23, 2026 Order, which granted Petitioner's Rule 59(e) motion, held the petition not moot under Robbins v. Christianson, 904 F.2d 492 (9th Cir. 1990), and expressly permitted Petitioner to file a further amended Rule 60 motion raising new arguments challenging the "other evidence" premise in the 2020 Findings and Recommendation. ECF 63 at 9–11.

Petitioner requests that the Court vacate the May 18, 2020 judgment and reopen the § 2241 proceeding. The judgment was procured by a materially false presentation of the Bureau of Prisons' NIK field-test evidence — specifically, the representation that a NIK Test U "burgundy" result was a positive identification of a controlled substance — and by the concealment of internal BOP records bearing on that representation. Vacatur would reopen the existing petition — no new § 2241 petition is required. If the Court concludes on the reopened record that, once the Test U misrepresentation is set aside, the disciplinary finding lacks some evidence of the Code 111 drug element, Petitioner asks the Court to grant the habeas relief originally sought and expunge Incident Report 3084272 and the Code 111 finding. If the Court concludes that any material fact must be developed before either vacatur or merits relief may be granted, Petitioner alternatively requests limited discovery and an evidentiary hearing directed to that fact.

MEMORANDUM

## I.  INTRODUCTION

This is not a false-positive case; it is a no-positive case. The testing BOP ran never produced a positive result for any controlled substance: Test U's only positive is dark blue, and it never turned blue; any conditional amphetamine pathway depended on a time-sensitive Test A predicate that was never objectively preserved; and Test W, the kit's amphetamine reagent, was never run. BOP nevertheless recorded the Test U burgundy reaction as itself a standalone positive for amphetamines — a reading no Safariland document of any era permits. The manufacturer's current chart makes the point express: "Amphetamine is indicated following Test W result." Ex. L at 1; see Ex. Q.

The charged offense was Code 111: introduction or making of "any narcotics, marijuana, drugs … or related paraphernalia not prescribed for the individual by medical staff." ECF 30 at 3. The "other evidence" the Findings and Recommendation invoked — communications, a tracking number, suspicious papers, photographs, staff memoranda, and credibility findings — could connect Petitioner to a package. It did not identify the package contents as a drug. The drug-identification element came from the NIK testing. And BOP's own conduct concedes as much: if the surrounding circumstances had themselves proved the drug element, no field test was necessary. BOP tested because Code 111 required proof of a drug — and the testing is what failed to supply it.

SIS Technician Aguilar reported that NIK Test U "turned an immediate dark burgundy color, indicating Amphetamines," and that "[t]he tests indicated a positive result for Amphetamines." ECF 12-6 at 2. But the NIK materials in this very record show that Test U has a single direct affirmative result, and it is dark blue: the manufacturer's printed insert states that "[a]n immediate dark blue color indicates" methamphetamine or MDMA and that "[i]f any other color develops, proceed to Test A and continue Polytesting." ECF 37-3 at 1; accord ECF 12-6 at 4. Burgundy is not that direct positive. Under the manufacturer's own chart, a burgundy or reddish Test U reaction can point toward amphetamine only conditionally — after a valid Test A orange-to-brown sequence — as the chart's own Footnote 2 makes explicit: "Red in Test U alone does NOT

indicate amphetamine-type compounds." ECF 37-3 at 2. Without that predicate, burgundy remains the reagent's baseline non-blue reaction. ECF 37-2 at 5.

The judgment should be reopened for two reasons. First, the United States — through the administrative record BOP supplied and the litigation position Respondent adopted — presented a non-blue Test U reaction to this Court as a standalone affirmative positive drug result, when the manufacturer's chart treats burgundy as, at most, a conditional inference requiring a Test A predicate this record never objectively preserved, and when the kit's dedicated amphetamine test (Test W) was never performed — all while the SIS investigation's own file, in the same exhibit as Aguilar's testing memorandum, identified the suspected substance as "Synthetic Marijuana also known as Spice," which no NIK reagent purports to identify. ECF 12-6 at 9; Part V.E. Second, internal BOP records bearing on exactly that practice — the written SIS testing procedures and flow-chart materials the Bureau has withheld in full, and the "one team" emails coordinating SIS investigation with the DHOs who adjudicate — were never disclosed in the original proceeding, so the premise could not be tested. The present record suffices to vacate the judgment and reopen the case; if any residual fact must be developed first, these materials establish good cause for the discovery and hearing the 2020 judgment denied.

Nor is the misdescription unique to this record. Since at least 2014, federal decisions have documented amphetamine field-test failures on paper substrates in BOP custody; by August 2017, a BOP incident report at another institution — applying written "NIK testing procedures outlined in an SIS ADVISORY dated March 27, 2017" — recorded a burgundy Test U reaction on suspected K2-saturated greeting cards as indicating "the presence of Amphetamine," Ex. P; and for years federal courts, including this District, have recited burgundy or maroon Test U reactions as "positive … for amphetamines" in the words BOP supplied, without the manufacturer's chart before them. See Part X. Across that span the burgundy label has functioned as a catch-all — reported positive for amphetamines in one record and negative for methamphetamine in another — while Test W, the one reagent whose direct affirmative endpoint identifies amphetamine, went unused here. In 2021 the manufacturer itself reissued the chart so the amphetamine lane runs

through Test W. Ex. L; Part V.G. Courts do not scrutinize the chemistry; they accept the label. That is the materiality of the misdescription, and why its correction must come through Rule 60(d)(3).

In DHO terms, the defect is simple: the record documented suspicious association plus a Test U burgundy reaction reported as a standalone positive — with no documented Test A predicate and no Test W. Hill requires some evidence of the drug element; a predicate-dependent inference without its predicate is not some evidence.

## II.  PROCEDURAL POSTURE

Petitioner filed this § 2241 petition in January 2019 challenging a BOP disciplinary finding that cost him 41 days of good-conduct time. ECF 1; ECF 63 at 1. The charged offense was Code 111. ECF 30 at 3.

On February 25, 2020, Magistrate Judge Russo recommended denial, finding the decision supported by "some evidence" — the positive test results and the surrounding package-association evidence. ECF 30 at 9–10. The Court adopted the Findings and Recommendation and entered judgment on May 18, 2020. ECF 39, 40.

On January 26 and 30, 2026, Petitioner moved for relief from judgment under Rule 60. ECF 43, 45. On May 6, 2026, the Court denied the amended motion as moot, with a footnote stating that, even reaching the merits, it would deny relief because Judge Russo had found some evidence in addition to the NIK test. ECF 53 at 7 n.3. Petitioner moved under Rule 59(e). ECF 54. On June 23, 2026, the Court granted that motion, held the petition not moot under Robbins, and stated that Petitioner "may file a further amended Rule 60 motion" raising "new arguments" challenging the other evidence Judge Russo relied upon. ECF 63 at 9–11. This is that motion.

It proceeds under Rule 60(d)(3), not Rule 60(b)(3); the one-year limit of Rule 60(c) therefore does not bar it. Fed. R. Civ. P. 60(d)(3); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944).

## III.  RULE 60(d)(3) STANDARD

Rule 60(d)(3) preserves a federal court's inherent power to "set aside a judgment for fraud on the court." Fraud on the court is not ordinary fraud between litigants, and it is not mere error. It

is misconduct that corrupts the judicial process itself — the deliberate presentation of materially false evidence, or the concealment of material evidence, by a party or an officer of the court — shown by clear and convincing evidence, including through an unconscionable plan or scheme calculated to influence the court. Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1131–33 (9th Cir. 1995); United States v. Estate of Stonehill, 660 F.3d 415, 443–44 (9th Cir. 2011); Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003); United States v. Sierra Pacific Indus., Inc., 862 F.3d 1157, 1168–73 (9th Cir. 2017).

**The root authority and the source of the power.** The doctrine traces to Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), which recognized the inherent and historic power of a federal court to vacate its own judgment, even years later, where the judgment was procured by a deliberate scheme to defraud the court. Accord Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 580 (1946) ("The inherent power of a federal court to investigate whether a judgment was obtained by fraud[] is beyond question."); Chambers v. NASCO, Inc., 501 U.S. 32, 43–46 (1991). A § 2241 disciplinary-credit case is a recognized vehicle for its exercise: in Bullock v. Reckenwald, 2016 U.S. Dist. LEXIS 114253, at *3, *53 (S.D.N.Y. Aug. 24, 2016) — a § 2241 petition by a BOP inmate who, like Petitioner, had lost 41 days of good-conduct time — the court held that where a petitioner contends the respondent committed fraud on the court by fabricating evidence and making misrepresentations, "it is the Court's inherent authority that provides the primary basis on which to act," and proceeded to the merits because the relief would be claim-dispositive.

**The burden.** The movant must show, by clear and convincing evidence, that the misconduct was deliberate and material — not inadvertent, not immaterial. Bullock, at *54; cf. Wyckoff v. White, 2020 U.S. Dist. LEXIS 105781, at *12 (M.D. Pa. June 17, 2020) (a clerical error is not fraud). Petitioner recognizes the limiting force of Sierra Pacific: Rule 60(d)(3) does not correct an ordinary evidentiary mistake or a later-developed impeachment theory. The deliberate-misconduct showing here comes from the alignment of the affirmative-positive label, the record materials contradicting that label, Respondent's adoption of the label in court, and the undisclosed

institutional records showing a separate burgundy-positive reporting practice and SIS/DHO coordination protocol. Any unresolved intent question is itself the precise issue for discovery and a hearing.

**"Some evidence" does not answer a fraud or procedural-integrity attack.** The Government's reflexive defense — that a NIK color change is itself "some evidence" under Superintendent v. Hill, 472 U.S. 445 (1985) — does not reach a fraud or concealment theory. The Eleventh Circuit holds that Hill "is 'irrelevant'" "when the basis for attacking the judgment is not insufficiency of the evidence." Dean-Mitchell v. Reese, 837 F.3d 1107, 1113 (11th Cir. 2016) (quoting Edwards v. Balisok, 520 U.S. 641, 648 (1997)). The Supreme Court source is Edwards v. Balisok, which holds that allegations of fabrication and bias necessarily imply the invalidity of the disciplinary judgment notwithstanding the existence of "some evidence." 520 U.S. at 646–48.

**This Court has granted § 2241 relief on this principle.** In Smith v. Ives, 275 F. Supp. 3d 1219 (D. Or. 2017), Judge Simon — presiding here — granted a § 2241 petition on facts materially analogous in the respects that matter here: a federal prisoner charged with attempting to introduce liquid synthetic cannabinoids ("K2") through the mail on saturated paper (Code 199A, treated as most like Code 111A), sanctioned with the loss of 41 days of good-conduct time — the same sanction imposed on Petitioner — in a case built from excerpts of facially drug-neutral communications he was denied access to test. Id. at 1220–22. Judge Simon held that denial of access to the records that "constituted the entirety of the foundational evidence against petitioner" violated due process; that because the denial "precludes him from demonstrating prejudice," the petitioner had "made a sufficient showing" for relief; and — consistent with Balisok — declined to reach "some evidence" because the evidence "was not fully developed." Id. at 1224. The Court ordered a new hearing within sixty days, failing which BOP was to expunge the finding and restore the good-conduct time. Id.

**Synthesis.** Petitioner must establish, by clear and convincing evidence, deliberate and material misconduct by a party or officer of the court that subverted the judicial process. He need not relitigate ordinary sufficiency: under Dean-Mitchell and Balisok, the some-evidence standard

does not answer a fabrication, concealment, or bias theory; and under Smith v. Ives, the withholding of the documentary foundation of a drug-introduction charge — with the impossibility of proving prejudice it creates — can itself support relief. The present record makes the showing necessary to vacate and reopen; discovery and a hearing are needed only if the Court identifies a material fact to resolve first.

## IV.  THE NON-TEST EVIDENCE PROVED ASSOCIATION WITH A PACKAGE, NOT THE DRUG ELEMENT OF CODE 111

### A.  Hill deference does not eliminate the charged-offense requirement.

Under Hill, the question is whether there is "any evidence in the record that could support the conclusion reached by the disciplinary board." 472 U.S. at 455–56; ECF 30 at 9. The conclusion reached here was Code 111: introduction of narcotics. ECF 30 at 3. Some evidence of association with a package is not some evidence that the package contained a drug. A court may not uphold one charge on evidence of a different, uncharged theory; a record with no evidence of the charged offense fails due process. Burnsworth v. Gunderson, 179 F.3d 771, 774–75 (9th Cir. 1999).

### B.  The evidence Judge Russo listed did not independently identify a drug — and the Findings and Recommendation said as much about the communications.

The Findings and Recommendation listed communications between Petitioner and the sender, the tracking number, photographs of the papers and testing, staff memoranda, the positive test results, Petitioner's relationship with the sender, adverse credibility findings, and Petitioner's statements. ECF 30 at 10. Those items may show Petitioner knew about or was associated with the package; they do not establish what was in it. The tracking number identifies a mailing; the photographs show papers and test pouches; the staff memoranda repeat the NIK conclusion.

The Findings and Recommendation itself confirms the point as to the communications: it acknowledged that "[t]he emails did not reference illegal substance explicitly," and that the investigator merely believed the references to legal work "were in code." ECF 30 at 2. A belief that communications are coded is not evidence of what substance, if any, was in the package. A DHO

could reasonably view the package evidence as suspicious; the legal problem is that suspicion does not identify the substance.

Communications, tracking, relationship evidence, credibility findings, and a money-transfer narrative may support suspicion, association, or motive. None of them chemically identifies the papers as narcotics.

The non-drug character of the seized papers reinforces this. BOP's own records describe them as appearing to be legal forms from the Law Office of Leslie R. Ramos — divorce-related forms and publicly available federal court (PACER) records concerning another inmate. ECF 12-6 at 1, 5–9. Petitioner offers this not to relitigate the charge but to show the surrounding facts were ambiguous and non-drug-specific, and became "drug" evidence only after the NIK result was labeled positive.

## C.  Respondent's own 2020 briefing confirms the NIK result was indispensable.

Respondent did not treat the non-test evidence as independent proof of drugs. It framed that evidence as corroboration for the NIK result. Respondent wrote that the papers "appeared heavily soaked with liquid narcotics, and tested positive for amphetamines," ECF 38 at 2; that the NIK test "simply confirmed" that the surrounding circumstances "were a ruse to import drugs," id.; that the suspicious behavior and mail were "corroborating evidence of the NIK Test's positive result for narcotics," ECF 38 at 4; and that "[t]he non-NIK Test evidence together with the positive NIK Test result" satisfied Hill, ECF 38 at 5. That is the Government's own structure: positive NIK result plus corroborating circumstances. A fact offered to corroborate a test cannot independently establish the very proposition the test was offered to prove. And BOP's investigative conduct says the same thing: it tested the papers because the charge required proof of a drug. If the surrounding circumstances had themselves supplied that proof, no field test was needed.

## D.  Respondent may not now pivot to an uncharged mail, value-transfer, or contraband theory — and the charge election forecloses it.

BOP's regulations contain separate prohibited acts for conduct that requires no proof of a drug: Code 296 (mail abuses that circumvent monitoring), Code 328 (giving or accepting anything

of value), and Code 305 (possession of anything unauthorized). 28 C.F.R. § 541.3, Table 1. If BOP believed the real misconduct was mail abuse, coded communication, or a value transfer, it knew how to charge that conduct. It did not. It charged Code 111 and alleged "narcotic soaked papers," ECF 30 at 3 — an election that required some evidence of a drug. The Court may not preserve a Code 111 finding on an uncharged non-drug theory. Wolff v. McDonnell, 418 U.S. 539, 563–64 (1974) (notice must allow the inmate to marshal a defense to the charge actually brought). Nor may Respondent recast clean legal papers as "related paraphernalia" independent of a drug finding; the narrative charged narcotic-soaked papers, and the NIK result supplied the "narcotic" premise.

The conclusion follows directly once Part V is understood. The only evidence offered to identify a controlled substance was the NIK result — and Test U produced no direct positive: it did not turn dark blue. Under Safariland's chart, its burgundy reaction could support amphetamine only derivatively, after a preserved Test A orange-to-brown predicate. BOP preserved no such predicate — the United States concedes the transition was never photographed, U.S. Answering Br. at 21 n.5, No. 20-35493 (9th Cir. Oct. 8, 2020) — and never ran Test W. The conditional inference therefore never arose, and no evidence of amphetamine remained — not weak evidence, none. What is left describes only uncharged conduct: suspicious mail, a money transfer, communications BOP believed were coded, association with a package. Those circumstances may identify who was connected to the package; they do not establish what was inside it — and the drug element is what Code 111 required.

**E.  The May 6 footnote cannot survive ECF 63 as a settled merits holding.**

The May 6 footnote stated the Court would deny relief because Judge Russo found some evidence beyond the NIK test. ECF 53 at 7 n.3. ECF 63 changed the posture: the Court granted Rule 59(e), held the petition not moot, and expressly allowed Petitioner to litigate the Rule 60 motion on the merits while raising new arguments against the "other evidence" premise. ECF 63 at 10–11. Those arguments show the other evidence did not independently establish Code 111. If the Court disagrees, Petitioner respectfully requests that it identify the specific non-test evidence that independently proves the papers contained a drug.

## V. THE NIK TEST U EVIDENCE WAS MATERIALLY MISDESCRIBED

**Roadmap for the Court — the chemistry in plain terms.** The misdescription is not subtle, and it can be stated from Safariland's own materials, each confirmable from the manufacturer's product instructions in this record.

| Test | What it screens for | Its direct positive color | What a non-positive color means |
|---|---|---|---|
| Test A (Marquis Reagent) | Amphetamine-type compounds generally (broad screen) | Orange rapidly turning brown | Not amphetamine-type; go to the next applicable test. |
| Test U | Secondary amines — methamphetamine or MDMA (narrow screen) | Dark blue | Not methamphetamine/MDMA. Per the manufacturer: "proceed to Test A and continue Polytesting." A burgundy reaction can point toward amphetamine only derivatively — after a valid Test A orange-to-brown predicate — and, per Footnote 2, "Red in Test U alone does NOT indicate amphetamine-type compounds." |
| Test W (Mandelin Reagent) | Amphetamine itself — the kit's direct amphetamine reagent | Olive green | No direct amphetamine result from Test W. |

Petitioner does not ask the Court to resolve any live scientific dispute, and he does not contend the Test A-to-Test U sequence is unusual or invented. He accepts that Aguilar reported Test A first went orange to brown and that Test U was then run. His point is narrower and prior: BOP stopped short of what its own chart requires and reported a conditional, predicate-dependent inference as though burgundy itself were a standalone positive.

### A. BOP reported Test U burgundy as a positive drug result.

Aguilar's memorandum states: "A small piece of paper was cut and tested with NIK testing kit 'A' lot# 10279321; it had an immediate orange rapidly turning brown color, indicating Amphetamines. Another small piece of paper was cut and tested with NIK testing kit 'U' lot# 10250541; it turned an immediate dark burgundy color, indicating Amphetamines. The tests indicated a positive result for Amphetamines." ECF 12-6 at 2. That language presents the Test U burgundy color as itself "indicating Amphetamines" and presents the result as positive. BOP and

Respondent carried that characterization into the disciplinary and habeas record. ECF 30 at 2, 10; ECF 38 at 2, 4–5.

**B.  Test U's one direct affirmative result is dark blue; burgundy is not a standalone positive.**

The manufacturer's printed instructions state the rule for Test U without qualification: "An immediate dark blue color indicates the presumed presence of methamphetamine or MDMA (Ecstasy). If any other color develops, proceed to Test A and continue Polytesting." ECF 37-3 at 1; accord ECF 12-6 at 4. The instruction identifies one direct affirmative result and directs the operator, on any other color, to run a different test — not to record the color as a finding. Test U's own baseline non-blue appearance is burgundy: "Test U will turn a burgundy color all by itself when the ampoules are broken with substance placed in the pouch. This is the nature of the chemicals." ECF 37-2 at 5.[1]

Test U is not an amphetamine test at all. The Bureau's own training deck states that Test U "tests for the presence of a chemical group called secondary amines" — methamphetamine and MDMA — and Test U's printed insert never mentions amphetamine. NIK System of Narcotics Identification Training, 1005991 rev.-0517, at 60 (Ex. E); ECF 37-3 at 1.

That does not mean burgundy can never bear on amphetamine — and Petitioner does not so contend. The chart assigns burgundy a narrow, conditional role, fixed by Footnote 2 in the manufacturer's own words: "Red in Test U alone does NOT indicate amphetamine-type compounds." ECF 37-3 at 2. Burgundy standing alone identifies nothing; it acquires an amphetamine meaning, if at all, only through the chart's conditional A-to-U pathway, on a preserved Test A predicate.

---

[1] The same insert page contains a training bullet reasoning that a Test U reaction that stays burgundy after a Test A orange-to-brown shift "is considered a negative reaction for the presence of Methamphetamine and therefore, by default, it indicates Amphetamine." ECF 37-2 at 5. That sentence does not make burgundy a positive: by its terms it is a default inference from the absence of the blue methamphetamine indication, conditioned on the documented Test A predicate this record lacks, Part V.C; and it must be read with Footnote 2, ECF 37-3 at 2, and with the manufacturer's construction that any non-blue color "would require additional testing to confirm the result." Dkt. 23-2 at 14, Page ID #309.

Safariland itself has now construed these instructions in federal court. In the related C.D. Cal. action, Safariland's counsel told the court that the Test U instruction that "if any other color develops [besides dark blue], proceed to Test A" is "a warning providing that any other color, including burgundy, would require additional testing to confirm the result," Steffey v. Peters, No. 2:25-cv-11105-VBF-SK (C.D. Cal.), Dkt. 23-2 at 14, Page ID #309 (emphasis added), and — to defeat Petitioner's conspiracy count — invoked the accuracy of the "direct language from Safariland's 'product insert and color chart show[ing] that only BLUE indicates a positive result,'" calling any contrary suggestion "baseless," id. at 19, Page ID #314. The manufacturer, speaking through counsel to a federal court, thus construed its own instructions: burgundy is not a confirmed positive; only blue indicates a positive result. Those statements are the manufacturer's own construction of its own materials — evidence of what the Test U instructions mean, from the party that wrote them — and they are irreconcilable with the representation to this Court that Test U burgundy was itself "indicating Amphetamines." No comparable manufacturer statement was before any court that has accepted the burgundy label. See Parts V.D, V.G, X.

**C.  BOP preserved no Test A predicate, and the kit's direct amphetamine reagent — Test W — was never run.**

Because a burgundy Test U reaction supports amphetamine only after a valid Test A orange-to-brown predicate, two record facts are dispositive.

First, the predicate was never preserved. Aguilar claims it occurred: his memorandum reports that Test A showed "an immediate orange rapidly turning brown color." ECF 12-6 at 2. That claimed transition is a seconds-long event. The manufacturer puts it "within 10-12 seconds" in the governing-era training deck, NIK System of Narcotics Identification Training, 1005991 rev.-0517, at 36, 63 (Ex. E), on the governing-era chart itself, ECF 37-3 at 3 (Ex. B), and "within 10 to 12 seconds" on its current chart, Ex. L at 2. And the United States has conceded there is no photograph of it: "[w]hile the photograph does not capture Test A's transition from orange to brown," the Government relied solely on "Aguilar['s] state[ment] that Test A turned orange first before turning brown." U.S. Answering Br. at 21 n.5, No. 20-35493 (9th Cir. filed Oct. 8, 2020)

(Ex. F). The record instead holds a static, already-brown end state photographed roughly an hour after the incident (incident 11:30 a.m.; photographs 12:30 p.m.). ECF 12-6 at 5–8. A still cannot document a ten-second transition — a frame of a brown pouch is equally consistent with a reaction that was never orange at all — and on Safariland's own master table a "brown result" standing alone in Test A routes to Test I, not to the amphetamine lane. Ex. C at 1; accord Riley v. Entzel, 2026 U.S. Dist. LEXIS 88288 (E.D. Ky. Apr. 22, 2026) (quoting Roper v. LeMaster, No. 24-cv-104-DLB (E.D. Ky. July 2, 2025)) (had the sample "turned to brown directly, the IdentiDrug Chart indicates that NIK Test I or NIK Test B would have been used"). NIK training told testers to "[n]ever rely on the results of Test A alone," to keep timed notes of all color changes, and to stop when a reaction falls outside the stated timeframes; here there is no photograph, no video, no timing note — only the technician's own uncorroborated wording. Only that objectively unpreserved, time-critical transition selects the amphetamine lane at all.

Second, the kit's direct amphetamine reagent was never used. Safariland does not leave "amphetamine, as opposed to methamphetamine/MDMA" to a reading of Test U's baseline color; it supplies a dedicated test for exactly that question: Test W (Mandelin Reagent), "a test for Amphetamines and Methadone," where "an immediate olive green color indicates the presence of Amphetamines." ECF 12-6 at 4. Test W is the only reagent in the NIK set whose direct affirmative endpoint identifies amphetamine as such. It was available in the same kit, and it was never run. ECF 12-6; ECF 30; ECF 38. The one direct confirmation the kit makes available for the very drug charged was skipped. Each step was available in December 2017 — the chart BOP itself used lists Test W on its face, ECF 12-6 at 4 — and the Bureau chose not to take them.

The point must be stated precisely; precision makes it durable on appeal. Test U produced no direct positive. Its burgundy reaction could support amphetamine only derivatively, on a time-sensitive Test A predicate that was never objectively preserved; and the dedicated amphetamine test that would have supplied a direct result was never performed. Aguilar's memorandum erased every one of these distinctions in a single sentence, reporting that Test U burgundy itself was "indicating Amphetamines" and that "[t]he tests indicated a positive result for Amphetamines."

ECF 12-6 at 2. In plain terms: BOP presented two steps of a three-step test and reported the missing third step's conclusion. The DHO and this Court were given a standalone positive-Test-U label the manufacturer's chart does not support — not a candid account of an unconfirmed, predicate-dependent inference from which the direct amphetamine test was omitted.

**D. This is a no-evidence case, not a false-positive case — and that distinguishes it from the decisions the Government will cite.**

Petitioner does not ask the Court to resolve an open scientific question or to reweigh a disputed result. His challenge goes to existence, not reliability. The § 2241 decisions the Government will invoke were false-positive cases: the inmates conceded a positive and disputed its accuracy. Petitioner shows there was no positive to begin with — no preserved Test A predicate, so the conditional inference never arose; what remained was a non-blue Test U reaction reported as "a positive result for Amphetamines." ECF 12-6 at 2. Where courts have sustained burgundy-based findings, they first credited a valid Test A predicate and then deferred to the derivative A-to-U inference. Petitioner's record presents the defect those courts did not decide: the predicate they found present is, on this record, absent.

Jenkins v. United States, 2024 U.S. Dist. LEXIS 160629 (N.D. Ala. Sept. 6, 2024), illustrates both the pattern and the distinction. There, after a full FTCA bench trial, the court sustained a technician's burgundy-based amphetamine reading — on a record different in three dispositive respects. First, the predicate was litigated and credited through the technician's live testimony that Test A ran orange to brown; Petitioner's record contains no objectively preserved record of the time-sensitive predicate — no photograph (as the United States concedes), no timing note, no testimony subject to adversarial testing; only Aguilar's conclusory memorandum wording. Second, the Bureau's own training exhibit in Jenkins states Petitioner's chemistry: "[b]y not turning dark blue and staying burgundy, this is considered a negative reaction for the presence of a secondary amine (Methamphetamine) and therefore it is an amine (Amphetamine)." Id. (quoting Trial Ex. 16, p. 56) (emphasis added). In the Bureau's own training language, burgundy is a negative reaction from which amphetamine may be inferred only through the Test A branch — the

conditional structure BOP's flat "positive result for Amphetamines" label concealed. Third, Jenkins predates Safariland's December 15, 2025 litigation construction of Test U (Part V.B); no manufacturer statement construing Test U was before the Jenkins court. No court that has accepted the burgundy label has ever confronted the manufacturer's own construction of its test.

BOP did not present its result as a conditional inference at all; it presented Test U burgundy itself as "indicating Amphetamines." If Respondent now argues that the Test A report plus Test U burgundy equals amphetamine under Safariland's sequence, that argument confirms the defect: it concedes the reading was always conditional on a Test A predicate, and it does not explain why that predicate was never preserved or why Test W was never run. That conditional theory is, at minimum, a matter for discovery and an evidentiary hearing; Petitioner reserves response for reply and any hearing.

### E.  BOP's own narrative separately claimed "Synthetic Marijuana also known as Spice."

The same exhibit that carries Aguilar's testing memorandum records that SIS believed Petitioner was "anticipating the arrival of the package of Synthetic Marijuana also known as Spice." ECF 12-6 at 9. That is not amphetamines, and it is not what Tests A and U were represented to identify. In the C.D. Cal. action, Safariland's motion recited Plaintiff's allegation that Safariland "never claimed that NIK tests can detect K2/Spice" and characterized such detection as outside its marketed product uses. Dkt. 23-2 at 15, Page ID #310. This mismatch alone does not prove innocence; the point is that BOP's file advanced two unreconciled drug theories, while the only drug-identification evidence was a NIK result that the materials in the record show was not a standalone Test U positive.

### F.  Respondent's own exhibit contradicts the narrative that the legal-mail character of the envelope was unclear.

The Chetwood Declaration told the Court Petitioner "was not told the item was sent as legal mail or satisfied BOP's legal mail requirements." ECF 12 at 5. The Government's own photographs show the envelope bearing red "LEGAL MAIL" and "open in presence of inmate" markings. ECF

12-6 at 5–9. The presentation was selective: ambiguous, non-drug-specific facts were rendered inculpatory only after the NIK result was labeled positive.

**G.  Safariland's 2021 revision of the same chart states the rule in terms — and its own disclaimer forecloses any contrary reading of the governing-era chart.**

In 2021, Safariland reissued the very chart in this record — same product, same part number, same chemistry — and on the manufacturer's own current statement, the result recorded against Petitioner was never a completed positive: "Only by following the proper sequence of tests from A to U to W is a positive result obtained." Ex. L at 2. The record chart is PART# 190-601 REV 0907 (© 2007). ECF 37-3 at 2. The current chart is PART# 190-601 REV 2021 (© Safariland, LLC), downloaded July 1, 2026 from Safariland's own Forensics Source retail site, https://forensicssource.com/products/identidrug-polytesting-desk-chart-1004933. Ex. L; Suppl. Steffey Decl. ¶¶ 2–3 (Ex. M). See Ex. Q (side-by-side, operative language highlighted). Petitioner does not contend the 2021 revision governed his December 2017 testing; every rule he applies is a governing-era rule. The 2021 chart enters only as the manufacturer's construction of an unchanged chemical system and as corroboration that "A to U" was never a completed amphetamine positive.

Three revisions matter, and each runs in the same direction. First, Footnote 2 — the same footnote, in the same position on the chart — now carries a third sentence. After "Red in Test U alone does NOT indicate amphetamine-type compounds," the 2021 chart adds: "Amphetamine is indicated following Test W result." Ex. L at 1. Second, the chart's worked EXAMPLE now states the complete sequence in terms: "A blue result in Test U confirms the presence of Methamphetamine. A reddish-pink or negative result in Test U indicates an Amphetamine-type compound. An olive-green result in Test W will indicate the presence of Amphetamine." Ex. L at 2. The governing-era chart's corresponding sentence read "from A to U." ECF 37-3 at 3. Third, the drawn amphetamine lane itself no longer terminates at Test U: it continues through Test W to an olive-green endpoint. Ex. L at 1. On the manufacturer's current chart, the amphetamine answer comes from Test W — the test never run here.

The chemistry did not change; only the manufacturer's statement of how to read it did. The reagents are the same reagents: the Test U insert in this record (1004926 - REV1109, ECF 37-3 at 1) and the Test U insert Safariland ships today (1004926 - REV0215, Ex. N) carry the identical operative language — dark blue indicates; any other color, "proceed to Test A and continue Polytesting." Ex. N. Across every revision from 2007 through 2021, no Safariland document has ever stated that a burgundy Test U reaction is itself a positive result for amphetamines. The 2007 chart strips red-alone of meaning; the 2021 chart names Test W as where amphetamine "is indicated." The only document in this record that treats burgundy as itself the positive is BOP's. ECF 12-6 at 2.

Safariland has also foreclosed the one response available to Respondent. The 2021 chart states on its face — as its 2007 predecessor did — that "[t]his latest revision in no way reflects upon or affects the accuracy of previous Polytesting charts." Ex. L at 1; ECF 37-3 at 2 (same sentence, REV 0907). If the 2021 chart states expressly what the prior chart already meant, then in December 2017 a non-blue Test U reaction was, at most, an intermediate indication en route to a confirmation that never occurred. If instead Respondent contends the revision changed the rule, that concedes the dispositive point: the governing-era chart did not state an A-to-U completed positive either — its Footnote 2 said the opposite — and the change Respondent would invoke is one the manufacturer says never occurred. As for retroactivity: none is at work — every rule applied here predates the incident.

Nor can Respondent recast the recording as an innocent misreading of confusing instructions. The Bureau's NIK certifications came through the vendor itself: records released under FOIA show staff completed Safariland's own end-user course, with vendor grading and certificate issuance. Ex. O. The Western Region's SIA enforced it in writing weeks after Petitioner's test: "ensure the staff member who tests the narcotics is certified to do so" — "[w]e have lost too many Incident Reports to appeals based on staff not being certified." Ex. J at 5. A vendor-certified operator should not mistake a continue-Polytesting instruction for a completed

positive; at minimum, the certification record makes any innocent-mistake account a factual question for discovery and a hearing.

From the disciplinary hearing forward, Petitioner has maintained one position: that Test U's only affirmative result is dark blue; that a burgundy reaction identifies no drug by itself; and that the reagent Safariland supplies to identify amphetamine is Test W. The manufacturer's current chart now states each of those propositions in terms, Ex. L, and states on its face that this clarification "in no way reflects upon or affects the accuracy of previous Polytesting charts." By the manufacturer's own account, then, nothing chemical changed between 2017 and 2021; the reagents and their results are the same, and only the precision of the manufacturer's wording improved. The consequence is that the position Petitioner has held since the disciplinary hearing was correct under the chart in force in 2017, not merely under its later restatement. Petitioner was not constructing a theory. He was reading the instructions.

## VI.  THE MISDESCRIPTION WAS MATERIAL TO THE JUDGMENT

The NIK evidence was not incidental; it supplied the only evidence of the drug element, and Respondent's own filings prove materiality: the NIK test "simply confirmed" the suspicious circumstances were a drug-importation ruse, ECF 38 at 2; the surrounding circumstances were "corroborating evidence of the NIK Test's positive result for narcotics," ECF 38 at 4; and the non-NIK evidence "together with the positive NIK Test result" satisfied the standard, ECF 38 at 5. The non-test evidence gave the Court a reason to suspect Petitioner was connected to the package; the NIK result gave the Court the drug.

BOP's own drug-testing policy confirms why that distinction is material. Under Program Statement 6060.08, an initial urine positive must be confirmed by a second test, using a different laboratory procedure, before it is reported. BOP Program Statement 6060.08, Urine Surveillance and Narcotic Identification, §§ 9.c, 11. The same Program Statement requires institutions to maintain NIK kits to determine the identity of unknown substances, but Safariland's training materials state that field tests are presumptive, not confirmatory; are not proof-positive, conclusive, or evidentiary; should never be the sole determining factor; and that substances should be

forwarded to a forensic laboratory for qualitative analysis. NIK System of Narcotics Identification Training, 1005991 rev.-0517, at 2–3, 31, 73. The urine rule does not directly govern seized-paper testing; the point is institutional knowledge: BOP knows the difference between a presumptive screen and confirmed drug proof — yet in NIK paper cases it treated a user-interpreted, non-blue Test U color as final proof of the drug element, without laboratory confirmation, against the manufacturer's own warnings. That contrast makes the positive-Test-U label material to the judgment and makes the nondisclosure of the contrary NIK records central to Rule 60(d)(3).

## VII.  THE "ONE TEAM" EMAILS INDEPENDENTLY SHOW A NEUTRAL-DECISIONMAKER DEFECT

In January 2018 — while Petitioner sat in the Special Housing Unit on this incident, days before his incident report issued on January 31, 2018, and weeks before his February 13, 2018 DHO hearing — BOP Western Regional SIS leadership circulated internal drug-testing guidance and tied it to DHO coordination. This is an independent Rule 60(d)(3) integrity ground and, at minimum, a discovery ground. Regional SIS leadership instructed SIS staff to "communicate with your DHO," directed that the guidance be sent "to your DHOs," and framed the exercise as operating as "one team" so inmates would not "beat us based on technicalities." Lynn emails, Jan. 23–25, 2018, Ex. J. Read beside Petitioner's sworn 2020 account, the withheld emails transform an unsupported inmate allegation into a corroborated institutional-practice issue.

**The verbatim directives — and their reach.** The chain's relevant feature is the adjudicative coordination. Regional SIS leadership stated that BOP had "lost too many [Incident] Reports to appeals," instructed staff to "communicate with your DHO," and added: "Remember we are all on one team … let's not let the inmates beat us based on technicalities." Ex. J. On January 25, 2018, the guidance was forwarded with the instruction: "Can you please send this out to your DHOs as a follow up to your email from yesterday." Id. The same chain tied the testing to staff certification — who ran the test, and that the tester was certified — alongside the lost-appeals warning. Id. Nor was it local guidance: it issued from the Western Regional Office — R. John Lynn, CSS (SIA) — for distribution across the Region's institutions, the Region that includes FCI

Lompoc, where Petitioner's hearing was then pending. Id. Petitioner had been in the Special Housing Unit since immediately after the December 5, 2017 incident, ECF 30 at 8, and remained in administrative detention when these directives circulated.

**The governing principle.** Wolff guarantees a disciplinary respondent "an impartial decision-making body." 418 U.S. at 570–71. The Bureau's regulation codifies that guarantee: the DHO "may not be … a victim, witness, investigator, or otherwise significantly involved in the incident." 28 C.F.R. § 541.8(b). Accord Meyers v. Alldredge, 492 F.2d 296, 306 (3d Cir. 1974): an impartial tribunal forbids adjudication by officials with "a direct personal or otherwise substantial involvement … in the circumstances underlying the charge." And an impartiality defect is not answered by "some evidence": Edwards v. Balisok holds that a claim that the hearing officer's deceit and bias tainted the proceeding necessarily implies the invalidity of the loss of good-time credits even if some evidence existed. 520 U.S. at 646–48.

**The emails corroborate the very allegation the Court rejected in 2020.** In the original proceeding, Petitioner averred under oath that his hearing was prearranged: that Aguilar told him the outcome had been arranged with the DHO if he did not contest the charge, and that DHO Chetwood opened the hearing by saying, "I have already talked to SIS Aguilar and he told me the deal." ECF 30 at 7–8. The Court found that "theory … not persuasive" and concluded Petitioner "ha[d] not established that DHO Chetwood was not impartial." Id. at 8. That credibility determination also rested on DHO Chetwood's sworn denial: he attested that "[t]here is no evidence of collusion between me and SIA Aguilar" and that his impartiality was shown by his status as one "who was not a victim, witness, investigator, or otherwise significantly involved in the incident." Chetwood Decl. ¶¶ 18–19 (ECF 12). Both representations were made to the Court on a record from which the Lynn emails were absent. Those emails — issued by Regional SIS leadership while Petitioner sat in pre-hearing detention — directed the precise investigator-to-adjudicator coordination he described. What the Court dismissed in 2020 as an implausible inmate account is, on the documents BOP did not produce, the agency's own contemporaneous directive.

Petitioner does not contend the emails name his DHO or his case; they corroborate the practice he described and remove the very basis on which his sworn account was disbelieved.

**The two grounds the Court gave for rejecting the allegation do not withstand the record.** First, the Court reasoned that Petitioner "did not 'take the shot on the chin'" because he "provide[d] a lengthy list of objections" — while acknowledging in the same sentence that he "did not admit or deny the allegations or present any witnesses." ECF 30 at 8. Petitioner mounted no defense: he called no witness, offered no evidence, and contested nothing of substance. The questions he did prepare he wrote on a sheet of paper that the DHO retained; they were never asked. Suppl. Steffey Decl. ¶ 5 (Ex. M). Preserving objections while declining to put on any defense is not "fighting" the charge; it is consistent with an inmate who believed the outcome was already arranged. Second, the Court reasoned that Petitioner's contention that he received no disciplinary segregation was "belied by" his immediate, weeks-long pre-hearing SHU placement. Id. That conflates administrative detention with imposed punishment: for a Greatest-Severity Code 111 charge, SHU placement pending the DHO hearing is automatic and administrative — a custody status, not a sanction — and the Court's own findings confirm the DHO "imposed a suspended sentence of 60 additional days of disciplinary segregation," that is, no segregation time to serve. Id. His continued SHU time reflected pre-hearing detention and, after the hearing, his status awaiting a disciplinary transfer to a higher-security institution out of state. Suppl. Steffey Decl. ¶¶ 4, 6 (Ex. M). The unusually lenient, fully suspended sanctions are precisely the outcome the alleged prearrangement predicted — and the Lynn emails now supply the institutional corroboration the 2020 record lacked.

**The relief this supports.** A disciplinary judgment entered by a tribunal that was not impartial cannot stand, Wolff, 418 U.S. at 570–71, and "some evidence" does not save it, Balisok, 520 U.S. at 646–48. Petitioner's sworn account no longer stands alone. The emails become an independent basis for vacatur if the Court credits the corroboration or if discovery confirms case-specific DHO/SIS involvement; at minimum they establish good cause for discovery into the

DHO/SIS/OGC communications concerning his Code 111 proceeding, so the Court can determine whether the adjudicator was "significantly involved in the … incident." 28 C.F.R. § 541.8(b).

## VIII.  WITHHELD BOP RECORDS SUPPORT DISCOVERY WITHOUT EXPANDING THIS MOTION BEYOND THE AMPHETAMINE NO-EVIDENCE DEFECT

### A.  The Oregon theory remains narrow: amphetamine, missing predicate, and no Test W.

The Oregon defect is narrow and complete: BOP reported a non-blue Test U reaction as a finished amphetamine positive, preserved no Test A predicate sufficient to trigger the derivative A-to-U inference, and never ran Test W.

The Bureau's own intelligence also believed the suspected substance was "Synthetic Marijuana also known as Spice." ECF 12-6 at 9. That mismatch matters because the file advanced unreconciled drug theories while the only drug-identification evidence was a predicate-dependent inference presented as a standalone positive.

### B.  The withheld SIS records remain discovery targets because they bear on burgundy reporting and DHO coordination.

The January 2018 Lynn emails, the written SIS testing procedures that BOP incident reports cite on their face — including the "SIS ADVISORY dated March 27, 2017" invoked in the Bailey report, Ex. P — and the NIK flow-chart pages BOP has withheld in full are BOP records, absent from the 2020 habeas record, bearing on whether the Bureau had non-public guidance for reporting burgundy Test U reactions as positive and for coordinating SIS drug cases with DHOs. They matter because discovery is necessary into whether the positive-Test-U label given to the DHO and this Court was an isolated description or an institutional reporting practice, and whether the DHO process was affected by undisclosed coordination.

### C.  Petitioner pursued these records diligently, and BOP continues to withhold related records.

Petitioner has pursued the withheld records since before judgment. In 2019 and 2020, while this case was pending, he requested the BOP/Safariland NIK testing instructions, flowcharts, bulletins, Test U materials, and records identifying who directed staff to treat burgundy as positive

— and renewed those requests repeatedly in 2025 and 2026. BOP located responsive pages in 2019 but withheld them in full, and has since invoked exemptions, a "complex track," and multiple components to avoid disclosure — returning pages fully redacted or blank while acknowledging the records exist, and declining even to acknowledge the Lynn emails when Petitioner attached his own copies. FOIA Nos. 2019-06228, 2020-02370, 2026-00947, 2026-04268, 2026-05140.

Petitioner does not ask the Court to decide a FOIA claim. The point is narrower: the records the Bureau has withheld in full — as "law-enforcement sensitive" and exempt — are the very emails, policies, and advisories that would confirm or refute the burgundy practice and show whether the positive-Test-U label presented to the DHO and to this Court was an isolated technician's mistake or an institutional practice. Their continued withholding, for more than six years, is itself a reason to permit the limited discovery Petitioner seeks. BOP's May 2020 response to Request No. 2020-02370 illustrates the pattern: it withheld the requested NIK flow chart in full under Exemption 7(E) while releasing records showing NIK end-user certification ran through the vendor, which graded the course tests and issued the certificates. Ex. O.

## IX.  THE MONTHS-LONG SHU CONFINEMENT AND THE ABANDONED CRIMINAL REFERRAL REQUIRE DISCOVERY

BOP's post-incident handling supplies a further, targeted ground for discovery. Petitioner was held in the SHU for 57 days before any incident report issued, ECF 30 at 2–3, and for months in total, told he was pending FBI prosecution; no prosecution ever occurred. Each possible explanation cuts in his favor and turns on records uniquely in the Government's possession: if the matter was never referred, the "pending FBI prosecution" representation that justified months of confinement was materially misleading; if referred and declined, that confirms the NIK label could not sustain a prosecution requiring admissible proof of drug identity; and if any laboratory test returned negative, inconclusive, or inconsistent results, the nondisclosure of that result would be central to the Rule 60(d)(3) inquiry.

Petitioner therefore requests discovery into all referral, laboratory, declination, evidence-retention, and SHU-placement records concerning the December 5, 2017 incident — records that

would exist if a referral occurred, and that bear directly on whether the Government possessed information inconsistent with the positive-test premise.

## X.  THE RECURRING § 2241 PATTERN CONFIRMS THE MATERIALITY OF THE "POSITIVE NIK" LABEL

The misrepresentation at the center of this motion did not occur in a vacuum. Reported decisions reflect a recurring formula: a NIK field result is labeled "positive," the label is presented to the tribunal as the identification of the controlled substance, the court accepts it under Hill, and the remaining "other evidence" shows only that the inmate was connected to the item. These cases are offered for one limited point — not to prove any inmate innocent, and not as merits holdings (most denied relief) — but to show the label carries the drug element; when the label is a misrepresentation, the judgment cannot stand on circumstantial proof alone.

**The label, not confirmed chemistry, supplies the drug element — and the label is unstable on its face.** In this District, Vasquez-Maldonado v. Salazar, 2020 U.S. Dist. LEXIS 24837, at *2 (D. Or. Feb. 12, 2020), recited that a "second test with 'kit U' … resulted in a positive test for Amphetamines, reflected by a burgundy color," and sustained the finding; Schreane v. Watson, 2021 U.S. Dist. LEXIS 96463, at *2, *9–10 (S.D. Ind. May 20, 2021), did the same for a "maroon in color result." Yet Wilson v. Fikes, 2021 U.S. Dist. LEXIS 117733, at *18, *21–22 (D. Minn. May 18, 2021), placed two BOP reports side by side: the petitioner's "maroon" Test U result "indicates a positive result for amphetamines," while a comparator inmate's identical "maroon" result "indicates a negative result for Methamphetamines." Id. at *22; accord Alejandro v. Fikes, 2021 U.S. Dist. LEXIS 106365 (D. Minn. Apr. 19, 2021) (same reading). A single endpoint reported as "positive" in one record and "negative" in another confirms the dispositive variable is the label, not a fixed readout. And the blue cases complete the picture: where Test U turned blue, that too was a positive — "a blue color indicating a positive result for methamphetamine." Miley v. Warden, 2023 U.S. Dist. LEXIS 135822, at *3 (E.D. Tex. July 7, 2023) (R. & R.), adopted, No. 1:22-cv-00243 (E.D. Tex. Aug. 2, 2023); see Goodloe v. Sage, 2024 U.S. Dist. LEXIS 5577 (M.D. Pa. Jan. 10, 2024) (Tests A, U, and W each separately reported "positive" for amphetamines).

Between the burgundy cases and the blue cases, every reported Test U outcome was a positive for something — a no-win reading under which no color the pouch produced could clear the inmate. Where courts have left the door open, Petitioner stands inside it: Baltazar v. Barnhart, 2019 U.S. Dist. LEXIS 180532, at \*4–5 (E.D. Ky. Oct. 17, 2019), aff'd, 2020 U.S. App. LEXIS 18724 (6th Cir. June 12, 2020), held a petitioner may defeat some-evidence by showing the test "provided essentially no evidence at all," failing only for offering no kit-specific evidence, and Ortiz-Negron v. Baltazar, 2019 U.S. Dist. LEXIS 80314, at \*14 (M.D. Pa. May 10, 2019), rejected the reliability challenge because the petitioner "raised no such challenge at the disciplinary hearing." Petitioner raised his at the hearing, and he now supplies the kit-specific manufacturer materials.

**The practice spans more than a decade, and the burgundy label has functioned as a catch-all.** In 2014, BOP's own record acknowledged a paper substrate "produced a false positive result for amphetamines" that laboratory testing "failed to substantiate." Fenner v. Ebbert, 2014 U.S. Dist. LEXIS 154440, at \*1–2, \*7 (M.D. Pa. Oct. 31, 2014). In August 2017 — four months before Petitioner's test — an FCI Herlong incident report applied "NIK testing procedures outlined in an SIS ADVISORY dated March 27, 2017" to suspected K2-saturated greeting cards and recorded the burgundy Test U reaction as indicating "the presence of Amphetamine." Incident Report No. 3025931, Ex. P. One color: reported positive for amphetamines in one record, reported negative for methamphetamine in another — and, on suspected-K2 paper, recorded as amphetamine all the same.

**After the 2021 revision, the Bureau's own incident reports demonstrate institutional knowledge of the sequence — and the contrast with this record.** In decisions from 2024 through 2026, BOP's own testing memoranda narrate the amphetamine lane exactly as the current chart draws it: burgundy is a waypoint, and the amphetamine indication comes from Test W. In Fuller v. Rich, 2025 U.S. Dist. LEXIS 13989, at \*7 (E.D.N.C. Jan. 27, 2025), the officer wrote that Test U "turned the test a burgundy color, directing me to NIK test kit W," whose olive result "indicated a positive result for Amphetamines." In Cloud v. Lepe, No. 2:25-cv-05671-FLA-JC, 2025 U.S. Dist. LEXIS 271768 (C.D. Cal. Dec. 7, 2025), the report states: "[t]he final test kit according to the

identidrug test chart is test kit 'W.'" Accord Mahasin v. Warden, USP Atwater, 2025 U.S. Dist. LEXIS 196514 (E.D. Cal. Oct. 3, 2025) (Tests A, U, and W "in order"; technician: "I am NIK test certified"). Riley v. Entzel supplies the sharpest exhibit: in May 2024, BOP ran the full A-U-W series, then rewrote the incident report two weeks later so the reported colors would match the chart — Test A from "turned brown" to "turned Orange … then … brown," Test W from "yellow" to "olive-green" — and the court sustained the finding because Test W "was conducted in conformity with the IdentiDrug Chart following a positive 'burgundy' result at the step before," while observing that the "burgundy" reported for Test U is "described generically as 'red'" in the chart itself. Riley, 2026 U.S. Dist. LEXIS 88288. Yet in the same post-revision years, other BOP records continued to stop at Test U and report burgundy itself as the finding: the paper "did test positive for Amphetamines … utilizing NIK Test kit 'A' (Orange to Brown) then Test Kit 'U' (Burgundy)." Rodriguez v. Gutierrez, 2023 U.S. Dist. LEXIS 83381 (D. Ariz. Apr. 4, 2023); accord Honesty v. Joyner, 2024 U.S. Dist. LEXIS 187158 (E.D. Ky. Oct. 15, 2024) (positive for amphetamines "using two different test kits (NIK Test Kit A and NIK Test Kit U)"). A reaction enlisted as the amphetamine verdict in one report, a routing waypoint in another, a methamphetamine negative in a third, and conformity material in a fourth is not a chemical finding; it is an instrument. When BOP follows the manufacturer's chart, it goes past burgundy to Test W. When it charged Petitioner, it stopped at burgundy and called the stop a positive.

**The manufacturer's 2021 chart closes the arc.** In 2021, Safariland reissued the chart so that the amphetamine lane no longer ends at Test U at all: "Amphetamine is indicated following Test W result," Ex. L; Part V.G. A decade of BOP records treated a non-blue Test U color as the finding; the manufacturer's current chart assigns the finding to a test never run here. The label did the work the chemistry could not — and this record is where the label was presented to this Court as proof.

## XI.  THE PRESENT RECORD ESTABLISHES FRAUD ON THE COURT AND WARRANTS VACATUR

The present record establishes the Rule 60(d)(3) showing by clear and convincing evidence, or at minimum establishes good cause for the targeted discovery and hearing needed to resolve any remaining factual issue, for four reasons.

**First, the representation was material.** The judgment required some evidence of Code 111, and the only evidence identifying a drug was the NIK result; Respondent's own briefing confirms the other evidence corroborated the NIK result rather than replacing it. ECF 38 at 2, 4–5.

**Second, the representation was false or materially incomplete in a way ordinary litigation could not correct without the concealed records.** Test U burgundy was reported as "indicating Amphetamines" and "positive." ECF 12-6 at 2. But Test U's one direct affirmative result is dark blue, ECF 37-3 at 1, burgundy appears "all by itself" as the reagent's baseline color, ECF 37-2 at 5, and under Footnote 2 "[r]ed in Test U alone does NOT indicate amphetamine-type compounds," ECF 37-3 at 2. BOP preserved no Test A predicate (the transition was never photographed, U.S. Answering Br. at 21 n.5, No. 20-35493) and never ran Test W — the test to which the manufacturer's current chart expressly assigns the amphetamine indication. Ex. L; Part V.G. The DHO and this Court were given a standalone positive-Test-U label the manufacturer's chart does not support.

**Third, the concealment affected the judicial process.** In 2020 the Court denied discovery for lack of good cause. ECF 30 at 10–11. But the documents that would have supplied good cause — the withheld burgundy-reporting records, the "one team" emails, and the related BOP records — were not disclosed, and their absence let a non-blue Test U color pass as ordinary positive test evidence rather than a disputed, conditional premise requiring development. Under Smith v. Ives, 275 F. Supp. 3d at 1224, where the documentary foundation of a drug-introduction charge is withheld and the withholding precludes the petitioner from demonstrating prejudice, the petitioner has "made a sufficient showing" for relief.

**Fourth, this is directed at the integrity of this Court's judgment.** The United States presented this Court with positive NIK drug evidence while BOP possessed institutional records undermining the way burgundy was being reported, and presented the DHO proceeding as ordinary adjudication while withholding regional directives instructing SIS staff to coordinate with DHOs as "one team" against inmate "technicalities." Under Dean-Mitchell and Balisok, the some-evidence standard is irrelevant to those integrity defects.

The record establishes each of these points by clear and convincing evidence sufficient to vacate the judgment and reopen the petition. **If the Court is not prepared to grant vacatur on the present papers,** the proper course is not denial: it is limited discovery and an evidentiary hearing directed to whatever factual question the Court identifies, including intent, concealment, Test A documentation, or DHO/SIS coordination.

## XII.  IF THE COURT DOES NOT VACATE ON THE PRESENT RECORD, GOOD CAUSE EXISTS FOR LIMITED DISCOVERY AND AN EVIDENTIARY HEARING

Petitioner's primary request is vacatur on the present record; this Part is reached only if a material fact must be developed first. Habeas discovery is available for good cause where specific allegations show reason to believe the petitioner may be entitled to relief if the facts are developed. Bracy v. Gramley, 520 U.S. 899, 908–09 (1997); ECF 63 at 10–11. Petitioner requests narrowly tailored discovery, and an evidentiary hearing, limited to the matters the Court identifies — for example:

1.  All NIK Test A and Test U instructions, training materials, color charts, competency materials, and manufacturer communications in BOP's possession from December 5, 2017 through May 18, 2020; and all revisions of the IdentiDrug chart (PART# 190-601, including REV 0907 and REV 2021) in BOP's possession, together with any guidance implementing or distributing any revision;

2.  All records concerning the NIK Test A lot 10279321 and Test U lot 10250541 used in Petitioner's case, including expiration, storage, chain-of-custody, and staff-certification records; Aguilar's NIK end-user certification and vendor training records (including the chart revision used); and the flow-chart pages withheld under FOIA Nos. 2019-06228 and 2020-02370;

3.  All photographs, metadata, chain-of-custody records, and evidence logs concerning the December 5, 2017 mailroom evidence and NIK testing, including the basis for the 11:30 a.m. incident time and 12:30 p.m. photo time;

4.  The January 18, 2017 SIS Advisory, the March 27, 2017 SIS Advisory, all attachments and distribution records, and all BOP/Safariland communications concerning burgundy Test U results, Test A/Test U interpretation, Test W availability or use, K2, Spice, or synthetic cannabinoids;

5.  The January 23–25, 2018 Lynn email chain, all attachments, distribution lists, and any responsive DHO/OGC guidance;

6.  Communications among SIS staff, the DHO, OGC, and regional SIS staff concerning Incident Report 3084272, the NIK testing, the charge selection, appeal risk, or Petitioner's DHO hearing;

7.  All FBI, DEA, USAO, or other law-enforcement referral, evidence-submission, laboratory, declination, evidence-retention/destruction, and SHU-placement records concerning the December 5, 2017 incident; and

8.  FOIA and records-processing materials for Petitioner's requests since 2019 seeking NIK Test U, SIS Advisory, Safariland, and burgundy-positive records, including requests 2019-06228, 2020-02370, 2026-00947, 2026-04268, and 2026-05140, limited to search notes, responsive-record identification, withholding bases, and communications concerning withheld emails, policies, advisories, and NIK/Safariland records.

Petitioner also requests an evidentiary hearing at which he may examine witnesses with knowledge of the NIK testing, the DHO process, the SIS Advisory records, the criminal referral, and the FOIA withholding — including SIS Technician Aguilar, the DHO, R. John Lynn, and an appropriate BOP records/FOIA custodian.

## XIII.  RELIEF REQUESTED

Petitioner respectfully requests that the Court:

1.  Grant this Rule 60(d)(3) motion and VACATE the May 18, 2020 judgment and the order adopting the Findings and Recommendation (ECF 39, 40), and reopen the § 2241 proceeding;

2.  Upon vacatur, if the Court reaches the reopened petition's merits on the present record and concludes that, once the Test U misrepresentation is set aside, the disciplinary finding lacks some evidence of the Code 111 drug element, order BOP to expunge Incident Report 3084272 and the Code 111 finding from Petitioner's central and disciplinary records and to correct any records reflecting it;

3.  Clarify that the May 6, 2026 footnote (ECF 53 at 7 n.3) is not a final adjudication that non-test evidence independently established the Code 111 drug element;

4.  Alternatively, if the Court concludes immediate expungement is premature after vacatur and reopening, or if it cannot grant vacatur or merits relief on the present record, order the limited discovery and focused evidentiary hearing described in Part XII before deciding the Rule 60 motion or the reopened petition's merits; and

5.  Grant any further relief the Court finds just.

## XIV.  CONCLUSION

The dispositive question is not whether suspicious circumstances existed; they did. It is whether the record contained some evidence that the package contained a drug — what Code 111 required and what BOP charged. The drug-identification evidence was the NIK testing, and it produced no positive. Test U's one direct affirmative result, shown on the pouch's own reference square and stated in the manufacturer's instructions, is dark blue. BOP obtained burgundy — the reagent's baseline color, which supports amphetamine only derivatively, after a preserved Test A orange-to-brown predicate — and told the DHO and this Court that burgundy itself was "indicating Amphetamines" and "positive." It did so without preserving the predicate that Safariland's Footnote 2 makes essential, and without running Test W — the test to which the manufacturer's current chart expressly assigns the amphetamine indication, in a sequence it states in terms: "from A to U to W." Ex. L. The conditional inference never arose; a predicate-dependent inference without its predicate is not some evidence. The non-test evidence proved only association with a package. The withheld "one team" emails independently show BOP encouraged investigator-adjudicator coordination — while Petitioner sat in pre-hearing detention — creating a serious

neutral-decisionmaker issue under Wolff. The Court should vacate the judgment and reopen the petition on the present record; if a single fact requires development first, the proper course is a limited evidentiary hearing directed to that fact — not denial.

Dated:　July 6, 2026.

Respectfully submitted.

/s/ Billy F. Steffey
Billy F. Steffey
Petitioner, Self-Represented
455 Capitol Mall, Suite 802
Sacramento, California 95814
Telephone: (916) 955-6332
Email: bsteffey@mac.com

CERTIFICATE OF COMPLIANCE (LR 7-2(b))

Pursuant to LR 7-2(b), the undersigned certifies that this motion and supporting memorandum contain 10,984 words, including headings, footnotes, and quotations, but excluding the caption, the tables of contents and authorities, the signature block, and the certificates of compliance and service, and therefore comply with the 11,000-word limitation of LR 7-2(b).

Dated:   July 6, 2026.        /s/ Billy F. Steffey

CERTIFICATE OF SERVICE

I hereby certify that on   July 6, 2026, I caused a true and correct copy of the foregoing PETITIONER'S FURTHER AMENDED MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60(d)(3), together with its Exhibits A through Q, to be served on counsel for Respondent by United States mail, first class, postage prepaid, and by email, addressed as follows: Assistant United States Attorneys Joshua Keller, Meredith Bateman, and Staci Schoff, United States Attorney's Office for the District of Oregon, 1000 SW Third Avenue, Suite 600, Portland, Oregon 97204.

/s/ Billy F. Steffey
Billy F. Steffey, Petitioner, Self-Represented

**UNITED STATES DISTRICT COURT – DISTRICT OF OREGON**

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

**PETITIONER'S FURTHER AMENDED RULE 60(d)(3) MOTION**
**INDEX OF EXHIBITS (A – Q)**

**Exhibit A — ECF 12-6 — Chetwood Declaration Exhibit F / NIK Testing Record**
Primary docket attachment containing the Aguilar memorandum, the reported Test A/Test U wording, the evidence photographs (incident 11:30 a.m.; photographs 12:30 p.m.), and the IDENTIDRUG chart page.

**Exhibit B — ECF 37-3 — Safariland Test U Printed Insert and IdentiDrug Chart (court record)**
Manufacturer Test U insert (1004926 - REV1109): dark-blue endpoint and instruction to proceed to Test A / continue Polytesting; IdentiDrug Chart, PART# 190-601 REV 0907 (© 2007), including Footnote 2, at ECF 37-3 at 2–3.

**Exhibit C — NIK Instructions on Use and IDENTIDRUG Chart (clean source copy)**
Manufacturer Instructions on Use table (REV0510) covering Tests A, I, U, W, and K, and the Polytesting chart.

**Exhibit D — ECF 37-2 — NIK Training Slides (record excerpt)**
Training material addressing Test U, secondary amines, and the burgundy baseline ("all by itself … the nature of the chemicals").

**Exhibit E — NIK System of Narcotics Identification Training, 1005991 rev-0517 (full deck)**
Training deck: Test A screening role, timing rules (orange-to-brown within 10–12 seconds), negative/stop instructions, note-taking and photography requirements, no-jumping rule, and Available Tests list (Test W — Amphetamines & Methadone).

**Exhibit F — United States' Ninth Circuit Answering Brief, No. 20-35493 (filed Oct. 8, 2020)**
Government appellate brief containing the concession at 21 n.5 that the photograph does not capture Test A's transition from orange to brown.

**Exhibit G — ECF 30 — Findings and Recommendation (Feb. 25, 2020)**
The Findings and Recommendation showing the acceptance of the reported NIK result, the "other evidence" listing, and the neutral-decisionmaker findings at issue.

**Exhibit H — ECF 38 — Respondent's 2020 Merits Briefing**
Respondent's briefing describing the non-test evidence as corroboration of "the NIK Test's positive result."

**Exhibit I — BOP SIS Advisory, January 18, 2017**
Internal BOP advisory concerning NIK Test U reporting, attributed by BOP to Safariland; withheld in full from Petitioner's FOIA requests.

**Exhibit J — Lynn "One Team" Emails, January 23–25, 2018**
Western Regional Office (R. John Lynn, CSS (SIA)) email chain: "communicate with your DHO," "we are all on one team … let's not let the inmates beat us based on technicalities," and the January 25 instruction to "send this out to your DHOs."

# UNITED STATES DISTRICT COURT – DISTRICT OF OREGON

*Steffey v. Warden, FCI Lompoc, No. 3:19-cv-00093-JR*

## PETITIONER'S FURTHER AMENDED RULE 60(d)(3) MOTION
## INDEX OF EXHIBITS (A – Q)

**Exhibit K — Safariland Motion to Dismiss Memorandum, Steffey v. Peters, No. 2:25-cv-11105-VBF-SK (C.D. Cal.), Dkt. 23-2 (Dec. 15, 2025)**

Safariland's counsel's constructions of the Test U instructions: any non-blue color "would require additional testing to confirm the result" (at 14, Page ID #309); "only BLUE indicates a positive result" / "baseless" (at 19, Page ID #314); K2/Spice outside marketed product uses (at 15, Page ID #310).

**Exhibit L — NIK IdentiDrug Polytesting Chart, PART# 190-601 REV 2021 (© Safariland, LLC)**

Safariland's current chart, downloaded July 1, 2026 from Safariland's Forensics Source retail site: Footnote 2 third sentence ("Amphetamine is indicated following Test W result"); EXAMPLE sequence ("from A to U to W"; amphetamine lane drawn through Test W (olive green); accuracy disclaimer.

**Exhibit M — Supplemental Declaration of Billy F. Steffey (28 U.S.C. § 1746), dated**  July 6, 2026

Authenticates Exhibits L and N (source, dates, and checksum) and states personal-kno           ecember 5, 2017 SHU placement and continuous administrative detention; hearing conduct (no witnesses, no evidence, written questions retained by the DHO and never asked); post-hearing SHU and out-of-state disciplinary transfer.

**Exhibit N — Current Manufacturer Insert Set — NIK Tests A, U, and W (REV0215) with Forensics Source Product Pages**

The printed instruction inserts Safariland ships today (each REV0215), downloaded June 30–July 1, 2026, with corresponding product pages — operative Test U language identical to the record insert (REV1109, ECF 37-3 at 1), establishing that the reagents and instructions have not changed.

**Exhibit O — BOP FOIA Response, Request No. 2020-02370 (May 6, 2020)**

Response withholding the requested NIK flow chart in full under FOIA Exemption 7(E) while releasing vendor-certification training records: the BOP Management and Specialty Training Center memorandum (NIK certifications obtained through the vendor) and the NIK Vendor Course end-user certification sheet.

**Exhibit P — BOP Incident Report No. 3025931 (FCI Herlong, Aug. 24, 2017)**

Incident report reciting on its face that suspected K2-saturated greeting cards were tested "utilizing the NIK testing procedures outlined in an SIS ADVISORY dated March 27, 2017," and recording the burgundy Test U reaction as indicating "the presence of Amphetamine." Source: BOP disciplinary record; previously filed in Steffey v. Peters, No. 2:25-cv-11105-VBF-SK (C.D. Cal.).

**Exhibit Q — Side-by-Side Comparison — NIK IdentiDrug Chart, PART# 190-601, REV 0907 vs. REV 2021**

Petitioner-prepared comparison of the chart in force at the December 2017 testing (REV 0907, ECF 37-3 at 2–3; Ex. B) with the manufacturer's current chart (REV 2021, Ex. L): Footnote 2; the worked EXAMPLE ("from A to U" / "from A to U to W"); Test W's olive-green amphetamine endpoint; and the accuracy disclaimer common to both revisions. Key language highlighted and quoted verbatim, with citations.

**Highlighting note.** Yellow highlighting appearing on the exhibits was added by Petitioner solely to direct the Court's attention to language quoted in the motion; the underlying documents are otherwise unaltered. Exhibit Q is a Petitioner-prepared demonstrative comparison assembled from Exhibit B (ECF 37-3) and Exhibit L.