Billy F. Steffey, Self-Represented Petitioner
455 Capitol Mall, Suite 802
Sacramento, California 95814
Telephone: (916) 955-6332
Email: bsteffey@mac.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| **BILLY F. STEFFEY,**<br><br>      Petitioner,<br><br>v.<br><br>**WARDEN, FCI LOMPOC,**<br>      Respondent. | **Case No. 3:19-cv-00093-JR**<br><br>**PETITIONER'S REPLY IN SUPPORT OF FURTHER AMENDED MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60(d)(3)**<br><br>The Honorable Michael H. Simon |

**TABLE OF CONTENTS**

I. INTRODUCTION..............................................................................................................4

II. THE GOVERNING MATERIALS SUPPORT ONE CONDITIONAL A-TO-U
INFERENCE, NOT TWO INDEPENDENT POSITIVE TESTS.........................................7

    A. Petitioner accepts the adverse language in REV 0907 and the 2017 training...............7

    B. Burgundy had no standalone amphetamine meaning, and Test A was a broad screen rather
    than an independent amphetamine-specific endpoint.........................................................8

    C. BOP converted the conditional sequence into two independently inculpatory results.10

    D. The 2021 chart is a reconciliation issue, not the governing rule.................................12

    E. Prior Hill decisions show recurrence, not adjudication here.......................................12

III. THE "OTHER EVIDENCE" DOES NOT ANSWER THE DRUG-IDENTITY QUESTION,
AND ECF 63 EXPRESSLY AUTHORIZED THIS ISSUE..................................................16

IV. THE AFTER-DISCOVERED INSTITUTIONAL RECORD MAKES THIS MORE THAN
AN ORDINARY COLOR DISPUTE OR NONDISCLOSURE CLAIM..............................19

    A. Petitioner accepts Rule 60(d)(3)'s narrow standard....................................................19

    B. The March 27, 2017 SIS Advisory is the central missing source document..............21

    C. Petitioner acted diligently; the Bureau possessed the records needed to prove more..24

    D. Contemporaneously memorialized evidence bears on institutional knowledge..........27

V. THE LYNN EMAILS ARE RELEVANT TO ADJUDICATOR COORDINATION, NOT
AMPHETAMINE CHEMISTRY.........................................................................................29

VI. GOOD CAUSE EXISTS FOR STAGED, PAPER-ONLY DEVELOPMENT...............32

    A. Respondent applies the ultimate burden to the threshold discovery inquiry...............32

    B. Stage One should consist only of four-page in-camera review and a custodian declaration.
    ...................................................................................................................................... 34

    C. Stage Two should occur only if the pages are relevant; an evidentiary hearing should be
    last...................................................................................................................................35

VII. CONCLUSION..............................................................................................................36

APPENDIX A — KEY RECORD AND EXHIBIT MAP......................................................40

## TABLE OF AUTHORITIES

### CASES

*Appling v. State Farm Mutual Automobile Insurance Co.*, 340 F.3d 769 (9th Cir. 2003).....19

*Bracy v. Gramley*, 520 U.S. 899 (1997)..............................................................6, 20, 28–29, 32

*Burnsworth v. Gunderson,* 179 F.3d 771 (9th Cir. 1999)........................................................18

*Cato v. Rushen*, 824 F.2d 703 (9th Cir. 1987)........................................................................17

*Dixon v. Commissioner*, 316 F.3d 1041 (9th Cir. 2003)..........................................................21

*Earp v. Davis*, 881 F.3d 1135 (9th Cir. 2018).......................................................................33

*Edwards v. Balisok,* 520 U.S. 641 (1997)....................................................................18–19, 32

*Fly v. Diaz*, 2024 U.S. Dist. LEXIS 231530 (D. Ariz. Dec. 23, 2024)...................................21

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944).............................14–15

*In re Levander*, 180 F.3d 1114 (9th Cir. 1999)..................................................................15, 20

*Jancsek v. Oregon Board of Parole*, 833 F.2d 1389 (9th Cir. 1987)......................................17

*Kerr v. U.S. District Court for the Northern District of California*, 511 F.2d 192 (9th Cir. 1975), aff'd on other grounds, 426 U.S. 394 (1976).........................................................................34

*Michel v. United States*, No. 3:16-cv-00277-GPC-AGS (S.D. Cal. Oct. 31, 2017)..................8

*Pizzuto v. Ramirez*, 783 F.3d 1171 (9th Cir. 2015).......................................................20, 28–29

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996)...................................................................26

*Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128 (9th Cir. 1995).................................19

*Rodriguez v. Gutierrez*, No. CV-22-00518-TUC-JAS (BGM), 2023 U.S. Dist. LEXIS 83381 (D. Ariz. Apr. 4, 2023)..........................................................................................................13–14, 36

*Smith v. Ives*, 275 F. Supp. 3d 1219 (D. Or. 2017).........................................................16, 32, 38

*Superintendent v. Hill*, 472 U.S. 445 (1985)......................................................................10–19

*Trendsettah USA, Inc. v. Swisher International, Inc.*, 31 F.4th 1124 (9th Cir. 2022)............20

*United States v. Estate of Stonehill*, 660 F.3d 415 (9th Cir. 2011)...................................11, 18

*United States v. Sierra Pacific Industries, Inc.*, 862 F.3d 1157 (9th Cir. 2017)...............19, 25

*Vasquez-Maldonado v. Salazar*, No. 3:19-cv-00075-AA, ECF 17 (D. Or. Feb. 12, 2020)....23

*Webster v. Fall*, 266 U.S. 507 (1925)....................................................................................13

*Withrow v. Larkin*, 421 U.S. 35 (1975)............................................................................31, 40

### STATUTES AND REGULATIONS

5 U.S.C. § 552(b)(7)(E), (F)..............................................................................................24, 26

28 C.F.R. § 541.8(b).........................................................................................................18, 32

### RULES

Federal Rule of Civil Procedure 60(d)(3)...........................................19, 25, 32–33, 37–38

Federal Rule of Evidence 801(d)(2)(D)................................................................................28

Rules Governing § 2254 Cases, Rules 1(b), 6, 7(c), and 8(c)..................................26, 32, 36

D. Or. LR 5-5......................................................................................................................34

D. Or. LR 7-2(b)..................................................................................................................39

**REPLY**

## I. INTRODUCTION

Respondent's Response properly identifies the 2007 IdentiDrug chart, REV 0907, as the governing chart. Resp. 8–9. That point requires precision, not avoidance. REV 0907 permitted a completed Test A-to-Test U sequence to support one conditional presumptive inference of an amphetamine-type compound. ECF 37-3 at 3 (Ex. B). Petitioner therefore clarifies that he does not ask the Court to apply the 2021 chart retroactively, does not contend that REV 0907 required Test W in December 2017, and does not contend that a properly obtained presumptive field-test result can never qualify as "some evidence." Petitioner does not ask the Court to resolve disputed chemistry in the abstract. The question presented is narrower: whether the evidentiary presentation made to this Court accurately reflected the governing materials and the institutional records the Bureau itself possessed. The narrowest request follows from that question: before denying relief for want of proof of institutional source, the Court should inspect the four pages BOP admits locating, reviewing, and withholding in response to Petitioner's targeted request for the one document a materially similar BOP report invokes by exact date as its testing authority — the March 27, 2017 SIS Advisory. Part VI, infra.

Equally important is what the Response does not contain. It does not dispute that Test U never displayed dark blue — the Test U insert's own affirmative endpoint for methamphetamine or MDMA. Resp. 8; ECF 37-3 at 1. It does not dispute that the Test A transition was never photographically preserved — the United States conceded on appeal that "the photograph does not capture Test A's transition from orange to brown," Answering Br. 21 n.5, No. 20-35493 — and it answers a demand for "video" the motion never made. Resp. 8, 11–12. It never mentions the January 18, 2017 SIS Advisory (Ex. I), the March 27, 2017 advisory cited by date in Exhibit P, the four withheld pages, or the sworn materials at ECF 54-1. And it attaches no evidence.

Respondent's sworn support has never grown: DHO Chetwood's 2019 declaration, ECF 12, predates every after-discovered record and addresses none of them, and no later brief — ECF 38, the appellate answering brief, ECF 60, this Response — adds a declarant on the advisories, the coordination chain, or the recurring independent-positive terminology. Silence is not concession, but a response that meets a documentary motion with characterization rather than evidence defines what is actually in dispute.

But Respondent's REV 0907 concession does not make BOP's presentation accurate. ECF 73 does not dispute the raw readings: Test U remained burgundy rather than dark blue, and Test W was not performed. Resp. 8–12. The manufacturer's governing materials said that red or burgundy in Test U had no amphetamine meaning by itself. ECF 37-3 at 2. Its significance arose only after Test A first changed from orange to brown and the operator followed the sequence to Test U. Id. at 2–3. Test U's own affirmative endpoint was dark blue for methamphetamine or MDMA. Id. at 1. Aguilar's memorandum did not disclose those limits. It attributed an amphetamine indication separately to Test A and separately to burgundy Test U, then characterized the pair as positive. ECF 12-6 at 2 (Ex. A). Respondent repeated the same two-test characterization in the disciplinary proceeding, in the 2020 litigation, and on appeal. ECF 38 at 2, 4–5 (Ex. H); Ex. F at 20–22. The accurate bottom line was one predicate-dependent sequence-level inference—not two independently positive amphetamine reagents.

That distinction alone does not automatically establish fraud on the court. Respondent's strongest answer is that Aguilar used imprecise shorthand for the bottom-line inference REV 0907 permitted. Petitioner's claim therefore does not rest on wording alone. It rests on the wording together with after-discovered institutional evidence bearing on its source, repetition, and court-facing use: a pre-incident BOP advisory attributing burgundy-reporting guidance to

Safariland; a second, specifically dated advisory cited in a materially similar BOP report; a graded vendor-certification structure; Western Regional instructions telling SIS staff to coordinate with "your DHO" as "one team"; and BOP's recent admission that it located, reviewed, and withheld four pages responsive to Petitioner's targeted request for the March 27, 2017 advisory. Exs. I, J, O, P; Reply Ex. R. It also rests on record evidence the Response leaves unaddressed: a Special Investigative Services lieutenant's statement about the reading, made to Petitioner in the presence of a third-party witness and memorialized in a letter mailed, per the sworn declarations, to the assigned magistrate judge before judgment. ECF 54-1; Part IV.D, infra. And the presentation's reach did not end with this docket: the some-evidence finding it produced has since been cited to sustain a materially similar A-to-U burgundy disciplinary finding in another district. Part II.E, infra. Parts II through V take the elements in order: the court-facing misrepresentation (Part II), its bearing on the drug element (Part III), its institutional source, exclusive control, and knowledge within the Bureau's investigative service (Part IV), and adjudicator coordination (Part V).

Respondent argues both that Petitioner has not carried the ultimate clear-and-convincing burden and that he has not shown good cause for any development. Resp. 2, 5–12. Those are different inquiries. The first asks whether the existing record establishes fraud on the court. The second asks whether specific allegations provide reason to believe that fully developed facts may establish entitlement to relief. *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997). BOP's exclusive possession of the identified institutional record cannot simultaneously create the evidentiary gap and defeat the narrowly tailored means of resolving it.

Petitioner accordingly narrows the alternative relief already requested at ECF 69 at 32–34. The first step requires no public disclosure, deposition, interrogatory, or evidentiary hearing.

---

Petitioner asks the Court to direct Respondent to tender for sealed, in-camera review the four pages BOP admits it located and withheld, with a short custodian declaration identifying what record or records the pages comprise. If the pages are not the March 27 advisory referenced in Exhibit P and do not bear on the source, distribution, or reporting of the practice at issue, the inquiry ends. Only if the pages are relevant would the Court decide whether any additional, case-specific production is necessary. That paper-only procedure addresses Respondent's relevance and scope objections while protecting every asserted security interest.

The Court may grant vacatur if it finds the present circumstantial record clear and convincing. If the Court concludes that actor, intent, or institutional-source questions remain unresolved, it should inspect the four identified pages before denying development because Petitioner has not proved facts those pages could confirm or refute.

## II. THE GOVERNING MATERIALS SUPPORT ONE CONDITIONAL A-TO-U INFERENCE, NOT TWO INDEPENDENT POSITIVE TESTS

### A. Petitioner accepts the adverse language in REV 0907 and the 2017 training.

REV 0907's worked example is Respondent's strongest chemistry evidence. It states that, after Test A changes from orange to brown, a blue Test U result confirms methamphetamine, while "[a] reddish-pink or negative result in Test U indicates an Amphetamine-type compound." It concludes: "Only by following the proper sequence of tests from A to U is a positive result obtained." ECF 37-3 at 3. Safariland's May 2017 training deck teaches the same route. It says Test U turns burgundy "all by itself"; that burgundy is negative for methamphetamine; and that, after a valid orange-to-brown Test A result, the negative Test U reaction "by default . . . indicates Amphetamine." ECF 37-2 at 5 (Ex. D); Ex. E, slides 60–61.

Those passages foreclose three categorical formulations. First, Petitioner cannot say the governing chart required Test W after A-to-U; it did not. Second, he cannot say a credited A-to-U sequence supplied no presumptive amphetamine inference; REV 0907 said it did. Third, he cannot erase Aguilar's contemporaneous memorandum merely because no photograph or video captured the brief Test A transition. The memorandum remains evidence that Aguilar claimed to observe the required transition.

Petitioner narrows ECF 69 accordingly. The issue is not whether REV 0907 contained an A-to-U route. It did. The issue is what that route meant and how BOP presented it to adjudicators and courts.

## B. Burgundy had no standalone amphetamine meaning, and Test A was a broad screen rather than an independent amphetamine-specific endpoint.

The governing chart's footnote states the limitation in direct terms:

Only after Test A goes from orange to brown AND Test U turns red can you presumptively identify the substance of an amphetamine-type compound. Red in Test U alone does NOT indicate amphetamine-type compounds.

ECF 37-3 at 2 (emphasis in original). The Test U insert likewise assigns Test U's own affirmative result to a different color and different drugs: "An immediate dark blue color indicates the presumed presence of methamphetamine or MDMA (Ecstasy)." If any other color develops, the operator must continue Polytesting. Id. at 1.

The record's own training materials state the reagent chemistry: "Test U tests for the presence of a chemical group called secondary amines" — the group that includes methamphetamine and MDMA, along with "other chemicals … in the field." Ex. E, slide 60. Consistent context appears in a contemporaneous federal record involving a different Safariland pouch built on the same reagent principle: the summary-judgment record in *Michel v. United*

*States* recites that the Simon's Reagent (sodium nitroprusside) chemistry tests for secondary amines, and that "if the chemical reaction with the substance produces a blue color change, then there is a secondary amine and if there is no secondary amine, then the color change is burgundy." No. 3:16-cv-00277-GPC-AGS (S.D. Cal. Oct. 31, 2017), ECF No. 87 at 5–6. Petitioner cites that recital as context consistent with Exhibit E's teaching — not as another court's finding offered for its truth.

Test A performed a different role. Safariland called it the "general screening test" that provides as many as fourteen "answers (or avenues)," and warned users never to rely on Test A alone. Ex. E, slide 9. When the substance was unknown, Test A selected the lane through the Polytesting System. When observations identified a suspected substance, the training allowed a substance-specific method, subject to departmental directives. Id., slide 36. And the same slide's test-selection table pairs "TEST A & U" with methamphetamine and with MDMA — it lists no A-and-U selection for amphetamine. Id. Thus, Test A could be an indispensable routing predicate under REV 0907 without becoming an independently sufficient amphetamine identification.

Test W matters only within those limits. It existed before the incident and was labeled "A test for Amphetamines and Methadone"; its listed immediate olive-green result directly indicated amphetamines. ECF 12-6 at 4; Ex. C at 2. Test W was therefore the contemporaneous pouch whose own affirmative endpoint directly paired a color with amphetamines. But REV 0907 did not route the relevant orange-to-brown A sequence through W. Petitioner relies on W to show the difference between a direct drug-specific reagent endpoint and REV 0907's conditional inference by sequence—not to impose W retroactively.

**C. BOP converted the conditional sequence into two independently inculpatory results.**

Aguilar reported:

> A small piece of paper was cut and tested with NIK testing kit "A" . . . it had an immediate orange rapidly turning brown color, indicating Amphetamines. Another small piece of paper was cut and tested with NIK testing kit "U" . . . it turned an immediate dark burgundy color, indicating Amphetamines. The tests indicated a positive result for Amphetamines.

ECF 12-6 at 2. That account omitted the chart's limiting relationship. It did not say that Test A supplied a broad amphetamine-type predicate and that non-blue Test U then supported one inference by sequence and exclusion. It attributed an amphetamine indication to each color separately and presented the "tests" as affirmative evidence.

Respondent's 2020 briefing preserved that presentation. It told the Court that the papers "tested positive for amphetamines," described the surrounding circumstances as "corroborating evidence of the NIK Test's positive result," and argued that the non-test evidence "together with the positive NIK Test result" satisfied Hill. ECF 38 at 2, 4–5. On appeal, the United States went further: it called the results "two positive NIK tests," stated that Test A's colors "indicate the presence of amphetamines," and said Test U "produced a positive result for amphetamines, as first identified by Test A." Ex. F at 8, 20–22. The appellate briefing postdated judgment and therefore did not procure it.

Respondent now quotes the conditional chart language but still says "both tests indicated Amphetamines." Resp. 9. Respondent's only record citation for that assertion is Aguilar's memorandum, which establishes what he reported—not whether the report accurately described the manufacturer's conditional sequence. The distinction is not semantic. Describing two tests as separately positive creates apparent corroboration within the chemistry. REV 0907 supplied only one conclusion, dependent on one transitory predicate and one negative-for-methamphetamine outcome. The Court should evaluate materiality using the evidence BOP actually presented, not a

more precise explanation supplied six years after judgment. The representation under challenge is offered as the proof of its own truth. Nor is the formulation historical: the Response's own background section repeats it, attributing an amphetamine indication separately to each test. Resp. 2–3.

The best defense remains that "both tests indicated" was harmless shorthand because the completed sequence still yielded the chart's bottom-line inference. But the difference is architectural, not semantic. Two independently positive tests corroborate each other; the evidence arrives with built-in redundancy, and that apparent redundancy is what Respondent's 2020 briefing leveraged when it described the surrounding circumstances as "corroborating evidence of the NIK Test's positive result." ECF 38 at 2, 4–5. One conditional inference is different in kind: it rests entirely on a single transitory transition reported by one technician and — as the United States concedes — captured in no photograph, followed by a reaction that never displayed dark blue and therefore excluded the only drugs Test U identifies. Presenting the second picture as the first overstated the evidence in the dimension Hill deference makes decisive — what the record could be believed to contain. Under Estate of Stonehill, the question is whether the accurate picture "significantly change[s]" the one the Court was shown; reducing two mutually corroborating positives to one unpreserved, predicate-dependent inference is that change. 660 F.3d at 435.

That answer also does not explain why the same standalone-positive terminology appears in materially similar BOP records, what internal instructions governed the reporting, or why the dated record BOP has now located remains unavailable for review. Nor was the formulation confined to one technician's memorandum: it was repeated by counsel in the 2020 merits briefing, by the United States on appeal, and in the Response filed this month. ECF 38 at 2, 4–5;

Ex. F at 8, 20–22; Resp. 2–3. Those are the questions for which Petitioner seeks the smallest possible first-stage development.

**D. The 2021 chart is a reconciliation issue, not the governing rule.**

The later REV 2021 chart redraws the amphetamine route through the preexisting Test W, states that "[a]mphetamine is indicated following Test W result," and revises the worked example to say that a positive is obtained by following the sequence "from A to U to W." Exs. L, Q. Petitioner does not ask the Court to apply that route to a 2017 test. Nor does the later chart, standing alone, prove why the route changed.

The relevant continuity is narrower and documented: Test W and its olive-green amphetamine endpoint existed before 2021; Test U's dark-blue methamphetamine/MDMA endpoint existed before 2021; and as to this lane the 2021 revision introduced no new Test A, Test U, or Test W, and no new endpoint — it redrew the published routing through components that existed throughout. Exs. B, C, L, Q. That history supports reconciliation of the published chart, BOP's training and directives, and the terminology used in Petitioner's case. It does not substitute a later instruction for REV 0907. And the revision's own face forecloses using it against Petitioner: it states that it "in no way reflects upon or affects the accuracy of previous Polytesting charts." Ex. L. If the revision states what the earlier materials already meant, burgundy was never an independently positive amphetamine result; if the rule changed in 2021, then the governing-era chart did not state the two-independent-positives reading BOP reported either. On either reading, the December 2017 labels find no home in any chart of any era.

**E. Prior Hill decisions show recurrence, not adjudication here.**

Part X of ECF 69 catalogued published decisions involving multiple BOP institutions in which burgundy, maroon, reddish-purple, or reddish-pink Test U reactions were reported as

supporting an amphetamine "positive." ECF 69 at 28–30. The color-stated chronology begins with testing in 2016 and continues through decisions issued in 2026; the 2014 record discussed at ECF 69 at 29 is only a precursor because its opinion did not identify Test U or any color. Some courts accepted the official positive label under Hill; some confronted a color challenge without the manufacturer and internal institutional materials assembled here; and later BOP records generally proceeded from burgundy Test U to Test W. Later opinions also cited earlier NIK decisions when rejecting confirmation or reliability challenges. That history does not prove that every disciplinary decision was invalid or that one centrally directed scheme caused every report. It does demonstrate the label's reach and its materiality to the drug element.

Petitioner asks this Court to review no other proceeding and disturb no other judgment. The point is instead that those decisions do not resolve a question they did not decide. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). So far as the published opinions disclose, they did not adjudicate whether BOP's one conditional A-to-U inference was repeatedly presented as two independently positive amphetamine tests pursuant to an institutional reporting instruction, or whether government actors knowingly carried that description into this habeas proceeding despite contrary information. Uniform acceptance of an official label measures the label's reach; it does not establish its accuracy on a factual question never presented and decided.

That reach is documented in this record's own line of citation. In Rodriguez v. Gutierrez, staff found black paper in a cell and reported that it "did test positive for Amphetamines utilizing NIK Test kit 'A' (Orange to Brown) then Test Kit 'U' (Burgundy)"; no Test W appears in the account. No. CV-22-00518-TUC-JAS (BGM), 2023 U.S. Dist. LEXIS 83381 (D. Ariz. Apr. 4,

2023), adopted, ECF No. 16 (D. Ariz. May 9, 2023). In recommending denial under Hill, the court cited the Findings and Recommendation later adopted in this case, ECF 30; ECF 39 — cited there as Steffey v. Salazar, 2020 WL 2530084 (D. Or. Feb. 25, 2020) — and quoted its conclusion that "this Court finds some evidence in the record to support" the disciplinary finding. Petitioner does not ask this Court to reopen Rodriguez or to review another prisoner's discipline. The point is narrower: the characterization accepted in this proceeding subsequently acquired decisional force in a materially similar A-to-U burgundy record, and judicial repetition is not independent chemical validation — it is the mechanism by which an unexamined label propagates. Respondent's own brief quotes the principle that makes this relevant: fraud on the court involves "far more than an injury to a single litigant." Resp. 7 (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944)).

The recurrence is significant because it became self-reinforcing, and its duration is documented: the color-stated records span a full decade, from testing in 2016 through decisions issued in 2026. ECF 69 at 28–30. Across that period, BOP records repeatedly presented Test A's broad screening transition as one positive and burgundy Test U as a second, even though neither reaction alone identified any controlled substance and REV 0907 supplied only one conditional, predicate-dependent inference from the completed sequence. Courts reviewing prison discipline ordinarily evaluate the record the agency presents; Hill does not ask them to reconstruct reagent architecture the agency itself describes as two positive tests. Once one court accepted that description, its decision became citable support for the next acceptance, as Rodriguez demonstrates — repeated judicial reliance on the same unexamined label, not independent chemical validation. The longer the cycle has run, the more decisional weight the unexamined label has accumulated — and the harder it has become for any incarcerated person, often

unrepresented, to challenge a description that no chart of any era, REV 0907 or REV 2021, actually states.

That propagation is Hazel-Atlas's precise concern: this species of fraud is "a wrong against the institutions set up to protect and safeguard the public." 322 U.S. at 246; see In re Levander, 180 F.3d at 1118 (quoting the same passage). Petitioner seeks no ruling for other inmates and no review of other judgments. But so far as located, this proceeding is the first in which the manufacturer's limiting materials, the Bureau's internal advisories and certification records, and the label's court-facing use are all before one court at once. Careful examination of the source materials in this proceeding is how the cycle is interrupted — and the institutional consequence it yields is modest and case-bound: this judgment would no longer supply citable support for a two-independent-positive description that no manufacturer chart states. Nothing about that examination revisits any other judgment.

This case therefore does not depend on declaring the prior decisions "tainted." It presents a record those opinions did not: the manufacturer's limiting materials placed beside after-discovered BOP advisories, vendor-certification and distribution evidence, the Western Region communications, and four admittedly located pages responsive to the targeted March 27-advisory request. Recurrence alone cannot prove fraud on the court. It makes the source-and-intent question concrete and explains why citation to prior Hill outcomes cannot substitute for resolving it here. So far as located, no reported § 2241 decision has presented this combined evidentiary record.

## III. THE "OTHER EVIDENCE" DOES NOT ANSWER THE DRUG-IDENTITY QUESTION, AND ECF 63 EXPRESSLY AUTHORIZED THIS ISSUE

Respondent again invokes the footnote in the May 6, 2026 order stating that relief would have been denied even if the NIK findings were unreliable. Resp. 9–10. ECF 63 did not preserve that footnote as a final merits disposition. The Court quoted the issue, acknowledged Petitioner's challenge to the other evidence, and held that it would "not preclude Petitioner from litigating his Rule 60 motion on the merits and raising these new arguments." ECF 63 at 10–11. It then held that allowing the May 6 order to stand would be manifestly unjust and granted Rule 59(e) relief. Id. at 11. ECF 63 did not grant Rule 60 relief or decide that the non-test evidence was insufficient, but it did authorize the merits question Respondent now asks the Court to treat as closed. The May 6 order no longer stands; citing its footnote as though it survived Rule 59(e) inverts ECF 63.

The question is not whether the record contained suspicious circumstances. It did. Communications associated Petitioner with the tracking number; financial activity linked him to another inmate; staff described the paper as unusual; and the DHO made credibility findings. ECF 12-5 at 1–4; ECF 12-6 at 1–10. Those facts could support package association, knowledge, or suspicion. Respondent identifies no non-test item that independently established what drug, if any, the paper contained. This Court likewise declined to reach *Hill* in *Smith v. Ives,* where withholding had left the disciplinary evidence undeveloped; "some evidence" should not be treated as dispositive here before the specifically identified institutional record is inspected. 275 F. Supp. 3d at 1224.

The disciplinary decision itself returned to the chemical premise: "You question whether the narcotics were tested. They were, and the results were positive for amphetamine." ECF 12-5

at 4. The 2020 Findings and Recommendation separately listed "the positive test results" among the evidence. ECF 30 at 10 (Ex. G). Respondent then called the surrounding circumstances "corroborating evidence of the NIK Test's positive result" and argued that those circumstances "together with" the positive result satisfied Hill. ECF 38 at 4–5. That presentation treated the NIK result as the drug-identification bridge and the remaining evidence as corroboration—not as an independent chemical identification. The question the Response never answers is direct: which listed non-test item identifies a controlled substance? Twelve pages do not say.

Petitioner does not argue that circumstantial evidence is legally incapable of satisfying Superintendent v. Hill, 472 U.S. 445, 455–56 (1985), or ask the Court to reweigh evidence. He asks the Court to separate two elements that Respondent's aggregate list blurs: association with the package and proof that the package contained a controlled substance. If the court-facing test description materially overstated the only drug-identification evidence, the surrounding circumstances do not automatically cure that presentation merely because they were suspicious. The DHO's adverse credibility findings are of the same kind: they bear on association and candor, not on what the paper contained.

Respondent's own authorities sharpen both points. The reliability issue is not whether REV 0907 authorized any A-to-U inference; it did. It is whether presenting that single conditional inference as two independently positive tests materially overstated the evidence on which Hill review proceeded. The Response cites Jancsek v. Oregon Board of Parole for the requirement that the supporting evidence bear "some indicia of reliability," Resp. 11, and Jancsek draws that requirement from Cato v. Rushen, which found the standard unmet where the only supporting item lacked reliability. 833 F.2d 1389, 1390 (9th Cir. 1987); 824 F.2d 703, 705 (9th Cir. 1987). A report that converts one conditional, predicate-dependent inference into two

independently positive tests — a pairing described by no chart of any era, including the chart page reproduced in Respondent's own brief — lacks those indicia of reliability as presented: its entire chemical force depended on a single unpreserved Test A transition reported by one technician, recast as two mutually corroborating positives. And if, once the challenged presentation is set aside, the reopened record lacks evidence of the charged act's drug element, Burnsworth marks the remedial endpoint. Cf. Burnsworth v. Gunderson, 179 F.3d 771 (9th Cir. 1999) (vacating a prison disciplinary finding unsupported by any evidence of the charged act).

*Stonehill* supplies a materiality limit that Petitioner accepts. It denied relief where the after-discovered material did not "significantly change the picture already drawn by previously available evidence," affect the outcome, or concern the central issue. *United States v. Estate of Stonehill*, 660 F.3d 415, 435, 448, 452 (9th Cir. 2011). Here, the challenged representation concerned the only chemical evidence offered to identify the paper's contents, and Respondent described the remaining circumstances as corroborating the NIK result. ECF 38 at 2, 4–5. The requested records matter only insofar as they show that the court-facing label reflected a known institutional protocol inconsistent with the manufacturer materials. If they do, they go to the central issue and materially change the evidentiary picture; if they do not, they will not.

Nor does Hill resolve the neutral-decisionmaker issue. Hill supplies the low evidentiary-sufficiency standard for prison discipline. It does not decide whether a federal judgment was procured through an institutional misrepresentation, and it does not make decisionmaker deceit or bias irrelevant. See Edwards v. Balisok, 520 U.S. 641, 647–48 (1997); 28 C.F.R. § 541.8(b). A decisionmaker-integrity defect is not cured by evidentiary weight: "[a] criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the

evidence against him." Balisok, 520 U.S. at 647. Those distinct theories must be evaluated on their own terms.

## IV. THE AFTER-DISCOVERED INSTITUTIONAL RECORD MAKES THIS MORE THAN AN ORDINARY COLOR DISPUTE OR NONDISCLOSURE CLAIM

### A. Petitioner accepts Rule 60(d)(3)'s narrow standard.

The parties agree that fraud on the court is reserved for grave misconduct directed at the judicial process. Petitioner must prove by clear and convincing evidence an unconscionable plan or scheme designed to improperly influence the Court; ordinary perjury, nondisclosure, or discovery misconduct does not suffice by itself. *Appling v. State Farm Mutual Automobile Insurance Co.*, 340 F.3d 769, 780 (9th Cir. 2003); *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1130–31 (9th Cir. 1995); Resp. 5–7. Evidence known at judgment, or discoverable earlier through reasonable diligence, ordinarily cannot be repackaged as fraud on the court. *United States v. Sierra Pacific Industries, Inc.*, 862 F.3d 1157, 1167–69 (9th Cir. 2017).

Petitioner therefore does not rely on the chart dispute alone. He raised Test U's burgundy reaction and the manufacturer materials in 2020. ECF 37 at 9–12. That history is an important limitation, not a fact to obscure. The current Rule 60(d)(3) theory depends on after-discovered institutional evidence that may significantly change whether the original presentation was individual shorthand or the court-facing product of a broader reporting instruction.

The federal-process nexus is specific: Respondent placed Aguilar's memorandum before this Court through Chetwood's declaration and relied on the reported "positive" result in its merits briefing to satisfy *Hill*. ECF 12; ECF 12-6 at 2; ECF 38 at 2, 4–5. Petitioner also placed the manufacturer materials and endpoint dispute in the federal record before Respondent defended the characterization. ECF 37 at 9–11; ECF 37-3; ECF 38 at 2, 4–5.

*Pizzuto v. Ramirez* supplies the habeas-specific boundary. It treated as necessary evidence connecting the underlying misconduct to the federal defense and denied relief because there was "no specific evidence" that the federal habeas lawyers knew of the underlying facts. 783 F.3d 1171, 1180–81 (9th Cir. 2015). The acts above establish the federal-court connection, but they do not alone establish who knew what about undisclosed institutional directives.

The unresolved element is knowing participation in that court-facing presentation. *Trendsettah USA, Inc. v. Swisher International, Inc.,* 31 F.4th 1124, 1132–35 (9th Cir. 2022), reversed fraud-on-the-court relief where the evidence did not clearly show that the party or counsel knowingly participated in the deception. Petitioner does not ask the Court to presume that nexus. The source, distribution, training, and case-communication records are directed to it. If the existing circumstantial evidence does not establish the nexus clearly enough for vacatur, *Pizzuto* and *Trendsettah* identify the knowledge-and-participation element Petitioner must ultimately prove; *Bracy* supplies the threshold standard for developing it. Focused development — not an inference against the party excluded from the records — is the proportionate course.

Respondent's own authorities mark the same boundary and the reason this record sits past it. In re Levander — quoted in the Response's standard, Resp. 7 — explains why nondisclosure or perjury "by itself" ordinarily is not fraud on the court: in those cases the movant "had the opportunity to challenge the alleged perjured testimony or non-disclosure because the issue was already before the court." 180 F.3d 1114, 1119–20 (9th Cir. 1999). Levander found fraud on the court where the party "knew and did not disclose to the court" the operative fact, because concealment eliminated that opportunity. Id. at 1119–20, 1122. The parallel is direct: in 2020 the Bureau disclosed none of these records, authenticated none of them, and produced none of them — the burgundy-reporting advisories, the certification and distribution records, and the

coordination directive remained in its exclusive custody, and the agency's own letters document refused attempts to obtain them before judgment. ECF 54-1, Steffey Decl. ¶ 12; Part IV.C, infra. Dixon v. Commissioner — also in the Response's string citation, Resp. 6 — held fraud on the court "clearly and convincingly demonstrated" where a "pattern of government misconduct," "including its persistence and concealment," harmed the integrity of the proceeding, and reaffirmed that no showing of prejudice is required. 316 F.3d 1041, 1046–47 (9th Cir. 2003). And Fly v. Diaz, the Response's out-of-district decision, Resp. 9, rejected an unsupported accusation that declarants "lied." 2024 U.S. Dist. LEXIS 231530, at *15 (D. Ariz. Dec. 23, 2024). This motion makes no accusation on Petitioner's word alone; it places the government's representation beside the government's own exhibits and lets the documents disagree.

The present record does not require the Court to infer a nationwide scheme from repeated colors. It presents a narrower, falsifiable institutional-source question.

**B. The March 27, 2017 SIS Advisory is the central missing source document.**

These are not disconnected exhibits; they converge on one specifically identified document. The central missing source record is not a category of agency files. It is the SIS Advisory dated March 27, 2017, invoked on the face of a materially similar BOP incident report as the source of the testing procedures used. On August 24, 2017, FCI Herlong staff reported testing suspected K2/Spice-associated greeting cards "utilizing the NIK testing procedures outlined in an SIS ADVISORY dated March 27, 2017," and recorded that testing "produced a positive results [sic] for Methamphetamine Reagent which indicates the presence of Amphetamine by results turning burgundy in color." Ex. P at 2. In one government sentence: the methamphetamine reagent, the burgundy color, and an amphetamine label — under written advisory procedures identified by exact date.

What the existing record proves is what the Bailey report states on its face — and no more. The report does not supply the advisory's title, author, text, attachments, distribution, or Test A route. It does not prove that the advisory was distributed to Lompoc, that Aguilar received it, or that it controlled his test. Those gaps are not defects in the request; they are the precise questions the Advisory's text, attachments, originating office, distribution class, and transmittal records exist to answer. What the report does fix is a date, an operational use, a paper substrate associated with suspected K2/Spice, a burgundy reaction, and an amphetamine label — all approximately three months before Petitioner's paper was tested.

Petitioner's own record supplies a close factual counterpart. BOP intelligence stated that Petitioner expected a package containing synthetic marijuana or Spice. ECF 12-6 at 9. Aguilar then used Tests A and U on paper and reported burgundy as "indicating Amphetamines." Id. at 2. In both records: suspected K2/Spice on paper, the methamphetamine reagent, the burgundy reaction, an amphetamine label — and, in Bailey, a dated written advisory as the stated authority. The congruence does not prove common source. It makes the source inquiry concrete and falsifiable.

The advisory mechanism itself was not novel. Two months earlier, BOP's January 18, 2017 SIS Advisory conveyed internal guidance about how a burgundy Test U reaction was to be reported in a different drug-testing sequence, attributed the information to Safariland, and directed dissemination to investigative staff. Ex. I. That advisory does not govern Petitioner's amphetamine sequence and does not prove what Aguilar was taught. It shows that BOP used dated SIS advisories to standardize how burgundy reactions were reported — and that it attributed such guidance to the manufacturer.

Vasquez-Maldonado v. Salazar, No. 3:19-cv-00075-AA, ECF 17 at 2–3 (D. Or. Feb. 12, 2020), documents materially similar reporting at another institution nine days before Petitioner's test: Test A orange-or-brown reported as positive for amphetamine-type compounds, and burgundy Test U reported as "a positive test for Amphetamines." Id. at 2. When the DHO there ordered a control test of an identical new pen to determine "whether it generated a false positive," the resulting memorandum reported a single test — Test A, recorded as negative — and never re-ran Test U, the reagent whose reaction had supplied the challenged positive. Stopping at a negative Test A was consistent with the published route; the narrower point is that the one reading in question was the one reading never control-tested — and on this record a Test U control could not have exculpated, because Test U displays burgundy "all by itself." Id. at 3; ECF 37-2 at 5 (Ex. D). Petitioner claims no right to a retest; the point is what happened when a DHO ordered one. The Court need not decide whether that stopping point was deliberate, and Petitioner attributes no motive to that technician and asks this Court to revisit nothing in that judgment. The limited relevance is recurrence and practice: different personnel, a different institution, nine days apart, the same independent-positive formulation — and, when tested, a control that never reached the reading at issue.

Finally, the reporting occurred within a formal certification structure. Safariland's pre-incident course required staff to demonstrate proper use, pass an examination at 80 percent, submit answer sheets to Safariland, and receive certificates after grading. Ex. E, slides 4, 76. BOP's own materials directed that NIK certifications be obtained through the vendor and that completed tests be sent to the vendor for grading. Ex. O at 4–5. These records do not prove Aguilar completed a particular course or what he personally was taught. They do make training,

distribution, and reporting instructions identifiable records subjects rather than speculation about what an isolated employee may have inferred from a pouch.

Respondent can answer this cluster in two ways. It may show that the March 27 record concerned a different practice and that the repeated wording simply reflected independent applications of REV 0907. Or the record may show a standardized instruction that materially governed how BOP reported the evidence. The four located pages are the direct and proportionate way to distinguish those explanations.

**C. Petitioner acted diligently; the Bureau possessed the records needed to prove more.**

Before the 2020 judgment, Petitioner sought chemical-analysis records, photographs and metadata, case communications, NIK manuals and operating memoranda, training and certification records, and confirmatory-testing procedures. ECF 24 at 8–10. He raised the burgundy issue and the non-test evidence's dependence on the drug-test premise in his objections. ECF 37 at 9–12. He also pursued NIK procedures and burgundy-reporting records through FOIA. ECF 69 at 26–27; Ex. O. The Court denied broad discovery on the then-existing showing. ECF 30 at 10–11.

The diligence record includes sworn evidence concerning the 2019 request and the agency's own correspondence concerning the 2026 request. On August 28, 2019 — while this petition was pending — Petitioner submitted a FOIA request seeking Safariland NIK instructions and flowcharts. Petitioner's sworn declaration recounts the Bureau's determination dated September 27, 2019: four pages of responsive records located, and all four "must be withheld in their entirety" under 5 U.S.C. § 552(b)(7)(E). ECF 54-1 at 6–8, Steffey Decl. ¶ 12. And by response dated May 6, 2020 — twelve days before judgment — the Bureau withheld the NIK flow chart in full under Exemption 7(E), releasing only vendor-certification records in part. Ex.

O. Judgment entered May 18, 2020, with the agency having confirmed in writing, twice, that responsive institutional records existed and would not be released to him through FOIA. In 2026, the targeted request — this time naming the March 27, 2017 advisory itself — ended the same way: four pages, located and reviewed, withheld in full. Reply Ex. R at R-8 to R-9. The two requests were not the same request: the 2019 request did not name the March 27 advisory, and Petitioner does not assert that the two four-page determinations concern the same record. The parallel is chronology, not identity — twice, years apart, on requests directed at the Bureau's NIK instructions, the agency located responsive institutional records and withheld them in full. This chronology materially distinguishes Sierra Pacific: evidence is not discoverable through reasonable diligence when the movant asked for it before judgment and its sole custodian refused to produce it. 862 F.3d at 1168–69.

The present issue is not that Petitioner suspected a problem earlier. Suspicion is not possession of the internal records needed to establish source, actors, distribution, and intent. BOP did not authenticate the Lynn chain, disclose its distribution records, produce the March 27 advisory, or produce the responsive institutional materials Petitioner sought. Rule 60(d)(3) requires Petitioner to prove more than an interpretive error; the withheld records are the materials capable of supplying or disproving that additional institutional nexus.

Reply Exhibit R documents the most recent effort. On May 10, 2026, Petitioner requested "specifically [the] March 27th SIS Advisory document" and notified BOP that court process would be sought. Steffey Second Supp. Decl. ¶ 2; Reply Ex. R at R-2. On May 26, BOP said the request did not describe a record with enough detail to permit a search. Id. ¶ 3; Reply Ex. R at R-3 to R-5. On May 27, BOP reopened the request, assigned it to a complex track under an "and/or" list of possible conditions, and estimated processing would take "up to 9 months." Id. ¶

4; Reply Ex. R at R-6 to R-7. On May 28, BOP stated that staff had "located 4 pages of responsive records," forwarded them for a release determination, carefully reviewed them, and withheld all four in full under 5 U.S.C. § 552(b)(7)(E) and (F). Id. ¶ 5; Reply Ex. R at R-8 to R-9.

Petitioner does not call the four pages "the four-page advisory," infer their contents, or argue that invoking a FOIA exemption proves fraud. Exemption 7(F) concerns information whose public disclosure "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Prison-security and investigative-technique concerns can be legitimate. But the invocation should be noticed for what it asserts: the request named a dated drug-testing advisory of the kind BOP incident reports cite on their face, and BOP invoked Exemptions 7(E) and 7(F) as grounds for withholding all four responsive pages in full. The Court need not question that assessment to see its consequence. Exemption 7(F) addresses public disclosure; sealed, court-only inspection discloses nothing to Petitioner or the public. An exemption claim of that gravity is not a reason to leave the pages unexamined — it is the reason examination should occur in camera, where every asserted safety interest remains fully protected. The letters establish only that four pages responsive to the targeted request exist, were reviewed, remain in BOP's exclusive control, and cannot be presented by Petitioner without judicial assistance.

Exhibit R is offered in direct rebuttal to ECF 73's assertion that Petitioner cannot identify specific discovery capable of establishing relief. It is not offered to prove the pages' contents, fraud, or motive. Respondent authored or possesses the correspondence and will suffer no authenticity surprise. Consistent with Habeas Rule 7(c) and *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), Respondent may admit or deny the correctness of the added materials; if

the Court intends to rely on Reply Exhibit R for any broader purpose, Petitioner does not oppose a short response confined to the authenticity, control, and relevance of Reply Exhibit R alone. The other materials cited in this reply — including ECF 54-1 — have been on the docket since May 11, 2026, and the Response does not address them.

### D. Contemporaneously memorialized evidence bears on institutional knowledge.

The documentary record above carries this motion; this section answers Respondent's say-so characterization with direct evidence already on the docket. The element Respondent says is unsupported — institutional knowledge — is the element on which the record already contains direct evidence, filed months before the Response and addressed nowhere in it. On two occasions in late October and late November 2019, Petitioner met at FCI Sheridan with the institution's Special Investigative Services lieutenant, Lt. Carter, accompanied both times by Eric Forsyth, a percipient witness who has sworn to what he heard. At the second meeting, Lt. Carter stated, in substance: "We know that. We know that that's a false reading. We know that. We all know that" — and communicated that the reading in question was the practice of treating a burgundy result on the NIK Test U pouch as a positive result for drugs. ECF 54-1 at 2–4, Forsyth Decl. ¶¶ 4–10. At the same meeting, Petitioner asked whether Lt. Carter would speak with his case manager in support of additional residential-reentry placement, on the ground that the disciplinary finding should not have been imposed, and Lt. Carter agreed to do so. Forsyth Decl. ¶ 11. Petitioner's contemporaneous letter reported that Lt. Carter then called the case manager and asked her to increase the placement by forty-one days — the same number of good-conduct-time days this finding cost. ECF 54-1, Ex. 3.

That account was memorialized while it was fresh. Petitioner's letter to Magistrate Judge Russo — dated November 26, 2019, composed on the Bureau's monitored TRULINCS system, bearing a TRULINCS system timestamp of December 7, 2019, and, per the sworn declarations,

thereafter printed and mailed to the Court before judgment — reported the substance of the conversations and invited the Court to contact Lt. Carter at FCI Sheridan to verify them. ECF 54-1 at 12–14 (Ex. 3); *id.* at 6–8 (Steffey Decl. ¶¶ 3, 6, 9–10). Petitioner cites the letter for its existence, its dates, its transmission, and its contemporaneous report — not for its characterizations. It has been of record at ECF 54-1 since May 11, 2026, and predates the May 18, 2020 judgment by more than five months. Whatever else may be said of the statement, it cannot be called recent fabrication.

The statement is offered first in support of good cause under Bracy, and it is evidence in its own right: a statement by the Bureau's own investigative lieutenant, on a matter within the scope of Special Investigative Services duties, offered as the statement of a party-opponent's agent. Fed. R. Evid. 801(d)(2)(D). Its limits are equally plain, and Petitioner states them. Lt. Carter served at FCI Sheridan, not FCI Lompoc; he was not the technician who tested the paper or the DHO who decided the charge; and his statement does not by itself establish what Aguilar or Chetwood personally knew in 2017 and 2018. What it establishes is that, while this habeas case was being litigated, the burgundy-as-positive reading was known and discussed within the investigative service at FCI Sheridan, in the terms its lieutenant used — and that Petitioner told this Court so before judgment.

Pizzuto affirmed denial because there was "no specific evidence" of knowledge — only allegations and implications. 783 F.3d at 1180–81. This record supplies specific evidence: a sworn percipient-witness declaration, a contemporaneous memorialization mailed to the Court per the sworn declarations, and conduct — the case-manager commitment Forsyth witnessed and the call reported in the contemporaneous letter — consistent with the statement. It is directed to knowledge within the Bureau's investigative service; the remaining link — what the individual

actors and federal counsel knew — is held in records only Respondent possesses. Under Pizzuto that connection remains an ultimate-proof gap; under Bracy it is precisely the gap the narrow development requested here would test. Respondent's "broad, unsupported allegations" characterization, Resp. 9, does not survive ECF 54-1, which the Response does not mention. At minimum, the statement supplies the "reason to believe" that fully developed facts may establish entitlement to relief, Bracy, 520 U.S. at 908–09, and it identifies whose training, guidance, and communications the four withheld pages and the Stage One custodian declaration can illuminate. If the Court considers the ECF 54-1 materials or Reply Exhibit R for any purpose beyond good cause, Petitioner does not oppose a short response confined to them. And if the Court concludes the existing circumstantial record leaves the knowledge nexus short of clear and convincing, the proportionate answer is the paper-only first stage described below — not denial on a record that remains incomplete because the relevant institutional materials are held exclusively by Respondent.

## V. THE LYNN EMAILS ARE RELEVANT TO ADJUDICATOR COORDINATION, NOT AMPHETAMINE CHEMISTRY

Respondent calls the Lynn emails irrelevant because their subject concerns Suboxone incident reports. Resp. 10. Petitioner does not offer them as amphetamine chemistry or as proof that Chetwood necessarily followed them. Their relevance is structural.

The emails came from R. John Lynn, CSS (SIA), at BOP's Western Regional Office, were addressed to "WXR SIS and Captains," and circulated January 23–25, 2018. Ex. J at 2–3. The incident report issued January 31 — six days after the last email in the chain and fifty-seven days after the December 5, 2017 events it describes. The DHO hearing followed on February 13. That chronology does not prove receipt or causation, but it places the regional instruction while

this incident was pending. Lynn required certified testers and specified supporting documentation; warned that OGC would not support incident reports if steps were omitted; told staff to "communicate with your DHO" about what the DHO reviewed on the "legal side"; said SIS personnel and DHOs were "all on one team"; urged that inmates not "beat us based on technicalities"; and directed that the follow-up be sent "to your DHOs." Id.

The chain's strongest innocent reading is quality control: use certified staff, identify the tester, photograph evidence, obtain supporting memoranda, and prepare reports that can survive review. General institutional quality-control guidance is not itself unconstitutional, and necessary communication between investigators and adjudicators is not automatically disqualifying. The emails also do not name Petitioner, Aguilar, Chetwood, Lompoc, or Incident Report 3084272.

But Respondent's "different drug" objection does not eliminate the neutral-adjudicator concern created by the chain's source, audience, timing, and language. The absence of individual names does not make the directive institutionally remote: an organization-wide instruction is ordinarily addressed to positions and distribution classes — offices, roles, and groups — not to each subordinate by name. This chain issued from the Region's SIA at the Western Regional Office to the distribution class for institution-level investigative and correctional leadership, and it directed onward transmission to the adjudicators themselves. Lompoc was a Western Region institution: its SIS function and its Captain sat within the addressed class, its DHOs were the directed recipients of the follow-up, and Petitioner's hearing — before DHO Chetwood on February 13 — was then pending. In a hierarchical correctional organization, a written instruction in operational terms from regional investigative leadership to subordinate institutional personnel supports a reasonable inference of expected implementation across the Region's institutions — not optional commentary from which institution-level staff would freely deviate.

That inference is what makes the coordination concern systemic rather than speculative. The documents still do not establish that Chetwood personally received the chain or that case-specific contact occurred, and Petitioner does not ask the Court to presume those ultimate facts.

That boundary makes the request narrower, not irrelevant. Distribution records for the chain and communications using Petitioner's name, incident-report number, tracking number, or NIK terminology can answer whether the directive reached the relevant personnel and whether case-specific communication occurred. ECF 69 at 33, Requests 5–6. An organization-wide directive ordinarily generates the records that answer them: distribution lists, receipt data, and any case-specific communications. Those records exist, if at all, only in Respondent's hands — and Respondent's exclusive possession cannot convert a concrete institutional question into speculation. The Court need not infer receipt or action to find good cause to resolve two discrete questions.

The original Findings and Recommendation did not resolve this question against Petitioner on a complete record. It recited his sworn account — including that DHO Chetwood told him at the hearing, "I have already talked to SIS Aguilar and he told me the deal" — and found the prearrangement theory "not persuasive" for reasons addressed to the alleged bargain's terms, applying the rule that the presumption of decisionmaker integrity "may be overcome by evidence of a risk of actual bias or prejudgment based on special facts and circumstances." ECF 30 at 7–8 (citing Withrow v. Larkin, 421 U.S. 35, 46–47, 58 (1975)). The chain corroborates the practice Petitioner described, not the specific bargain he alleged — and that is the point. What the 2020 record lacked was any Bureau-disclosed, authenticated institutional evidence that investigator-adjudicator coordination was directed regional practice. That evidence existed in BOP's records; it was simply never disclosed, authenticated, or placed before the Court. The

Court therefore evaluated Petitioner's account without the institutional evidence now available. The after-discovered regional directive gives the "special facts and circumstances" inquiry its documentary predicate, and it is relevant to the impartial-DHO requirement of 28 C.F.R. § 541.8(b) and to the deceit-or-bias theory recognized in Balisok, 520 U.S. at 647–48, even though the chain's operational example involved another drug.

## VI. GOOD CAUSE EXISTS FOR STAGED, PAPER-ONLY DEVELOPMENT

### A. Respondent applies the ultimate burden to the threshold discovery inquiry.

Rule 60(d)(3) relief ultimately requires clear and convincing proof. Discovery under Habeas Rule 6 requires good cause: specific allegations showing reason to believe that, if facts are fully developed, the petitioner may be able to demonstrate entitlement to relief. Bracy, 520 U.S. at 908–09. Rule 1(b) permits application of the Rules Governing § 2254 Cases to this § 2241 proceeding. Respondent itself briefs discovery under the habeas rules and quotes the correct good-cause standard, Resp. 11, but then faults Petitioner for not already proving what the exclusively held records will show. Resp. 10–12.

This Court's own decision in *Smith v. Ives* addresses the consequence of exclusive government control over potentially material records. 275 F. Supp. 3d 1219 (D. Or. 2017). There, BOP alleged an attempt to introduce K2 or Spice through saturated letters, relied on excerpts of monitored communications, and imposed the loss of forty-one days of good-conduct time. Id. at 1220–22. The petitioner asked for the complete records to place the excerpts in context; the request was refused, and the Government never provided the records to the Court. Id. at 1223–24. This Court held it was "impossible" for the petitioner to demonstrate prejudice where prison officials refused him access to the records he claimed could exonerate him and the Government had not provided those documents to the court for review; because the evidence was

not fully developed, it declined to reach whether "some evidence" supported the conviction, and it ordered a new hearing or expungement with restoration of the forty-one days. Id. at 1224. *Smith* was a *Wolff* documentary-evidence case, not a Rule 60(d)(3) case, and Petitioner does not offer it as governing the ultimate fraud determination. Its logic nevertheless answers the Response's threshold posture: Respondent cannot rely on the absence of proof concerning source, distribution, and knowledge while retaining the one specifically identified record capable of confirming or refuting those facts — and then ask the Court to resolve the motion on the resulting gap. The request here is narrower than the records at issue in *Smith*: sealed, court-only inspection of four identified pages, with a stopping rule.

This is not a request to search broadly for a possible theory. Exhibit P identifies a March 27, 2017 SIS Advisory as the procedural source used in an actual BOP drug-testing report. Petitioner asked specifically for that dated advisory. BOP now admits it located, reviewed, and withheld four responsive pages. The proposed Stage One therefore identifies the record, custodian, relevance question, and stopping rule in advance.

That concrete chain distinguishes the attenuated "might possibly" theory rejected as a fishing expedition in *Earp v. Davis*, 881 F.3d 1135, 1144–45 (9th Cir. 2018). The requested pages are not hypothetical. BOP has identified them, reviewed them, and confirmed that they are responsive to the targeted request.

The first stage is also narrower than the discovery categories at ECF 69 at 32–34. A reply may narrow existing requested relief in response to an overbreadth objection. Petitioner does so here.

**B. Stage One should consist only of four-page in-camera review and a custodian declaration.**

Petitioner asks the Court to direct Respondent to tender the four responsive pages to the Clerk in paper under D. Or. LR 5-5 for sealed, court-only inspection, accompanied by a declaration from a knowledgeable BOP records custodian stating:

1. whether the four pages comprise one record or multiple records;

2. each record's date, title, author or originating office, and number of pages;

3. whether any record is the March 27, 2017 SIS Advisory referenced in Exhibit P;

4. whether the reviewed material includes or incorporates attachments;

5. the recipient class or distribution level, including whether it was distributed to the Western Region or FCI Lompoc; and

6. whether the record addresses NIK testing or reporting involving Test A, Test U, burgundy, amphetamine, K2, Spice, or synthetic cannabinoids.

No copy need be disclosed to Petitioner or the public at Stage One. No merits fact should be decided against either party from undisclosed substance. The Court's inspection would serve only as relevance screening and as a basis to determine what, if any, adversarial procedure is required next.

BOP's FOIA determination governs public disclosure; it does not create an evidentiary privilege in this proceeding. The Supreme Court in *Kerr* endorsed precisely the procedure Petitioner proposes, describing in camera review as a "relatively costless and eminently worthwhile method" of balancing asserted governmental interests against demonstrated need. *Kerr v. U.S. District Court for the Northern District of California*, 426 U.S. 394, 405–06 (1976). The Ninth Circuit's underlying decision adds that FOIA's exemptions "were not intended to

create evidentiary privileges for civil discovery" and address withholding from the public generally. 511 F.2d 192, 197–98 (9th Cir. 1975), *aff'd on other grounds,* 426 U.S. 394 (1976). Petitioner does not seek to defeat any properly asserted governmental privilege; he asks first for sealed, court-only review. The universe is four pages already located and reviewed. Every legitimate concern about public disclosure is preserved by court-only inspection.

**C. Stage Two should occur only if the pages are relevant; an evidentiary hearing should be last.**

If the four pages are unrelated to the Bailey-referenced advisory or the reporting practice at issue, the institutional-source branch ends. If they are relevant, the Court can select only the smallest additional step needed for a fair merits decision. Petitioner proposes, in order:

1. a redacted version, neutral summary, or stipulated description sufficient to permit adversarial testing without exposing protected operational detail;

2. the limited training, certification, advisory-distribution, and case-specific communication records already requested at ECF 69 at 32–33, Requests 1–2 and 4–6, restricted to the Court-identified issue, together with narrowly tailored transmittal, access, or distribution records sufficient to determine whether the advisory or the responsive pages were provided to BOP's Office of General Counsel, the Department of Justice, or the United States Attorney's Office in connection with this litigation, subject to any properly asserted privilege and an appropriate privilege log; and

3. only if material factual disputes remain after documentary development, a focused evidentiary hearing.

That sequence answers every proportionality concern in ECF 73. It starts with no deposition, no public disclosure, no broad historical production, and no hearing. It gives the

Court an inexpensive paper record on which either to terminate development or define a genuinely necessary next step. If the Court ultimately finds an evidentiary hearing warranted, Habeas Rule 8(c) will govern any required appointment of counsel. No appointment is requested in this reply.

## VII. CONCLUSION

Respondent is correct about an important part of the governing record: REV 0907 allowed a completed A-to-U sequence to support one conditional presumptive amphetamine-type inference, and it did not require Test W. Petitioner has narrowed his argument to honor that language. But Respondent's concession does not transform Test A and burgundy Test U into two independently positive amphetamine tests. Test A was a broad screen; burgundy had no standalone amphetamine meaning; and the manufacturer's conclusion depended on a particular sequence that BOP repeatedly presented as separate affirmative evidence.

Whether that presentation was innocent shorthand or the product of an institutional reporting instruction is the central actor-and-intent question. Petitioner has identified a dated advisory used in a materially similar report, formal certification and distribution structures, regional investigator-DHO coordination, and four responsive pages that BOP admits locating and withholding. He seeks no ruling for other inmates and no adjudication of other cases. The requested relief concerns this judgment, this disciplinary finding, and the records capable of testing the specific fraud-on-the-court allegations. Relief here disturbs no other judgment; it addresses, at its documented source, the propagation Rodriguez illustrates. The challenged formulation did not end with the incident report: it was adopted in the disciplinary decision, defended in this Court, repeated on appeal, repeated again in the present Response, and then cited — through the Findings and Recommendation this Court adopted — in a later materially

similar proceeding. That history does not itself prove the intent Rule 60(d)(3) requires. It proves materiality, and it explains why the inquiry cannot be dismissed as a semantic disagreement over one technician's wording.

Assembled, the record identifies evidence on each element Rule 60(d)(3) asks about — and identifies what remains unresolved and who holds the proof. Misrepresentation: one conditional, predicate-dependent inference was presented — to the DHO, to this Court through a sworn declaration's exhibits, and in merits briefing — as two independently positive amphetamine tests. Ex. A; ECF 12; ECF 38 at 2, 4–5. Institutional source: the advisories, vendor-certification structure, and distribution records frame a concrete, falsifiable source question, and four pages responsive to the targeted request for the dated advisory have been located, reviewed, and withheld. Exs. I, O, P; Reply Ex. R. Knowledge within the investigative service: an SIS lieutenant's statement, witnessed by a third party and reported to this Court before judgment, shows the reading was known and discussed within the investigative service at FCI Sheridan. ECF 54-1. Coordination directive: a regional directive instructed investigator-DHO communication while this discipline was pending, beside the DHO's own recorded pre-hearing statement. Ex. J; ECF 30 at 7–8. Exclusive control and nonproduction: the representation was defended through judgment while the governing internal records — including the flow chart itself, withheld in full twelve days before judgment, Ex. O — remained in the Bureau's exclusive control. What remains unresolved — what the Lompoc actors and the federal advocates knew — is unresolved because its proof sits in Respondent's exclusive custody. Whether the assembly is clear and convincing is for the Court. If any element remains open, the four identified pages and a custodian declaration are the narrowest conceivable next step — and Respondent's exclusive possession is what makes them necessary.

Petitioner respectfully asks the Court to grant the Further Amended Rule 60(d)(3) Motion, vacate the May 18, 2020 judgment, and reopen the § 2241 proceeding. As this Court recognized in *Smith v. Ives,* a petitioner cannot fairly be faulted for failing to prove what records withheld from both the petitioner and the reviewing court would show. 275 F. Supp. 3d at 1224. If the Court concludes that any factual question — actor, intent, or institutional source — remains unresolved, it should not deny relief without first inspecting the four pages BOP admits locating, reviewing, and withholding in response to the targeted request for the March 27, 2017 SIS Advisory — the document a materially similar BOP report invokes by exact date as its written testing authority.

Dated: _____July 27th_____, 2026.


Respectfully submitted,

_____
Billy F. Steffey
Petitioner, Self-Represented
455 Capitol Mall, Suite 802
Sacramento, California 95814
Telephone: (916) 955-6332
Email: bsteffey@mac.com

## CERTIFICATE OF COMPLIANCE

Under D. Or. LR 7-2(b), I certify that this memorandum contains 10,649 words, including headings, footnotes, quotations, and Appendix A, but excluding the caption, table of contents, table of authorities, signature block, exhibits, and this certificate.

Dated: _____July 27th_____, 2026.

_____

Billy F. Steffey

## APPENDIX A — KEY RECORD AND EXHIBIT MAP

| Record | Docket location | Limited purpose in this reply |
|---|---|---|
| Aguilar NIK memorandum | ECF 12-6 at 2; Ex. A | Exact Test A/Test U reporting language |
| Test U insert and REV 0907 chart | ECF 37-3 at 1–3; Ex. B | Governing endpoints, Footnote 2, and A-to-U example |
| Safariland 2017 training | ECF 37-2 at 5; Exs. D–E | Burgundy baseline, conditional A-to-U teaching, Test A screening role |
| Test W instructions | ECF 12-6 at 4; Ex. C at 2 | Preexisting direct olive-green amphetamine endpoint |
| 2020 government briefing | ECF 38 at 2, 4–5; Ex. H | Non-test evidence characterized as corroboration of NIK result |
| January 18 SIS Advisory | Ex. I | Advisory mechanism for burgundy reporting; not Petitioner's protocol |
| Lynn email chain | Ex. J at 2–3 | Regional investigator-DHO coordination; distribution class |
| Vendor-certification materials | Ex. O at 4–5 | Institutional training and grading structure |
| Bailey incident report | Ex. P at 2 | Face-of-report reliance on the March 27, 2017 Advisory |
| 2021 chart comparison | Exs. L, Q | Reconciliation issue only; not governing law in 2017 |
| ECF 63 | ECF 63 at 10–11 | Rule 59(e) relief and authorization to litigate new merits arguments |
| FOIA 2026-05140 chain | Second Supp. Decl.; Reply Ex. R | Existence, control, review, and withholding of four responsive pages only |
| Forsyth Declaration | ECF 54-1 at 1–5 | Percipient account of the Sheridan meetings; Carter's quoted words |
| Nov. 26, 2019 TRULINCS letter | ECF 54-1 at 12–14 (Ex. 3) | Contemporaneous memorialization mailed per the sworn declarations |
| 2019 FOIA chronology | ECF 54-1 at 6–8, ¶ 12 | Four responsive pages located and withheld pre-judgment |
| DHO pre-hearing statement recital | ECF 30 at 7–8 | "Already talked to SIS Aguilar" recital; Withrow special-facts rule |